Robert B. Sykes (#3180)
C. Peter Sorensen (#16728)
Christina D. Isom (#17244)
**SYKES MCALLISTER LAW OFFICES, PLLC**
311 S. State Street, Suite 240
Salt Lake City, Utah 84111
Telephone No. (801) 533-0222
bob@sykesmcallisterlaw.com
pete@sykesmcallisterlaw.com
christina@sykesmcallisterlaw.com

Mario Arras (#13036)
**MARIO ARRAS LAW FIRM, PLLC**
4001 South 700 East, Suite 500
Salt Lake City, Utah 84107
Telephone No. (801) 635-0403
AttorneyMarioArras@Gmail.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| JUAN MERCADO, father, heir and personal representative of JOVANY MERCADO, deceased; ROSA MERCADO, mother and heir of JOVANY MERCADO; and ESTATE OF JOVANY MERCADO, by its Personal Representative Juan Mercado,<br><br>        Plaintiffs,<br><br>    vs.<br><br>OGDEN CITY, by and through its POLICE DEPARTMENT (OPD); OFFICERS BRANDON SEVENSKI (Officer No. 1); NIGIL BAILEY (Officer No. 2); KARSON GARCIA (Officer No. 3); JOHN POULSEN (Officer No. 4); DET. TRENT FUSSELMAN; and JOHN and JANE DOES 1-10,<br><br>        Defendants. | **COMPLAINT**<br>**& Jury Demand**<br><br><br>Civil No. _____<br><br><br>Judge _____ |

Plaintiffs, by and through their undersigned counsel of record, hereby complain against Defendants, and assert the following allegations in their totality and in the alternative:

## PRELIMINARY STATEMENT

The following allegations are based upon counsels' understanding of information presently available. This is a civil rights action in which Plaintiffs seek relief for Defendants' violations of the rights of Jovany Mercado Bedolla (aka Jovany Mercado), guaranteed by the United Sates Constitution, specifically, the Second, Fourth, Fifth, and/or Fourteenth Amendments, which rights are further secured by the Civil Rights Act of 1871, codified as 42 U.S.C. §1983 and §1988. This action also seeks relief under the Constitution of the State of Utah, Article I, Sections 1, 7, 9, 14 and 25, to the extent applicable under the facts. This is further an action at law to redress grievances under the laws and statutes, as well as the Constitution of the State of Utah.

Jovany Mercado, on August 16, 2019, had a right to open carry a pocketknife in Ogden. He was always peaceful and non-threatening. When the Defendant Officers confronted him, they improperly demanded that he surrender his pocketknife in violation of the Second Amendment to the United States Constitution and Article I, § 6 of the Utah Constitution. When he did not do so within a few seconds, all four opened fire on him and killed him on his own property. The shooting of Jovany Mercado was unlawful under rights guaranteed by the United States Constitution, the Utah Constitution, and the laws of the State of Utah.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1334 because the matters in controversy arise under the Constitution and the laws of the United States. Specifically, Plaintiffs assert claims under the Second, Fourth, Fifth and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983.

2.      This action also seeks redress for violations of Plaintiffs' constitutional rights secured by the Utah Constitution, specifically, Article I, §14, which provides:

> The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause supported by oath or affirmation, particularly describing the place to be searched, and the person or thing to be seized.

This provision of the Utah Constitution is self-executing and does not require notice under the Governmental Immunity Act.  This Court further has pendent jurisdiction over any and all State claims.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants reside within this Court's judicial district and a substantial part of the events or omissions giving rise to the claims occurred within this district.

4.      This Court also has jurisdiction over any State Constitutional claims and any pendent State claims Plaintiffs may wish to bring, or have brought, pursuant to 28 U.S.C. § 1367.

## PARTIES

5.      Plaintiff **Juan Mercado ("Juan")** is a citizen of the United States and a resident of Ogden, State of Utah. Juan is the father of Jovany Mercado, deceased. On January 30, 2020, Juan was appointed by a Utah state court as the personal representative of the Estate of Jovany Mercado.

6.      Plaintiff **Rosa Mercado ("Rosa")** is a resident of the United States and resides in Ogden, State of Utah.  Rosa is the mother of Jovany Mercado, deceased.

7.      Defendant **Ogden City ("Ogden")** has a law enforcement branch known as the **Ogden Police Department ("OPD")**.  OPD is a municipal police department authorized to operate as such by the State of Utah and by Ogden City. The OPD employed several officers who are currently designated as Officers 1-4 and Does 1-10. Ogden City, through the actions of the OPD and Does 1-10, is a "person" within the meaning of 42 U.S.C. §1983.  Officers 1-4 and Does 1-10 were at all times "state actors."

8.      Defendant **Officer Brandon Sevenski ("Sevenski")** (Officer No. 1) is sued in his official and individual capacities. At all relevant times, Sevenski was a police officer working with the OPD. Sevenski had an active role in the events which caused the death of Jovany Mercado and which caused injuries and damage to Juan and Rosa. At all relevant times, he was acting within the course and scope of his employment with Ogden City and the OPD, and pursuant to OPD policies. Sevenski improperly and unconstitutionally used deadly force against Jovany.

4

9.  Defendant **Officer Nigil Bailey ("Bailey")** (Officer No. 2) is sued in his official and individual capacities. At all relevant times, Bailey was a police officer working with the OPD. Bailey had an active role in the events which caused the death of Jovany Mercado and which caused injuries and damage to Juan and Rosa. At all relevant times, he was acting within the course and scope of his employment with Ogden City and the OPD, and pursuant to OPD policies. Bailey improperly and unconstitutionally used deadly force against Jovany.

10. Defendant **Officer Karson Garcia ("Garcia")** (Officer No. 3) is sued in his official and individual capacities. At all relevant times, Garcia was a police officer working with the OPD. Garcia had an active role in the events which caused the death of Jovany Mercado and which caused injuries and damage to Juan and Rosa. At all relevant times, he was acting within the course and scope of his employment with Ogden City and the OPD, and pursuant to OPD policies. Garcia improperly and unconstitutionally used deadly force against Jovany.

11. Defendant **Officer John Chandler Poulsen ("Poulsen")** (Officer No. 4) is sued in his official and individual capacities. At all relevant times, Poulson was a police officer working with the OPD. Poulsen had an active role in the events which caused the death of Jovany Mercado and which caused injuries and damage to Juan and Rosa. At all relevant times, he was acting within the course and scope of his employment with Ogden City and the OPD, and pursuant to OPD policies. Poulsen improperly and unconstitutionally used deadly force against Jovany.

5

12.     Defendant **Detective Trent Fusselman ("Fusselman")** is sued in his official and individual capacities. At all relevant times, Fusselman was a Detective working with the OPD. Fusselman had an active role in the search of the Mercado home after the death of Jovany Mercado, which search caused injuries and damage to Juan and Rosa and violated their rights. At all relevant times, Fusselman was acting within the course and scope of his employment with Ogden City and the OPD, and pursuant to OPD policies. Fusselman knowingly, improperly, and unconstitutionally falsified information and omitted information in order to obtain a fraudulent search warrant of the Mercado premises.

13.     Defendants **John and Jane Does 1-10 ("Does 1-10")** are sued in their official and individual capacities. John and Jane Does 1-10 were responsible for the supervision and/or training of Sevenski, Bailey, Garcia, and Poulsen.  Each Doe had an active role in the events which caused the death of Jovany Mercado and which caused injuries and damage to Juan and Rosa. At all relevant times, each Doe was acting within the course and scope of his or her employment with Ogden City and the OPD, and pursuant to OPD policies. Does 1-10 are believed to have been complicit or involved when Bailey, Poulson, Garcia, and Sevenski improperly and unconstitutionally used deadly force against Jovany.

14.     Ogden City, acting through the OPD, made and enforced policies, practices and procedures for police officers in Ogden, and for Sevenski, Bailey, Garcia, Poulsen, and Does 1-10.

## FACTS

15.     Jovany was 26 years old on August 16, 2019.

16.     He was 5'7" in height and weighed approximately 135 pounds.

17.     On August 16, 2019, between about 8:45 - 9:00 p.m., Jovany was seen by neighbors walking around the neighborhood with an open pocketknife.

18.     Jovany was obviously disoriented, intoxicated and/or mentally impaired or mentally ill.

19.     Jovany never threatened anyone.

20.     Jovany never assaulted or threatened to assault anyone.

21.     Utah is an open-carry state and Jovany had a constitutional right to carry the pocketknife.

22.     Jovany was violating no laws by walking openly in Ogden with the pocketknife in his hand, on August 16, 2019.

23.     Shortly before 9:00 p.m., an individual apparently called 911 and stated that Jovany was either intoxicated or disoriented.  The call made it clear that Jovany was likely having an episode of mental illness.

24.     The information conveyed by the 911 caller did not state a violation of criminal law by Jovany Mercado.  Nor did the 911 caller indicate that Jovany was making any threats to any citizens

25.     At approximately 9:00 p.m., a dispatch call went out from Ogden, to Defendants Sevenski, Bailey, Garcia, and Poulsen.

26. These Officers arrived at the home of Jovany's neighbor in Ogden at approximately 9:00 p.m.

27. Sevenski arrived on the scene first and called for backup.

28. Bailey was training Poulsen and they arrived soon after the request for backup went out.

29. Bailey said it was not in their assigned area, but they took the call for training experience.

30. Based on the 911 dispatch call, these Officers were essentially responding to a "welfare check," not a violation of criminal law.

31. Defendants report that they were responding to a weapons disturbance.

32. Poulsen reported that there was an emergency tone on the radio and the information was being relayed through dispatch that someone had brought a knife to an outdoor party. A male was not threatening anyone with the knife but he was in a state that had people very nervous and scared.

33. Jovany and his wife were separated, so Jovany was living at the time with his parents, Juan and Rosa Mercado, in Ogden, Utah.

34. The Mercados' carport gate faced west and was slightly open.

35. A sliding chain link gate on wheels provided access to the driveway.

36. Sevenski approached the mobile chain link gate that was slightly open on the west end of the driveway.

37. The gate was the border between the Mercados' property and an Ogden City sidewalk.

38. Jovany was in the back section of the carport or rear patio, behind the house, and was alone.

39. Jovany was initially not in sight of the officers.

40. Garcia arrived after Bailey, Polson and Sevenski began to converse with Jovany.

41. Bailey reported that Jovany slowly turned around and looked at the officers.

42. The Officers each began yelling for Jovany from the chain link gate.

43. Sevenski opened the chain link gate a little further.

44. Jovany walked slowly out of the backyard/patio and the open carport, and then walked slowly down the driveway toward the Officers, as they had demanded.

45. The Officers called to Jovany "to come out to them," and he immediately did exactly as instructed. The Officers never told him to stop.

46. Jovany was alone as he walked slowly toward the officers.

47. Officer Sevenski reported that Jovany approached the Officers at a "steady pace."

48. The Officers were all yelling loudly at Jovany and shining blinding flashlights in his eyes.

49. Some yelled for Jovany to "drop the pocketknife" that was in his hand.

50.     This yelling was such that the Officers were yelling over one another simultaneously.

51.     The combined yelling by the Officers made their demands overlapping and confusing.

52.     At no time did Jovany indicate that he heard or understood what the Officers were yelling.

53.     As Jovany approached the Officers, the motion-detector lights switched on, illuminating the carport.

54.     Sevenski reported that the male suspect never said a word and never wavered from his route toward the officers.

55.     Garcia also reported that the male suspect's countenance was "blank" as he continued to walk towards them.

56.     As Jovany walked slowly from the carport into the driveway and toward the sliding chain link gate, he made ***no threatening statements or gestures*** toward any of the Officers or toward any other person.

57.     Jovany made ***no threatening movements*** toward any of the Officers or toward any other person.

58.     At the time deadly force was used, under the circumstances, Jovany did not constitute a risk of death or serious bodily injury to any officer or to another person.

59.     The reports of Defendant Officers 1– 4 all differ about any physical positioning or posturing that Jovany took. However, the video confirms that he made no threating movements towards the Officers.

60.     Defendants all report Jovany *uttered no threats or threatening speech* during the entire interaction with the Officers.

61.     Jovany *walked at a normal pace* towards Defendant Officers.

62.     Sevenski, Bailey, Garcia, and Poulsen were standing approximately 20-25 feet away from the gate opening, and 35-40 feet from Jovany who was *walking towards them* in his own driveway.

63.     Despite the fact Jovany is seen *walking peacefully*, and *had committed no crime,* Officers demanded that Jovany put down his pocketknife.

64.     The pocketknife was seen by the Officers to be at Jovany's side.  He *never raised or moved the pocketknife in an aggressive manner*.

65.     Jovany was *given virtually no time* (just a few seconds) to comply with the confusing and overlapping "drop it" and "come to them" commands of the Officers.

66.     Sevenski, Bailey, Garcia, and Poulsen each opened fire on Jovany with their guns and killed him while he was standing in his own driveway.

67.     Sevenski, Bailey, Garcia, and Poulsen fired a combined **20 shots** in their encounter with Jovany.

68.     From the time Sevenski, Bailey, Garcia, and Poulsen got to the chain link gate, to the time of the shooting, the only people at the scene were Jovany and the Officers.

69.     Each of the John and Jane Does 1-10 was an OPD officer and/or a supervisor who allowed, permitted and/or encouraged the unlawful use of deadly force, and/or failed to supervise and train on the proper use of deadly force.

70.     Based upon the statements of Officers 1-4, and based upon the body camera videos, Sevenski, Bailey, Garcia, and Poulsen all could have easily retreated and avoided using deadly force.

71.     Sevenski, Bailey, Garcia, and Poulsen had no need to use deadly force in the situation.

72.     The use of deadly force by Officers Sevenski, Bailey, Garcia, and Poulsen under the circumstances of this shooting violated the customary rules of police procedure, violated the rules on the use of deadly force promulgated by the Ogden Police Department, and violated the training officers receive at POST (Police Officers Standards and Training).

73.     Any competent and reasonably trained officer, objectively viewing the circumstances confronted as Jovany walked toward the gate on his own property, would have known that the use of deadly force was inappropriate.

74.     Officers 1-4 each had several non-deadly force alternatives available which included, but are not limited to Tasers, Asps, pepper spray, and/or beanbag guns.

75.     Defendants gave conflicting reports whether they could have retreated farther or to different, safer positions. For example, Sevenski said that he felt that he could not retreat any further because it would put himself, the other officers, and others at risk. However, Garcia said that he didn't remember thinking that he could not go back any further and said he could have gotten behind his vehicle if needed.

76.     Immediately after the shooting, Jovany's mother, Rosa, and his sister came out of the house and were racked with inconsolable anguish and grief upon realizing that Jovany had been shot. Garcia began yelling at them to get back.

77.     Defendant Officers saw that Jovany was lying on the ground mortally wounded after he was shot.  They rolled him onto his belly to handcuff him.  Then they again rolled him onto his back.

78.     Approximately 3 minutes after rolling Jovany onto his back, a new Officer arrived named Officer Docsteader. Docsteader cut off Jovany's shirt and started CPR.  After 12-15 chest compressions, the Officer stopped and began a conversation with another Officer and then resumed CPR after a short time.

79.     Despite the presence of Jovany's mother and sister, Officers acted inhumanely and uncompassionately toward Jovany and his body. Officers completely disregarded the presence of Jovany's family as his life was coming to an unnecessary, abrupt and violent end.

80.     The entire shooting event was caught on multiple Officers' body cameras, as well as on Mercado's home security cameras at the rear of the home.

81.    Defendant Officers' firing of their weapons in the direction of Jovany was done with willful and reckless disregard for other persons because Jovany's mother, brother, sister and sister's girlfriend were in the home.  One of them could easily have been in the line of fire at the time of the shooting because the Officers shot into one of the bathrooms and also through the basement door.

82.    The use of force by Sevenski, Bailey, Garcia, and Poulsen was unreasonable and excessive.

83.    Garcia fired several shots.

84.    Bailey felt that he fired four or five times.

85.    The deficient training and supervision by Does 1-10 resulted in the shooting of Jovany by Sevenski, Bailey, Garcia, and Poulsen.

86.    Garcia reported that when he arrived on the scene, the other Defendants had already deployed lethal force. So, Garcia pulled his gun as well because he erroneously made the assumption that they were past the point of less lethal force.

87.    The actions of Sevenski, Bailey, Garcia, and Poulsen and Does 1-10 were willful, reckless, and malicious, and/or manifested a knowing and reckless indifference toward, and a disregard of, the rights of Jovany and his family.

88.    The actions of Defendants amounted to a punishment or an execution of a citizen who had not been tried or convicted.

89.     After Jovany's "execution," Officers from the OPD began a series of harassing acts toward Juan and Rosa Mercado and other members of their family who reside at and visit the home.

90.     Officers have regularly been parking in front of Juan and Rosa Mercado's home. This was never the case before the shooting.

91.     Officers allegedly do "paperwork" while parked in front of the Mercado home.

92.     Armed, uniformed Officers of OPD began "assisting" as crosswalk crossing guards for students at a nearby elementary school which is a block away from the Mercado home.

93.     Armed, uniformed Officers had never before appeared at this particular school crosswalk to escort children across the street.

94.     The above-described post-shooting actions are retaliation against Plaintiffs.  These actions are designed to intimidate Plaintiffs and are in violation of their civil rights.

95.     The actions of intimidation and retaliation described above were directed or permitted by one or more of the Does 1-10.

96.     On August 17, 2019, at 1:07 a.m., just hours after Jovany's "execution," Detective Trent Fusselman obtained an illegal, falsified search warrant without probable cause for the Mercado residence.  *See* Exhibit 1.

97.     The warrant contained false statements and material omissions.

98.    As a result of the falsified warrant, Officers illegally forced their way into the Mercado home.

99.    The ostensible reason was to obtain bullets from the Mercado's home, but the real reason was to illegally obtain the video footage of the shooting as recorded by Plaintiffs' home security system.

100.    Among several falsehoods, the illegal warrant states that the Mercado's home video "was unlawfully acquired or is unlawfully possessed; has been used or is possessed for the purpose of being used to commit or conceal the commission of an offense; or is evidence of illegal conduct." Exhibit 1. The warrant materials also claim that the Mercado family "illegally" obtained footage of the shooting.

101.    Several additional and blatantly false statements were used to illegally obtain a search warrant without probable cause.

## CAUSES OF ACTION

102.    The headings stated under each individual cause of action are for general descriptive purposes only and are not intended to limit Plaintiffs' claims for relief. Plaintiffs reserve the right to assert any available legal theory or claim for relief applicable to the facts set forth in the Complaint or an Amended Complaint pursuant to F.R.Civ.P. 8.

103.    The causes of action asserted herein are asserted individually and/or in the alternative.

## FIRST CAUSE OF ACTION

### ~ *Unconstitutional Use of Deadly Force* ~

*Deprivation of Federal Constitutional Rights – 42 U.S.C. § 1983*
*Against Defendant Officers Bailey, Poulson, Garcia, and Sevenski and Does 1-10*

104.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as though fully set forth in this Cause of Action.

105.    At all relevant times, and in performance of the acts set forth herein, Defendant Officers Sevenski, Bailey, Garcia, and Poulsen and Does 1-10, and each of them individually, acted under color of state law.

106.    At all relevant times, and in performance of the acts set forth herein, each named Defendant, Officers Sevenski, Bailey, Garcia, and Poulsen, and Does 1-10, actively and personally caused the violations of constitutional rights alleged herein.

107.    Each of said Officers' wrongful conduct alleged herein included the use of unreasonable and unjustified deadly force, which subjected Jovany Mercado to the deprivation of his rights to be free from unreasonable arrest and from the use of unreasonable deadly force, as protected by the Fourth and Fourteenth Amendments to the United States Constitution.

108.    Does 1-10 are other Officers or Ogden City employees who enabled or may have enabled Officers Sevenski, Bailey, Garcia, and Poulsen to commit the violations alleged herein, either by direction, poor supervision, inadequate training, allowing or wrongfully tolerating unconstitutional practices, and/or by other means.

109.    The Officers' wrongful and unconstitutional use of deadly force and other misconduct alleged herein, included at least: (a) demanding that Jovany surrender a lawfully possessed pocketknife, (b) retaliating with deadly force against Jovany for mere noncompliance with their demands, (c) improperly using deadly force when no officer or other person was in immediate risk of death or serious bodily injury; and (d) shooting Jovany Mercado.

110.    If deadly force is used, then an officer's use of that force is reasonable only "if a reasonable officer in Defendants' position would have had probable cause to believe that there was a threat of serious physical harm to themselves or others." *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).

111.    In the case *Ceballos v. Husk,* 919 F.3d 1204 (10th Cir. 2019), a case with very similar facts to the case *sub judice,* the Tenth Circuit noted that a police officer responded to a wife's report that a homeowner had a baseball bat and was acting crazy in the home's driveway.  Officer Husk responded to the call.  Within a minute of the arrival of Husk and the other officers, Officer Husk shot Ceballos to death in the street in front of his home.  Officer Husk claimed that he was entitled to qualified immunity.  The district court rejected the qualified immunity claim.  The Tenth Circuit held that prior Tenth Circuit precedents going back to 1997, including *Allen v. Muskogee,* 119 F.3d 837, 839-841 (10th Cir. 1997), were "sufficient, *a fortiori,* to put Officer Husk on notice that his actions … violated Ceballos's Fourth Amendment rights." *Ceballos,* 919 F.3d at 1216.

112.    The case of *Harris v. Roderick*, 126 F.3d 1189 (9th Cir. 1997), arose out of the Ruby Ridge shooting in northern Idaho in 1992.  The day before plaintiff was shot by an FBI sniper, there was an incident on a nearby road where gunfire erupted. Sammy Weaver, Randy Weaver's 14-year-old son, was killed.  Harris, in that exchange of gunfire, fired blindly into the woods and apparently unknowingly shot and killed a U.S. Marshal.  (Harris was later acquitted of murder.)  The next day, Kevin Harris and Randy Weaver were walking to a shed where the body of Weaver's son, shot the day before, had been placed.  An FBI sharpshooter opened fire, causing Harris to run back to the Weaver cabin, where a sniper shot Weaver's wife in the head, killing her.  That same bullet passed through Mrs. Weaver and seriously injured the plaintiff, Harris.  Harris later filed a *Bivens* civil rights action against the sniper and others.

113.    The Ninth Circuit denied qualified immunity and held as follows:

> Harris went to the shed with Randy Weaver and his daughter Sarah to help minister to the body of Weaver's dead son. ***Even though Harris was armed, he made no aggressive move of any kind*** when Horiuchi [the sniper] started shooting; instead, with the others, ***he ran back toward the cabin*** from which they had recently emerged. Examining Horiuchi's actions from the perspective of a reasonable law enforcement officer faced with the need to make on-the-spot decisions, ***it is plain to us that his actions were <u>not objectively reasonable.</u>*** Graham's totality of the circumstances test ***does not permit the use of deadly force to kill a suspect*** who is running back to a cabin where he is temporarily staying and who makes no threatening movement of any kind, ***<u>even though the suspect had engaged in a shootout with law enforcement officers on the previous day and may have been the person responsible for the death of one of the officers</u>***.

*Id*. (emphasis, <u>double</u> emphasis and bracketed words added).

114.   It is important that an officer give a warning and opportunity to surrender where possible, even if the suspect committed a violent crime in the immediate past. The Court held:

> Horiuchi's shooting of Harris was ***not objectively reasonable***. Harris was returning to the cabin, not escaping. ***Horiuchi gave him no warning and no opportunity to surrender or to otherwise cease his resistance*** to the exercise of lawful authority. ***<u>The fact that Harris had committed a violent crime in the immediate past is an important factor but it is not, without more, a justification for killing him on sight</u>***. Horiuchi and his fellow officers were safely ensconced on the hill overlooking the Weaver cabin. No threatening movement was made by Harris with respect to Horiuchi or anyone else, even after Horiuchi shot Randy Weaver. The law that deadly force may not be used under the circumstances present when Horiuchi killed Vickie Weaver and seriously wounded Harris was ***clearly established*** under *Graham*, *Garner*, *Ting*, and *Curnow*, and ***<u>no reasonable officer could have thought otherwise</u>***.

*Id*. (emphasis and <u>double</u> emphasis added).

115.   Simply because a suspect such as Jovany Mercado is holding a knife does not mean that he can be shot.

116.   Furthermore, even if deadly force is necessary in the first instance, Tenth Circuit law requires officers to justify each additional bullet after the first bullet. *See, Fancher v. Barrientos,* 723 F.3d 1191, 1201 (10th Cir. 2013) ("Prior to shooting Dominguez, Barrientos stepped back, felt safer, and noticed Mr. Dominguez slump. This allowed him enough time … to recognize and react to the change in circumstances and cease firing his gun. Under these circumstances, we have no trouble concluding Barrientos lacked probable cause to believe Dominguez posed a threat of serious harm to Barrientos or others at the time he fired shots two through seven"); *Estate of Fuentes ex rel. Fuentes*

*v. Thomas*, 107 F. Supp. 2d 1288, 1300 (D. Kan. 2000) aff'd sub nom; *Cerca v. Thomas*, 30 F. App'x 931 (10th Cir. 2002) (unpublished opinion) ("The court cannot find that Cpl. Thomas's actions were objectively reasonable because the evidence … is such that a rational fact-finder could infer that the defendant fired the third shot after the threat was abated. Because Cpl. Thomas has not shown that his actions were objectively reasonable, he is not qualifiedly immune to prosecution").

117. The Fourth Amendment requires police officers making an arrest to use only an amount of force that is objectively reasonable in the light of the circumstances facing them. *Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985).

118. OPD training materials and actual training warned or should have warned Officers 1-4 and Does 1-10 that deadly force may only be used where there is an immediate threat of serious bodily injury or death to the officer or others. "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Tennessee v. Garner*, 471 U.S. at 11.

119. The conduct of the Officers and Does 1-10 alleged herein, including their use of unreasonable or unnecessary deadly force by shooting Jovany while on his own property, holding a pocketknife and many feet away, subjected Jovany to the deprivation of his rights to be free from unreasonable arrest and/or to be free from excessive force, as protected under the Fourth Amendment to the United States Constitution.

120.    Considered against an objectively reasonable standard, the actions of Officers 1-4 and Does 1-10 cannot be considered to be objectively reasonable for several reasons, which include:

a)    the 911 caller indicated that Jovany was intoxicated or disoriented and was not threatening anyone when he was walking around the neighborhood with his pocket knife;

b)    Jovany was inside his property in the back patio, alone, when Officers arrived;

c)    when called out, Jovany walked in a steady, non-violent, non-agitated, non-alarming manner towards the blinding flashlights of the shouting Officers;

d)    Officers clearly knew Jovany had a knife in his lowered hand, and not some unknown object, such as a gun;

e)    Jovany never moved his arms or his knife towards the Officers or anyone else, because there was no one else around;

f)    Jovany never moved his arms or his body in a manner that would be reasonably perceived to be a threat to Officers or anyone else;

g)    Jovany never accelerated his steps or made a movement to suggest he would do so;

h)    Officers had ample time to switch to non-lethal devices given the distance between Jovany and the Officers;

         i)     Officers were in an open street, with their police cars nearby, and they could easily have retreated if circumstances would have required it when dealing with a disoriented man with a pocket knife; and

         j)     Officers opened fire on Jovany with a combined total of 20 shots fired, while Jovany was still within his own property.

       121.   Objectively reasonable officers who had been properly trained would have known from the 911 call, would have perceived at scene, that Jovany was having a mental health crisis.  The failure of Officers 1-4 to take this into account in a deadly force situation constituted excessive force in violation of the Fourth Amendment.

       122.   The objectively unreasonable actions of Officers 1-4 and Does 1-10 deprived Jovany of his right to be free from an unreasonable seizure and/or his right to be free from excessive force, as protected and guaranteed under the Fourth Amendment to the United States Constitution.

       123.   If, under the facts, Jovany is not deemed to have been "seized" under the Graham factors relating to the Fourth Amendment, and not deemed to be in custody, then Defendant Officers' actions deprived Jovany of life, liberty, and bodily integrity, as substantively guaranteed to Jovany under the Fifth and Fourteenth Amendments.

       124.   The unreasonable, excessive, and dangerous deadly force used by Defendant Officers, which directly caused Jovany's death as described above, deprived him of a liberty interest without due process of the law, in violation of the Fifth and/or Fourteenth Amendments to the U.S. Constitution.

125.    The actions of the Officers 1-4 and Does 1-10 violated Jovany's clearly established constitutional rights of which reasonable police officers are or should be aware.

126.    The actions of the Officers 1-4 and Does 1-10 proximately caused Jovany's death and the harm alleged by Plaintiffs.

127.    Plaintiffs have been damaged by the wrongful death of Jovany Mercado.

128.    Plaintiffs have suffered loss of society and companionship and other wrongful death damages due to Defendants' wrongful actions.

129.    As a result of the Officers' unlawful actions, and to remedy misconduct of significant importance to the public, Plaintiffs have had to retain counsel.

130.    The Officers' actions manifested malicious, reckless, and callous indifference to the rights and the very life of Jovany Mercado.

## SECOND CAUSE OF ACTION

### ~ *Failure to Train and Unconstitutional Practices and Procedures* ~

*Deprivation of Federal Constitutional Rights – 42 U.S.C. § 1983*
*Against Defendant Ogden City, through the OPD*

131.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as though fully set forth in this Cause of Action.

132.    The Ogden Police Department (OPD) is an authorized department or division of Ogden City (Ogden). Ogden City is therefore responsible for the actions of OPD Officers.

133.    The actions of Officers Sevenski, Bailey, Garcia, Poulsen and Does 1-10 toward Jovany Mercado were pursuant to, and consistent with, an established policy, practice, and/or custom of Defendant Ogden City, through the OPD, for which Ogden City is responsible.

134.    The actions of Officers Sevenski, Bailey, Garcia, and Poulsen and Does 1-10 were pursuant to an OPD policy, practice, or custom that consists of arming police officers with deadly weapons and condoning their use without requiring the consideration of less lethal alternatives, and without providing proper training and/or supervision regarding their safe, reasonable, and appropriate use in situations like the Officers and Does 1-10 faced here.

135.    Defendant Ogden City, through the OPD, was deliberately indifferent toward the proper training, arming, and supervision of its employees and agents.

136.    The actions of Defendant Ogden, through its OPD, were the proximate cause of Jovany's death, as well as pain and suffering to Jovany Mercado, and the wrongful death and other damages sustained by Plaintiffs as set forth above.

137.    As a result of the OPD's and Ogden's actions, and in order to remedy this important issue of public concern, Plaintiffs have had to retain legal counsel.

## THIRD CAUSE OF ACTION

### *~ Falsification of Affidavit, Illegal Search and Misleading a Judge ~*

*Violation of the Fourth Amendment
to the Constitution of the United States
Cognizable Under 42 U.S.C. §1983
Against Detective Fusselman in His Individual Capacity*

138.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as though fully set forth in this Cause of Action.

139.    The United States Supreme Court has held that the veracity of an affidavit supporting a search warrant may be challenged if it contains falsehoods or omissions. *Franks v. Delaware*, 438 U.S. 154 (1978). "Under *Franks*, a hearing on the veracity of the affidavit supporting a warrant is required if the defendant makes a substantial showing that the affidavit contains intentional or reckless false statements and if the affidavit, purged of its falsities, would not be sufficient to support a finding of probable cause." *U.S. v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997).

140.    "If the Defendant establishes at the evidentiary hearing by a preponderance of the evidence that the false statement was included in the affidavit by the affiant 'knowingly and intentionally, or with reckless disregard for the truth,' and the false statement was 'necessary to the finding of probable cause,' then the Supreme Court has ruled that 'the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.'" *U.S. v. Kennedy,*

131 F.3d 1371, 1376 (10th Cir. 1997) (citing *Franks v. Delaware* 438 U.S. 154, 155-156 (1978)).

141.    "In addition, we have ruled that the standards of 'deliberate falsehood' and 'reckless disregard' set forth in *Franks* apply 'to material omissions, as well as affirmative falsehoods.'" *U.S. v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997) (citing *Stewart v. Donges*, 915 F.2d 572, 581 (10th Cir. 1990)).

142.    "A deliberate or reckless omission [of information in an affidavit for a search warrant] can be the basis for a *Franks* suppression [of evidence]." *U.S. v. DeLeon*, 979 F.2d 761, 764 (9th Cir. 1992), as cited in *Kennedy*, 131 F.3d at 1376.

143.    The Tenth Circuit has explained how material omissions in search warrant affidavits should be viewed and what effect it should have:

> We exclude evidence discovered pursuant to a search warrant when (1) a defendant proves by preponderance of the evidence the affiant knowingly or recklessly included false statements in or omitted material information from an affidavit in support of a search warrant and (2) after excising such false statements and considering such material omissions we conclude the corrected affidavit does not support a finding of probable cause.

*U.S. v. Thompson*, 425 Fed.Appx. 695, 697 (10th Cir. 2011) (quoting from *United States v. Campbell*, 603 F.3d 1218, 1228 (10th Cir. 2010) (internal punctuation omitted).

144.    "'The standards of deliberate falsehood and reckless disregard set forth in *Franks* apply to material omissions as well as affirmative falsehoods' . . . An omission is material if it is 'so probative as to negate probable cause.'" *U.S. v. Thompson*,

425 Fed.Appx. 695, 697 (10th Cir. 2011) (quoting *United States v. McKissick*, 204 F.3d 1282, 1297 (10th Cir. 2000) and *Stewart v. Donges*, 915 F.2d 572, 581 (10th Cir. 1990)).

145.    Utah state law is similar to federal law. The Utah Supreme Court has held:

> Just as police officers may not include materially false statements in a search warrant affidavit, they similarly cannot omit information that materially affects the finding of probable cause, and the scope of the person(s) and property to be searched and seized.

*State v. Fuller*, 2014 UT 29, ¶ 29, 332 P.3d 937, 947 (quoting *State v. Krukowski*, 2004 UT 94, ¶ 15, 100 P.3d 1222, 1226).

146.    An affidavit like Detective Fusselman presented "violates the Fourth Amendment when he knowingly and intentionally, or with reckless disregard for the truth, includes a false statement in [a] warrant affidavit." *Marin v. King*, 720 Fed.Appx. 923, 936 (10th Cir. 2018) (quoting *Frank v. Delaware*, 438 U.S. 154, 155-56 (1978)) (internal punctuation omitted).

147.    Fusselman knowingly and intentionally supplied false and misleading information and/or omitted material information, in order to secure a warrant to search the home of Juan and Rosa Mercado.

148.    Fusselman either falsely swore out an affidavit of probable cause and/or omitted material facts necessary to understand the truth of the evening's events.

149.    The falsehoods alleged by Fusselman in his affidavit, which secured the search warrant, include allegations that "bullet slugs, empty shell casings, DVR and all

electronic devices with the home surveillance system including digital recordings from the DVR, blood evidence, weapons including any similar like [sic] knives that the subject was holding" were ***"unlawfully acquired or is unlawfully possessed;"*** and have "been used or is possessed for the ***purpose of being used to commit or conceal the commission of an offense; or is evidence of illegal conduct."*** (Emphasis added).

150.    At the time the warrant was obtained, Fusselman knew that the bullet holes and shell casings were from the Officers' weapons, fired at Jovany, and were not evidence of any illegal conduct by the Mercados, or by Jovany for that matter.

151.    At the time the warrant was secured, Fusselman knew that the evidence he sought to acquire, particularly the home security video, was not "unlawfully acquired" or "unlawfully possessed" by the Mercados. He knew that the home security video was not illegally obtained footage of the event.

152.    At the time Fusselman secured the warrant, he knew the evidence he sought to be gathered, particularly the home security video, was not being used or possessed "for the purpose of being used to commit or conceal the commission of an offense."

153.    At the time the affidavit was submitted, and the warrant was obtained, Fusselman knew that the purpose of the warrant was to improperly secure footage from the Mercados' home security system that provided damning evidence of the illegal and unconstitutional use of deadly force by Officers 1-4.

29

154.    Fusselman withheld and/or omitted to state in his affidavit for a search warrant that Officers Sevenski, Bailey, Garcia, and Poulsen each had a body camera which showed the shooting, such that it was totally unnecessary to seize or secure evidence from the surveillance cameras owned by the Mercados and installed in their home.

155.    Fusselman's false, misleading statements and/or omissions caused a search warrant of the Mercado home to be issued, which resulted in an illegal search of the Mercados' home, against their will.

156.    The Mercados had a Fourth Amendment right to be free from unreasonable searches and seizures.

157.    Being subject to a fraudulently and otherwise improperly obtained search warrant violated the Mercados' Fourth Amendment right to be free from unreasonable searches and seizures.

158.    Fusselman acted with malice when he fraudulently obtained a warrant by making false statements and/or omitting material facts as set forth above. This justifies punitive damages.

159.    The Mercados have been damaged by Defendants as set forth herein.

//

//

//

//

//

## FOURTH CAUSE OF ACTION

### ~ *Outrageous Conduct that Shocks the Conscience* ~

*Violations of the Fourteenth Amendment
to the Constitution of the United States
Cognizable Under 42 U.S.C. §1983
Against All Defendants*

160.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as though fully set forth in this Cause of Action.

161.    Prior to Jovany's unnecessary death, as described above, Defendants knew that Jovany was probably mentally ill and/or emotionally disturbed, based on the 911 phone call.

162.    These Defendants were well aware of the fact that Jovany was carrying a small knife, based on the phone call.

163.    Officers Sevenski, Bailey, Garcia, and Poulsen were each physically fit officers, armed not only with pistols, but undoubtedly armed with less-than-lethal pepper spray, Tasers, Asps and/or beanbag or rubber pellet guns.

164.    Prior to the needless killing of Jovany, Defendants had plenty of time to secure less than lethal force from their squad cars.

165.    Prior to the needless killing of Jovany, Defendants knew or should have known that non-lethal force, such as tasers or pepper spray, could control Jovany, if necessary.

166.    Prior to opening fire on him, Defendants did not give Jovany oral indication of any of the following:

        a)     That Jovany was under arrest;

        b)     A warning that he would be shot if he did not comply with demands to put down the knife;

        c)     Any warning to stop or he would be shot; or

        d)     Any warning to get on the ground.

167.    As Jovany walked toward the Officers from his carport and down his driveway, he uttered no threats or threatening statements, made no threatening movements, walked at a normal pace, and he never raised or moved the pocketknife in an aggressive manner.

168.    As seen by the body cam videos, Jovany was given virtually no time (just a few seconds) to comply with confusing and overlapping commands to "drop it" and "come" to us.

169.    The actions of Defendants in shooting Jovany as set forth herein were outrageous and conscience shocking.

170.    Defendants' actions, as set forth herein, constituted a substantive due process violation of the Fourteenth Amendment in that Defendants' actions "demonstrate[d] a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Uhlrig v. Harder,* 64 F.3d 567, 574 (10th Cir. 1995).

171.   To show a defendant's conduct is conscience shocking, a plaintiff must prove a government actor arbitrarily abused his authority or "employ[ed] it as an instrument of oppression." *Williams v. Berney,* 519 F.3d 1216, 1220 (10th Cir. 2008) (internal punctuation omitted).

172.   The Tenth Circuit has held that "[o]utrageous government conduct during a criminal investigation may constitute a violation of substantive due process rights." *Romero v. United States*, 658 Fed.Appx. 376 (10th Cir. 2016) (citing *United States v. Mosley,* 965 F.2d 906, 908-09 (10th Cir. 1992) (internal punctuation omitted).

173.   Such outrageous conduct occurred in the interaction and shooting of Jovany by the Defendants.

174.    The Court should order Defendants: a) to issue a public apology for their outrageous actions; and b) to establish new policies to prioritize the safety of citizens in welfare, mental health, and other such police and citizen misconduct investigations.

175.   Plaintiffs have been damaged as set forth above.

176.   Plaintiffs are entitled to attorney fees under §1988.

## FIFTH CAUSE OF ACTION

### *~ Violations of Utah Constitution – Art. I, §§ 1,6,7,14,25 ~*

*Against All Defendants*

177.   Plaintiffs incorporate by reference all other paragraphs of this Complaint as though fully set forth in this Cause of Action.

178.    The actions of Defendants described herein violated Jovany Mercado's rights secured by **Article I, Section I** of the Utah Constitution ("All men have the inherent and inalienable right to enjoy and defend their lives and liberties; to acquire, possess and protect property[.]").

179.    The actions of Defendants described herein violated Jovany Mercado's rights secured by **Article I, Section 6** of the Utah Constitution ("The individual right of the people to keep and bear arms for security and defense of self, family, others, property, or the state, as well as for other lawful purposes shall not be infringed[.]").

180.    The actions of Defendants described above violated Jovany Mercado's rights secured by **Article I, Section 7** of the Utah Constitution ("No person shall be deprived of life, liberty or property, without due process of law.").

181.    The actions of Defendants described herein violated Jovany Mercado's rights secured by **Article I, Section 14** of the Utah Constitution ("The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated.").

182.    The actions of Defendants described herein violated Jovany Mercado's rights secured by **Article I, Section 25** of the Utah Constitution ("The enumeration of rights shall not be construed to impair or deny others retained by the people.").

183.   Based upon the text, the historical context, case law, and other considerations, the protections and rights afforded by **Article I, §§ 1, 6, 7, 14 and 25** are broader than the interests and rights afforded by the United States Constitution.

184.   Defendants' actions described herein amount to flagrant violations of Jovany Mercado's rights under the Utah Constitution.

185.   There is no other adequate state law remedy for these violations.

186.   Injunctive relief cannot redress Plaintiffs' injuries

187.   Defendants' actions as alleged herein were the proximate cause of pain and suffering to Jovany, of Jovany's death, and of the damages sustained by Plaintiffs.

188.   In order to remedy Defendants' unconstitutional conduct, Plaintiffs have had to retain counsel.

## JURY DEMAND

Plaintiffs request a jury trial on all issues in this case.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

1.   For damages for wrongful death due to unconstitutional conduct including the improper and unnecessary shooting of Jovany, the illegal search, and other misconduct by Defendants. This includes all economic damages as well all appropriate pain and suffering damages, and damages available under federal common law, as per *Berry v. City of Muskogee,* Okl., 900 F.2d 1489 (10th Cir. 1990);

2.      A declaration and judgment that the deadly force, as well as the policies, customs and practices relating to deadly force as employed by the Defendants, are and were unconstitutional;

3.      For economic and noneconomic damages as provided under applicable law and deemed appropriate by a jury;

4.      For attorney fees and litigation expenses pursuant to 42 U.S.C. § 1988, and as otherwise pursuant to Utah law and equity, to the full extent provided under all applicable laws;

5.      For punitive damages against Defendants, as provided under applicable law and to the extent deemed appropriate by the court or by a jury;

6.      For costs as provided and appropriate under applicable law;

7.      For pre-judgment and post-judgment interest as proved under applicable law; and

8.      For all other legal and equitable relief which is available and which is deemed just and appropriate by the Court, including an order (a) requiring OPD to be equipped with and utilize body cameras and vehicle dash cameras while on patrol, (b) requiring OPD Officers to carry non-lethal weapons while on patrol, and to prioritize use of non-lethal weapons, (c) to provide and require annual training regarding the use of non-lethal as well as lethal force, (d) to provide and require annual training regarding how to deal with a mentally ill or emotionally disturbed person, and (e) to implement regular

training, supervision, and policies required to meet federal and state constitutional requirements.

DATED this 22nd day of July, 2020.

**SYKES MCALLISTER LAW OFFICES, PLLC**

 */s/ Robert B. Sykes*
ROBERT B. SYKES
C. PETER SORENSEN
CHRISTINA D. ISOM
*Attorneys for Plaintiffs*

**MARIO ARRAS LAW FIRM, PLLC**

 */s/ Mario Arras*
MARIO ARRAS
*Attorney for Plaintiffs*