HEATHER S. WHITE (7674)
DANI N. CEPERNICH (14051)
SNOW CHRISTENSEN & MARTINEAU
10 Exchange Place, Eleventh Floor
Post Office Box 45000
Salt Lake City, Utah 84145
Telephone: (801) 521-9000
hsw@scmlaw.com
dnc@scmlaw.com

*Attorneys for Defendants Ogden City, Brandon Sevenski,
Nigil Bailey, Karson Garcia, and John Poulsen*

UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| JUAN MERCADO, ROSA MERCADO, and ESTATE OF JOVANY MERCADO,<br><br>  Plaintiffs,<br><br> vs.<br><br>OGDEN CITY, BRANDON SEVENSKI, NIGIL BAILEY, KARSON GARCIA, JOHN POULSEN, AND DET. TRENT FUSSELMAN;<br><br>  Defendants. | **OGDEN DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br><br>Case No. 1:20CV90 RJS<br><br><br>Judge Robert J. Shelby<br><br>**ORAL ARGUMENT REQUESTED** |

**RELIEF SOUGHT AND GROUNDS**

Pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, Defendants Ogden City,

Brandon Sevenski, Nigil Bailey, Karson Garcia, and John Poulsen (collectively, the Ogden

Defendants) move the Court for judgment on the pleadings.

This case arises out of the fatal shooting of Plaintiffs' son, Jovany Mercado[1], after Officers Sevenski, Bailey, Garcia, and Poulsen (collectively the Officers) responded to a 911 call reporting a disturbance with a man holding a six-inch knife and wandering suspiciously around the neighborhood.  The Officers encountered Jovany in the carport of a nearby home.  Almost immediately upon seeing the Officers, Jovany flicked open the knife and began coming at the Officers with it.  Despite the Officers backing away from Jovany and repeatedly yelling for him to drop the knife, Jovany continued advancing on the Officers and citizens behind them.  When the Officers could not feasibly retreat any further—some of them almost backed up against cars parked on the street—and Jovany began closing the space between them, getting closer than twenty feet from them, the Officers shot Jovany.

The Mercados filed this civil rights action as a result.  They claim the Officers used excessive force in violation of the Fourth Amendment of the United States Constitution, and that their conduct also constituted a Fourteenth Amendment due process violation.  They assert a federal *Monell* municipal liability claim asserting the City has a pattern and practice of permitting similar constitutional violations and failed to adequately train the Officers.  And they finally claim the Officers' conduct violated Article I, Sections 1, 6, 7, 14, and 25 of the Utah Constitution.  Among other things, they seek punitive damages and injunctive relief.

Ogden Defendants are entitled to judgment on each of these claims.  As an initial matter, the Mercados lack standing to assert survival claims under § 1983 as parents and heirs of Jovany.  Only a duly-appointed personal representative of the estate may assert such claims, and only on

---

[1] Defendants refer to Plaintiffs' son as Jovany for clarity since Plaintiffs' last name is also Mercado.

his behalf, not theirs.  To the extent the Mercados have asserted a claim against the Ogden Police Department, the department is not a legal entity amenable to suit.

The Mercados cannot maintain their claims on behalf of Jovany's estate under § 1983 (first, second, and fourth causes of action) because the facts pleaded do not establish the Officers violated Jovany's constitutional rights.  They show the amount of force the Officers used was reasonable under the circumstances (first cause of action), and a substantive due process claim is unavailable where, as here, a more specific constitutional right applies (fourth cause of action).  Consequently, the Officers are entitled to qualified immunity under the first prong of the qualified immunity analysis.  Because a municipality may not be held liable where there was no underlying constitutional violation by its officers, Ogden City is entitled to judgment on the Mercados' claim against it (second cause of action).

Even if the Mercados had alleged a cognizable violation of Jovany's rights under the Fourth or Fourteenth Amendment, the Officers are entitled to qualified immunity under the second prong of that analysis because it was not clearly established at the time of the incident that the use of deadly force under the circumstances was unreasonable.  Ogden City is likewise entitled to judgment on the pleadings because the Mercados have failed to allege facts to support a municipal liability claim.

The Mercados' claims under the Utah Constitution (fifth cause of action) fail for the much the same reasons as their excessive force and due process claims under § 1983: they have not alleged a flagrant violation of the Utah Constitution, and they have failed to sufficiently plead a basis for liability against Ogden City.

Finally, the Mercados are not entitled to punitive damages, nor is injunctive relief appropriate because there is no real and imminent threat of future violations.

## STATEMENT OF FACTS[2]

1.      On August 16, 2019, between 8:45 and 9:00 p.m., a man was seen walking around an Ogden City neighborhood with an open pocketknife.  (Compl. [Dkt. No. 2] ¶ 17.)

2.      Shortly before 9:00 p.m., a neighbor called 911 to report the man with a knife was at his house.  (911 Call (OC-000071) at 0:10–0:12, attached as **Exhibit 1**.[3])  The caller indicated he tried to talk to the man, who seemed confused, and had a knife pulled out.  (*Id.* at 0:44–0:46.) The caller reported the man had the knife out, was walking around, hanging around vehicles, and walked into his driveway and front yard while the caller was having a birthday party.  (*Id.* at

---

[2] As a motion for judgment on the pleadings is treated as a motion to dismiss, *Cummings v. Dean*, 913 F.3d 1227, 1238 (10th Cir. 2019), the Court must accept all facts alleged in the complaint as true, *see, e.g. Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016).  The following are taken from Plaintiffs' complaint.  The Ogden Defendants do not admit the truth of any of Plaintiffs' allegations and reserve the right to challenge the same at later stages in these proceedings.

[3] The events were captured on multiple video and audio sources.  There is no allegation that the recordings have been doctored or altered, so the Court can rely on the evidence while viewing in the light most favorable to Plaintiffs in resolving the motion.  *See Carabajal v. City of Cheyenne, Wyoming*, 847 F.3d 1203, 1207 (10th Cir. 2017).  Additionally, the events and videos are referenced in the complaint [Dkt. No. 2 at ¶¶ 59, 70, 168], the actions are central to Plaintiffs' claims, and the parties do not dispute the videos' authenticity, so this motion is not converted to a summary judgment motion.  *See Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007).  Moreover, the Court need not accept any of Plaintiffs' allegations that are inconsistent with what is depicted in the video and audio sources.  *See, e.g.*, "When the record on appeal contains video evidence of the incident in question, [] we will accept the version of the facts portrayed in the video, but only to the extent that it blatantly contradicts the plaintiff's version of events."  *Emmett v. Armstrong*, 973 F.3d 1127, 1131 (10th Cir. 2020) (brackets and internal quotation marks omitted); *Estate of Valverde ex rel Padilla v. Dodge*, 967 F.3d 1049, 1055 (10th Cir. 2020) ("To the extent that the synchronized video unmistakably establishes facts, we are to apply them, even if they are contrary to other evidence, such as testimony.").

0:53–1:05; 4:48.)  The man with the knife was going around and looking into the vehicles.  (*Id.* at 4:33–4:36.)

3.  The caller did not know the man.  (*Id.* at 1:07–1:10.)  The man did not leave and was "hanging around" in front of the caller's house.  (*Id.* at 1:11–13.)  While on the call, the caller noted the man was now in his neighbor's parking spot, which he could see from where he was standing in his yard.  (*Id.* at 2:38–44; 3:20–3:25.)

4.  The caller also indicated the man was not "making any sense" and was either "really drunk or really high."  (*Id.* at 0:34, 3:56; *see also* Compl. [Dkt. No. 2] ¶ 23.)  The caller told the 911 dispatcher that the individual seemed disoriented and did not appear to be "present in the situation."  (911 Call at 2:50, 4:06, **Ex. 1**.)

5.  The 911 dispatcher radioed officers about a "weapons disturbance," indicating, "There is a male on scene with a knife.  He does have the knife pulled out, hasn't threatened anyone.  The complainant is having a party.  He's advised the male approached the driveway with a knife in his hand.  It is approximately a six-inch pocketknife."  (911 Dispatch (OC-001107) at 0:23–2:00, attached as **Exhibit 2**.)

6.  The 911 dispatcher subsequently confirmed officers were responding to a "weapons disturbance," provided a description of the male, and confirmed he was last seen in the yard of a neighbor to the east of the complainant.  (*Id.* at 0:57–1:15)

7.      Officers Sevenski, Bailey, and Poulsen responded to the call around 9:00 p.m. (Compl. [Dkt. No. 2] ¶¶ 25-26; *see also* Poulsen Body Camera Footage (OC-000045), attached as **Exhibit 3**.[4])

8.      When Officer Poulsen arrived, he spoke with the 911 caller.  (Poulsen Camera Footage at 0:08, **Ex. 3**.)  The caller directed the three officers to where the man with the knife was, indicating he was in the backyard of a neighbor's residence.  (*Id.* at 0:11.)  There was still no indication who the man was.  (*See id.*)

9.      Officers Sevenski, Bailey, and Poulsen walked around the corner of the street to the house where the 911 caller and other partygoers told them they would find the man with the knife.  (*Id.* at 0:18–0:24.)  There were at least five partygoers outside on the corner of the street.  (*Id.* at 0:19–0:22.)

10.     The Officers radioed dispatch that the man was at a residence with a carport that had a star decoration on it.  (911 Dispatch at 1:57–2:00, **Ex. 2**.)

11.     The residence was on a neighborhood street with multiple cars parked on both sides of the street.  (Sevenski Body Camera Footage (OC-000042) at 0:03–0:17, attached as **Exhibit 4**; Poulsen Camera Footage at 0:37–0:50, **Ex. 3**; *see also* Carport Surveillance Video (OC-000041), attached as **Exhibit 5**.)

12.     The Officers approached the residence with flashlights in their hands.  (Carport Video at 2:04–2:10, **Ex. 5**.)

---

[4] Full versions of the Officers' body camera recordings have been attached as exhibits, which total over two hours.  The relevant portions of the incident all occur within the first five minutes of the recordings.  Relevant time stamps are also provided for reference.

13.     As the three officers approached the carport, which had a chain link gate at the border of the driveway and the sidewalk, they saw a man behind a car in the carport with his back toward the Officers.  (Sevenski Camera Footage at 0:19, **Ex. 4**; Poulsen Camera Footage at 0:49, **Ex. 3**.)

14.     The man was in the carport between the car and the residence.  (Sevenski Camera Footage at 0:18–0:25, **Ex. 4**); Poulsen Camera Footage at 0:47–0:50, **Ex. 3**.)  There was a car in the carport and were lights on inside the house.  (Sevenski Camera Footage at 0:17, **Ex. 4**; Poulsen Camera Footage at 0:45–50, **Ex. 3**.)

15.     The Officers shined their flashlights on the man and called out to him, "Hey man," "Come out here," "Police," and "Come here."  (Poulsen Camera Footage at 0:49–0:55, **Ex. 3**; *see also* Carport Video at 2:03–2:15, **Ex. 5**.)   The man turned around to face the Officers, (Sevenski Camera Footage at 0:23, **Ex. 4**; Poulsen Camera Footage at 0:50, **Ex. 3**), and flicked the knife open, (Sevenski Camera Footage at 0:24–0:27, **Ex. 4**).  That is the moment things changed.

16.     The Officers began yelling for the man to drop the knife, continuing to identify themselves as police officers:

> Drop it now!  Drop that knife!  Drop the knife now!  Drop it!  Drop the knife!  Drop that knife!  Police!  Drop the knife!  Drop the knife now!  Drop it!  Drop the knife!  Drop it! Drop that knife!

(Sevenski Camera Footage at 0:30-48, **Ex. 4**.)

17.     The man had a scowl and an angry look on his face.  (Sevenski Camera Footage at 0:26–0:47, **Ex. 4**; Poulsen at 1:09–1:17, **Ex. 3**.)  His shoulders were back, one hand was in a

fist, and the other was clenching the knife.  (Sevenski Camera Footage at 0:26–0:27, **Ex. 4**;

Poulsen Camera Footage at 1:09–1:18, **Ex. 3**; Carport Video at 2:33–2:40, **Ex. 5**.)

18.     The man began to advance on the Officers.  (Sevenski Camera Footage at 0:30–

0:48, **Ex. 4**.)  The Officers continued their commands to drop the knife.  (*Id.* at 0:30–0:48.)

19.     As the man advanced on them, the Officers backed into the street, creating space

between them and the man.  (Sevenski Camera Footage at 0:31–0:48, **Ex. 4**; Poulsen Camera

Footage at 1:13–1:18, **Ex. 3**; Carport Video at 2:30–2:40, **Ex. 5**.)

20.     During this time, Officer Garcia arrived in his vehicle and parked directly in front

of the home where the man was located, and where Officers Sevenski, Poulsen, and Bailey were

in the street with their guns drawn.  (Poulsen Camera Footage 1:03–1:10, **Ex. 3**; Carport Video at

2:25–2:30, **Ex. 5**.)

21.     The man continued advancing on the Officers with the knife in his hand without

acknowledging or responding to the Officers' commands, and without saying anything to them.

(Sevenski Camera Footage at 0:31–0:48, **Ex. 4**; Poulsen Camera Footage at 1:00–1:17, **Ex. 3**.)

22.     Lights on the carport came on as the man advanced toward the Officers.  (Carport

Video at 2:35, **Ex. 5**.)

23.     From the time the man turned to face the Officers, he did not pause, hesitate, or

speak when he saw the Officers.  (Sevenski Camera Footage at 0:30–0:50, **Ex. 4**.)

24.     As the man continued to advance, the Officers continued to retreat into the street

and toward the cars parked on the street.  (Carport Video at 2:30–2:40, **Ex. 5**.)

25.     When the man did not comply with the Officers' requests, and as he reached the opening in the gate, less than approximately twenty feet from the Officers, the Officers shot the man.  (Sevenski Camera Footage at 0:31–0:50, **Ex. 4**; Carport Video at 2:30–2:45, **Ex. 5**.)

26.     The time the first officer saw and began speaking to the man until he was shot was approximately 30 seconds.  (Poulsen Camera Footage at 0:48-1:18, **Ex. 3.**)

27.     From the time the man flicked open the knife until when shots were fired, the Officers had yelled for him to drop the knife more than twenty times.  At distinct and separate times, and over a period of almost twenty seconds, the Officers gave succinct commands such as "Drop the knife." "Drop it." "Police, drop the knife."  The Officers' commands were clear, direct, and easily understood, as they were not all shouting at the same time.  (Sevenski Camera Footage at 0:30–0:48, **Ex. 4**.)

28.     The man was later identified during the Weber County Attorney's investigation as Jovany Mercado.  (*See e.g.*, Compl. [Dkt. No. 2] ¶¶ 15–17.)

29.     The Officers did not have any information identifying the man or about his mental health, including whether he was "mentally ill and/or emotionally disturbed." (Compl. [Dkt. No. 2] ¶ 161).  (*See e.g.*, 911 Call, **Ex. 1**; 911 Dispatch Call**, Ex. 2**; Poulsen Camera Footage, **Ex. 3**.)

30.     The Officers likewise did not have any information about who owned or was in the home where Jovany was located by the Officers.  (*See e.g.*, 911 Call, **Ex. 1**; 911 Dispatch, **Ex. 2**; Poulsen Camera Footage, **Ex. 3**.)

## STANDARD OF REVIEW

"A motion for judgment on the pleadings under Rule 12(c) is treated as a motion to dismiss under Rule 12(b)(6)."  *Cummings v. Dean, 913 F.3d 1227, 1238 (10th Cir. 2019)*

(citation omitted).  When deciding a motion for judgment on the pleadings, the Court may consider the pleadings, all documents referenced therein, and all matters of which the court may take judicial notice.  *See Tellabs, Inc.*, *Makor Issues & Right, Ltd.*, 551 U.S. 308, 322 (2007).

The complaint must provide "enough facts to state a claim to relief that is plausible on its face," *Bell Alt. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), which requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' . . . Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.*

### Qualified Immunity

"Although actions for damages provide an important remedy for individuals injured by governmental officials' abuse of authority, such actions sometimes subject officials to costly and harassing litigation and potentially inhibit officials in performing their official duties." *Medina v. Cram*, 252 F.3d 1124, 1127 (10th Cir. 2001).  To balance these competing interests, courts created the doctrine of qualified immunity.  "[W]hen a defendant raises a qualified immunity defense, a heavy two-part burden must be overcome by the plaintiff.  Plaintiff must first establish that the facts alleged [taken in the light most favorable to the nonmoving party] show the officer's conduct violated a constitutional right.  Second, Plaintiff must demonstrate that the right was clearly established." *Phillips v. James*, 422 F.3d 1075, 1080 (10th Cir. 2005) (citation and quotation marks omitted); *see also Peterson v. Jenson*, 371 F.3d 1199, 1201 (10th Cir. 2004) ("Although summary judgment provides the typical vehicle for asserting a qualified immunity defense, we will also review this defense on a motion to dismiss.")

To satisfy the clearly-established law standard, the plaintiff must "identify[] an on-point Supreme Court or published Tenth Circuit decision; alternatively, the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Quinn v. Young*, 780 F.3d 998, 1005 (10th Cir. 2015). As the Supreme Court recently reiterated, "clearly established law should not be defined at a high level of generality." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (internal quotation marks omitted). Rather, "the clearly established law must be particularized to the facts of the case." *Id.* (internal quotation marks omitted). Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging a violation of extremely abstract rights." *Id.* (internal quotation marks and brackets omitted).

The Supreme Court has repeatedly emphasized the broad protection provided by qualified immunity. First, it shields "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Second, it grants officials "a right, not merely to avoid standing trial, but also to avoid the burdens of such pretrial matters as discovery." *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996) (quotation marks omitted). Accordingly, "courts should resolve the purely legal question raised by a qualified immunity defense at the earliest possible stage in litigation." *Medina*, 252 F.3d at 1127-28 (quotation marks omitted).

Reversing a trial court's denial of qualified immunity based on perceived issues of material fact about whether an officer's actions were objectively reasonable, the Tenth Circuit explained:

> Whether the officers acted reasonably . . . is a *legal determination* in the absence of disputed material facts. Although the *reasonableness* standard *is inevitably fact*

*dependent*, it should *not be reserved for the jury* in the absence of disputed material facts. Because qualified immunity is a question of law to be resolved at the earliest possible stage of litigation, courts often engage in determinations of reasonableness under the Fourth Amendment, necessarily applying the undisputed material facts to the legal standards.

*Medina*, 252 F.3d at 1131 (internal citation omitted). In so doing, the Court concluded no factual dispute existed. Additionally, the Supreme Court has determined that:

When opposing parties tell two different stories, one of which is blatantly contradicted by the record [a video recording], so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment . . . Respondent's version of events is so utterly discredited by the record [video recording] that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

*Scott v. Harris*, 550 U.S. 372, 380-81 (2007).

## ARGUMENT

### I. THE MERCADOS LACK STANDING AS JOVANY'S PARENTS AND HEIRS TO ASSERT SURVIVAL CLAIMS UNDER § 1983.

"By its express language, § 1983 provides remedies 'to the party injured' for violations of that party's constitutional rights." *Ostler v. Harris*, No. 2:18-CV-00254, 2019 WL 2409633, at *2 (D. Utah June 7, 2019) (unpublished) (citation omitted). "In the Tenth Circuit, when the injured party is deceased, 'the estate of a deceased victim must be the one to bring suit.'" *Id.* (quoting *Harold v. Univ. of Colorado Hosp.*, 680 F. App'x 666, 673 (10th Cir. 2017) (brackets omitted)). "This is because the decedent's estate is the only real party in interest in a § 1983 action." *Id.* (quotation marks omitted).

From the Mercados' complaint, it appears the § 1983 claims are asserted by Mr. and Mrs. Mercado as Jovany's parents and heirs, not just by Mr. Mercado as Personal Representative of the Estate of Jovany Mercado. Only the latter has standing to assert the § 1983 claims. To the

extent Mr. and Mrs. Mercado have brought claims under § 1983, they lack standing, and any such claims should be dismissed.

## II.   THE OGDEN POLICE DEPARTMENT IS NOT A LEGAL ENTITY AMENABLE TO SUIT.

From the Mercados' complaint, it is unclear whether they have asserted a claim against the Ogden Police Department in addition to Ogden City.  They have included "through its POLICE DEPARTMENT (OPD)" in the caption and alleged that "OPD is a municipal police department authorized to operate as such by the State of Utah and by Ogden City.  (Compl. [Dkt. No. 2] at 1, ¶ 7.)  To the extent the Mercados have asserted or attempted to assert claims against the Ogden Police Department separate from Ogden City, those claims should be dismissed.

A municipality's subdivisions, such as its police department, are not separate legal entities with the capacity to sue or be sued.  *Moaz v. Denver Int'l Airport*, 747 F. App'x. 708, 710 (10th Cir. 2018) (unpublished) (affirming dismissal of claims against the police department because it was not a separate entity).[5]  Because the Ogden Police Department is not a separate entity from Ogden City, any claim against it must be dismissed.

## III.   THERE WAS NO CONSTITUTIONAL VIOLATION OF JOVANY'S RIGHTS.

### A.   *Applying the* Graham *Factors, the Officers Did Not Use Excessive Force.*

To establish their Fourth Amendment claim, the Mercados must show the Officers' use of lethal force was unreasonable.  *Estate of Valverde ex Padilla v. Dodge*, 967 F.3d 1049, 1060

---

[5] *See also Lindsey v. Thomson*, 275 F. App'x 744, 746 (10th Cir. 2007) (unpublished) (affirming dismissal of § 1983 claims against police departments and county sheriff's department, entities with no apparent legal existence); *Fail v. W. Valley City*, No.  2:04-CV-1094, 2006 WL 842910, *2 (D. Utah Mar. 28, 2006) (unpublished) (dismissing claims against West Valley City Police Department); *Redmond v. Salt Lake City Police Dep't*, No. 2:08-CV-153, 2009 WL 675628, *2-3 & n.1 (D. Utah Mar. 10, 2009) (unpublished) (dismissing claims against Salt Lake City Police Department).

(10th Cir. 2020) ("In an excessive-force case, as in other Fourth Amendment seizure cases, a plaintiff must prove that the officer's actions were 'objectively unreasonable.'").  Courts assess objective reasonableness by evaluating "whether the 'totality of the circumstances' justified the use of force, as 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"  *Id.* at 1060 (citation omitted).

"Deadly force is justified under the Fourth Amendment if a reasonable officer in [a defendant's] position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others."  *Estate of Larsen v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) (citation and emphasis omitted).  The Supreme Court has made clear that an assessment of reasonableness in the context of use of force "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Graham v. Connor*, 490 U.S. 386, 396–97 (1989).  And it is well established that the reasonableness standard of the Fourth Amendment "does not require that officers use alternative less intrusive means."  *Medina v. Cram*, 252 F.3d 1124, 1133 (10th Cir. 2001).

The *Graham* factors are "three nonexclusive factors for determining whether a particular use of force was excessive:  (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight."  *Valverde*, 967 F.3d at 1060 (citing *Graham*, 490 U.S. at 396 (internal quotation marks omitted)).  "Each factor must be evaluated from the perspective of the officer on the scene."  *Valverde*, 967 F.3d at 1060.  Applying the *Graham* factors shows that the Officers' actions were not unreasonable.

1. <u>Immediate Threat to Safety</u>

The degree of threat is "undoubtedly the 'most important' and fact intensive factor in determining the objective reasonableness of an officer's use of force." *Pauly v. White*, 874 F.3d 1197, 1216 (10th Cir. 2017); *see also Reavis Estate of Coale v. Frost*, 967 F.3d 978, 985 (10th Cir. 2020).  The Tenth Circuit has repeatedly stated that "even [i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back . . . the officer would be justified in using more force than in fact was needed." *Estate of Larsen v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) (alterations in original) (cleaned up).  In fact, the reasonable officer "need not await the 'glint of steel' before taking self-protective action; by then it is 'often . . .too late to take safety precautions." *Id.* (omission in original) (citation omitted).

The Court is to consider the following factors to assess the degree of threat facing officers:  "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Larsen*, 511 F.3d at 1260.  These four factors weigh in favor of an immediate threat posed by Jovany to the Officers and people nearby.

Here, the Officers repeatedly (20 times) instructed Jovany to drop the knife.  Jovany did not comply or acknowledge their commands.  And because the Officers were all in uniform, it was reasonable for them to believe Jovany knew they were police officers, and he should comply with their requests.  *Emmett v. Armstrong*, 973 F.3d 1127, 1134 (10th Cir. 2020).

As to the second factor regarding Jovany's hostile motions, when the Officers first approached Jovany, he did not have the knife open.  But, almost immediately after the Officers

identified themselves, Jovany turned, flicked open his knife, and began advancing toward the Officers. Jovany appeared agitated and angry, and his body language was that of someone looking to fight. Opening a knife, ignoring commands given by Officers, and continuing to advance toward the Officers were all hostile actions taken towards the Officers necessitating the use of force. Indeed, the Tenth Circuit has rejected an argument that similar conduct does not constitute hostile motions absent charging or slicing or stabbing motions. *Larsen*, 511 F.3d at 1263 (holding that "Larsen did make hostile actions toward [the officer]" where he "ignored at least four police commands to drop his weapon and then turned and stepped toward the officer with a large knife raised in a provocative motion").

As to the third factor, Jovany was only a short distance away from the Officers – less than twenty feet – when they fired. Moreover, there were neighbors and partygoers just behind and around them. A car was in the driveway and lights were on in the home where Jovany was found lurking, indicating someone might be home, and a light on the carport switched on during the commotion of the officers yelling for Jovany to drop his knife, further supporting that possibility. Furthermore, the Officers did not know that Jovany was on his parents' property, or whether he was authorized to be there. They only knew that the man with a knife who was making others in the area nervous was now in the back of a neighbor's carport near the house with a car in the driveway and lights on inside. It is critical to note that the officers did not charge in on Jovany or even stand their ground. They were backing away from him, trying to create distance and de-escalate the situation. But Jovany continued to close in on them, and they fired only when they could no longer continue backing away because of cars behind some of them, and neighbors in the surrounding areas. The close proximity of Jovany to the Officers, partygoers, and potential

residents of the house further supports a conclusion that Jovany posed a serious threat of harm, justifying the use of lethal force. *See Atencio v. City of Albuquerque*, No. 15CV343, 2015 WL 13651179, *3 (unpublished) (crediting an officer's concern that "he had no 'way of stopping' [the suspect] if [the suspect] tried to . . . commit 'some felonious assault'" when the officer pursued suspect from behind and suspect was running toward a neighborhood 100-150 yards away).

As to the fourth factor, Jovany's manifest intentions were to continue on his course, which, as discussed above, presented a danger to Officers and partygoers nearby. Jovany did not appear confused or disoriented. He was deliberate and steady, never hesitating in his approach toward the Officers. He looked angry and agitated. His body language was that of someone ready to fight with his shoulders back and hands clenched. He ignored several commands from officers to stop and to drop the knife, and instead proceeded toward the officers with the knife in his hand, saying nothing in response.

Considering the totality of the circumstances, and the information known to the Officers at the time, Jovany was an immediate and serious threat to them and others that justified their use of deadly force.

2.      Severity of the Crime

Even if the original suspected crime or wrongdoing does not involve a violent crime, a change in circumstances can support a use of force. *See Giannetti v. City of Stillwater*, 216. F. App'x 756, 763 (10th Cir. 2007) (unpublished). In *Giannetti*, a woman was arrested and taken to jail for driving without headlights and eluding police. *Id.* at 758–60. During a struggle after the woman's refusal to change into a jumpsuit, an officer placed his knee of the woman's shoulder

with his leg across the back of her neck, which eventually led to her death. *Id.* at 760. The Tenth Circuit noted that the original traffic offense of driving without headlights was not severe enough to support an increased use of force, but the woman's behavior in refusing to change into a jumpsuit, resisting the officers, and her battery of an officer prior to the use of force that led to her death must be "factored in" to the court's analysis. *Id.* at 763. The Tenth Circuit eventually determined the officers did not use excessive force "given the 'tense, uncertain, and rapidly evolving' situation presented by" the woman's behavior. *Id.* at 765 (citation omitted).

Similarly, Jovany's actions presented a "tense, uncertain, and rapidly evolving situation." *Id.* Jovany was a suspect in a weapons disturbance, and it was reported that he was trespassing on the 911-caller's property. The concern around Jovany's actions and behavior were such that the Officers' involvement was beyond a mere welfare check and instead involved a potentially dangerous weapon. The Officers knew a man had a knife, was wandering the neighborhood, showing his knife, and was reported as entering a neighbor's property with the knife. *See Valverde*, 967 F.3d at 1061 ("The first factor can certainly be of central importance when the suspect is already holding a weapon when first observed by officers."). Furthermore, Jovany's actions of flicking the knife open, ignoring the Officers' commands, and advancing toward the Officers added to the tense situation which evolved at a very quick speed. His refusal to either stop or drop the knife increased the severity of the potential crime to an assault with a deadly weapon and, as in *Gianetti*, must be factored into the court's analysis.

3.     <u>Active Resistance</u>

As to the third factor, it is unclear if this analysis should only apply to incidents involving an arrest or if it includes incidents involving resisting a seizure or other investigatory actions

preceding an intent (or ability) to arrest a suspect. *Compare Bond v. City of Tahlequah, Oklahoma*, 981 F.3d 808, 820 (10th Cir. 2020) ("If the officers had no intent to arrest [the suspect], he could not have been actively resisting arrest or attempting to evade arrest by flight when he backed into the garage in response to [the officer's] approach.) *with Cavanaugh v. Woods Cross City*, 718 F.3d 1244, 1252 (10th Cir. 2013) ("There is a use-of-force spectrum, and where along the spectrum the officer's conduct justifiably falls depends on a variety of circumstances. This spectrum exists even when the seizure effected is merely an investigative detention and not an arrest…Recognizing this spectrum, the district court properly instructed the jury that one of the factors it may consider, among others, is 'whether [the suspect] was actively resisting *seizure* or attempting to evade." (emphasis in original)). To the extent this Court reviews this factor more broadly, Jovany was resisting the investigatory actions of the Officers as he ignored commands to drop the knife and advanced toward the Officers in an aggressive and threatening manner.

And even if the analysis were to apply only to an actual arrest and not investigatory actions, this factor is not determinative, and the other *Graham* factors still weigh heavily in favor of the reasonableness of the Officers' use of lethal force. *See Reavis Estate of Coale*, 967 F.3d at 985 (emphasizing the factor of whether the suspect poses an immediate threat to safety is "undoubtedly the 'most important'"); *Valverde*, 967 F.3d at 1060–61 (discussing giving weight to certain factors and that no single factor is determinative as to the reasonableness of the use of force). Indeed, the Tenth Circuit has repeatedly emphasized that the *Graham* factors are "non-exclusive" and courts are to look at the "totality of the circumstances" to assess the

reasonableness of an individual's actions.  *See e.g.*, *Valverde*, 967 F.3d at 1060 (citing other Tenth Circuit cases for similar propositions).

> 4. <u>Considering the Totality of the Circumstances, the Officers' Actions Were Reasonable.</u>

The facts presented resemble *Estate of Larsen v. Murr*, 511 F.3d 1255 (10th Cir. 2008). There, the Tenth Circuit affirmed summary judgment for an officer, ruling the officer used reasonable force in fatally shooting an armed suspect in front of his home.  *Larsen*, 511 F.3d at 1258, 1263.  In that case, two officers responded to a 911 call reporting a man threatening to kill someone or himself.  *Id.* at 1258.  When the officers approached the house, the man was on the porch holding a knife.  *Id.*  Both officers drew their guns and told the man to drop the knife.  *Id.* When one officer was somewhere between 7-12 feet from the man, he raised the knife above his shoulder "with the blade pointed outward" and turned toward the officer.  *Id.*  The officer told the man four times to drop the knife or the officer would shoot.  *Id.*  The man took a step toward the officer, and the officer fired twice, killing the man.  *Id.* at 1259.  The Tenth Circuit determined that even if the officer's "assessment of threat was mistaken, it was not objectively unreasonable."  *Id.* at 1261.

Similar to the suspect in *Larsen*, the Officers yelled over twenty times for Jovany to drop the knife; a command with which Jovany did not comply.  Jovany also advanced toward the officers in a deliberate manner and clenching a knife, posing an immediate threat to the Officers who were only a short distance away.  While he had not yet raised the knife at the officers, he could have done so at any moment, as he continued advancing deliberately toward them while they tried to create distance and safety.  They fired only when they could no longer keep backing

away, and Jovany was less than 20 feet away—a mere few steps from reach of being slashed or stabbed, were Jovany to extend the knife at any point.

### B. The Officers Did Not Create the Need for Lethal Force.

Another important question courts ask when analyzing the reasonableness of the use of force is whether the officers created the need for such. *See Valverde,* 967 F.3d at 1067 ("Our precedent recognizes that the reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment that they used force, but also on *whether the officers' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force*.") In this case, the Officers only responded to Jovany's hostile actions; they did not create a dangerous situation.

The Tenth Circuit has held "that an officer acts unreasonably when he *aggressively confronts* an armed and suicidal/emotionally disturbed individual without gaining additional information or by approaching him in a threatening manner." *Bond v. City of Tahlequah, Oklahoma,* 981 F.3d 808, 818 (10th Cir. 2020) (citation omitted). In that case, two officers shot and killed a man, and the man's estate brought a § 1983 claim alleging excessive force. *Id.* at 812. The Tenth Circuit reversed in part summary judgment in favor of the officers on the basis of qualified immunity because the officers cornered the man and created the need to use lethal force. *Id.* at 812, 823–24. After receiving a 911 call from the man's ex-wife, officers talked to the man in the doorway of the garage, and he refused a "pat down." *Id.* at 813. The officers took steps toward the doorway of the garage. *Id.* The man turned and walked to the back of the garage, the officers followed him, and the man eventually grabbed a hammer at the back of the garage. *Id.* The man held the hammer "as if preparing to swing a baseball bat," but then

dropped his left hand, holding it in front of him, "as if to signal to the officers to stop or to create distance between himself and them." *Id.* The officers repeatedly shouted at the man to drop the hammer, and the man repeatedly responded, "No." *Id.* There was about eight to ten feet between the officers and the man. *Id.* The officers continued to order the man to drop the hammer, and the man responded that he had "done nothing wrong" and was in his house. *Id.* at 814. In response to the man's movement with the hammer, two officers fired multiple shots that resulted in his death. *Id.*

The court evaluated "whether the officers approached the situation in a manner they knew or should have known would result in escalation of the danger." *Id.* at 815–16. The court focused in on the fact the officers knew the man was impaired and yet advanced upon and cornered him "escalating the tension and fear," leading him to grab a nearby hammer to defend himself. *Id.* at 815–16, 823. This, the court stated, was "in direct response to the officers' conduct." *Id.* at 824. In short, a jury "could find that the officers recklessly created a lethal situation by driving [the man] into the garage and cornering him with his tools in reach," and when the man grabbed the hammer, "the officers drew firearms and began shouting." *Id.* at 824.

This case is very different. First, the Officers calmly approached Jovany, in response to a call for a weapons disturbance and asked him to come talk to them. They knew he had already been seen with a weapon. They approached Jovany with their flashlights on, not with guns drawn. The Officers did not enter past the gate or under the carport area, but instead they remained on the sidewalk, not blocking Jovany in or advancing toward him, other than to come up to talk to him. It was only after Jovany turned, and flicked open the knife, that the Officers drew their weapons. Furthermore, the Officers gave clear and consistent commands to drop the

knife.  Unlike the man in *Bond*, Jovany did not acknowledge or respond to any commands from the Officers.  In fact, Jovany never said anything to the Officers but deliberately advanced toward them with the knife clenched in his hand.

The Officers did not rush Jovany, "block him in," or otherwise threaten him, drawing their weapons only *after* Jovany turned, flicked open his knife, and advanced toward the officers, while ignoring commands to drop the knife.  In fact, the Officers retreated and gave space to Jovany as they gave him commands to drop the knife.  The Officers attempted to de-escalate the situation by giving Jovany commands to drop the knife and stop advancing, commands Jovany ignored.  It was not until Jovany reached the gate leading to the street, and within only a few steps from the Officers, that they then fired their weapons.

The Tenth Circuit also recently addressed a similar but distinguishable set of facts, in *Ceballos v. Husk*, 919 F.3d 1204 (10th Cir. 2019), when it affirmed the denial of an officer's motion for summary judgment on an excessive force claim.  *Id.* at 1209.  In *Ceballos*, a wife called the police to report her husband was in their driveway "with a baseball bat 'acting crazy,' and that he was drunk and probably on drugs."  *Id.* at 1209.  She reported she was afraid and left the home with her young daughter.  *Id.*  There were further reports that the husband had "been a walkaway from [a nearby medical center] the previous night."  *Id.*  (alteration in original) (internal quotation marks omitted).

Two officers arrived on scene, parked several houses down the street, and spoke to the wife after identifying her as the 911 caller.  *Id.* at 1209-1210.  While the officers began walking toward the residence, two men who had been with the husband told the officers that the husband was "not acting right and might be on drugs."  *Id.* at 1210.  Two additional officers arrived at the

23

scene.  *Id.*  One officer testified that he recognized the husband from a medical center walkaway incident the night before and that "something in his face 'didn't seem right.'"  *Id.*  As the officers approached, they saw the husband "pacing in the driveway, swinging a baseball bat, yelling and throwing his arms in the air."  *Id.*  There was nobody else in the driveway with the husband, and officers knew his wife and daughter were down the street and not in the home.  *Id.*

Two officers repeatedly shouted commands for the husband to drop the bat.  *Id.*  The husband did, entered his garage, emerged again with the bat still in his hand, and began walking toward the officers.  *Id.*  The officers shouted commands at the husband, but he did not comply.  *Id.*  Neither officer retreated when the man approached them.  *Id.* at 1211.  Both officers fired, one with his taser and the other with his gun.  *Id.*  All of these actions took place within one minute of the officers arriving at the scene.  *Id.* at 1209.  The Tenth Circuit determined the circumstances closely matched those in *Allen v. Muskogee*, 119 F.3d 837 (10th Cir. 1997), namely that the officer approached the husband quickly, screamed at him to drop the bat, and refused to give ground/retreat as the man approached the officers.  *Id.* at 1215–16.

While there are similarities between *Ceballos* and this case, there are many more critical differences.  First, no one knew who Jovany was.  The 911 caller did not identify him to dispatch, nor did anyone identify him at the scene to the Officers.  There was no reason to believe he was authorized to be in the neighborhood, let alone in the carport just outside the house.  Second, contrary to what Plaintiffs pleaded, the Officers were not informed that Jovany had any mental health issues.  Third, there were no bystanders in the *Ceballos* case, as there were here.  The wife and daughter in *Ceballos* were parked safely down the street, and the husband's two friends had left the area.  *Ceballos*, 919 F.3d at 1209–10.  Here, there were multiple

24

partygoers in the immediate vicinity, and indications (which turned out to be true) that people were inside of the house where Jovany was lurking in the carport. Fourth, the officers in *Ceballos* were not responding to a possible crime but on a welfare check based on the wife's report that the husband was making her nervous. *Id.* at 1209. There was no crime for them to investigate. *Id.* Here, however, Jovany was reported to be involved in an ongoing weapons disturbance, and may have been in the process of a possible home invasion. The Officers started out just trying to investigate that, but he immediately escalated it by pulling out his knife and advancing on them.

Fifth, the husband in *Ceballos* remained in what the officers knew was his own driveway or garage throughout the altercation. *Ceballos*, 919 F.3d at 120–11. Here, as stated above, there was no indication Jovany was authorized to be where he was. Even if there were, the Officers did not shoot him until he crossed the threshold of the driveway fence to the sidewalk, where he could have more easily lunged at the Officers with the knife, taken a hostage from the numerous bystanders, or even fled with the knife. Jovany was actively advancing toward the Officers and toward the open gate leading to the street, thereby increasing the danger to the partygoers and neighbors known to be nearby. At least two of the officers saw or spoke to the partygoers immediately prior to being directed to Jovany's location, making the threat to the partygoers more than a "mere possibility." *See Cordova v. Aragon*, 569 F.3d 1183, 1190 (10th Cir. 2009) (finding that the facts did not show that any other motorists were in the area and "risk of future harm was not enough" to justify the officer shooting at the motorist). The threat here was not hypothetical or a mere possibility. It was very real and very present, and with each step Jovany

took forward, the threat to not only the Officers but the public increased, given the proximity of nearby neighbors.

Sixth, there is no indication that the officers in *Ceballos* tried to retreat when the suspect advanced on them. *Ceballos*, 919 F.3d at 1211. Here, the Officers began retreating as Jovany started walking toward them with the knife and continued doing so as they repeatedly yelled for him to drop it. It was only when Jovany continued advancing on the Officers and citizens behind them, closing the space between them, getting closer than twenty feet from them, and when the Officers could not feasibly retreat any further, that they shot.

Seventh, Jovany was armed with a knife. As noted by the Court in *Bond*, 981 F.3d 808, (10th Cir. 2020), a knife has greater lethal potential than a baseball bat.

For similar reasons, the facts of this case are distinguishable from *Allen v. Muskogee, Okl.*, 119 F.3d 837 (10th Cir. 1997), which was discussed in *Ceballos*. There, a family member reported a man was armed and threatening suicide outside her house. *Id.* at 839. Officers arrived to find the man in driver's seat of a vehicle with a gun in his right hand. *Id.* Within ninety seconds, multiple officers arrived, told the man to drop his gun, reached into the vehicle to attempt to seize the gun, which led to an exchange of gunshots by officers and the man, resulting in the man's death. *Id.* The Tenth Circuit determined it was disputed how the officers approached the suspect, including reports he ran up screaming and immediately shouting at the man, and this was evidence that the officers' actions "precipitated the need to use deadly force." *Id.* at 841. For the reasons discussed above, this case is distinguishable as there is no evidence the Officers' created any dangerous situation as the videos show that the Officers calmly approached Jovany.

The *Valverde* court summarized the main distinctions: in *Ceballos* and *Allen*, "the officers were dealing with an impaired, emotionally distraught person" and that in those circumstances "officers may be asking for trouble by heightening tensions and fear." *Valverde*, 967 F.3d at 1068. And the analysis is different when the officer is "seeking to apprehend someone believed to be involved in high-violence crimes." *Id.* at 1068. Similar to *Valverde*, in the present case, the Officers did not have information that Jovany may have been emotionally or mentally distraught or impaired. Instead, they were responding to a weapon disturbance and possible trespass by a man carrying a knife.

Based on the foregoing, the Officers did not create a dangerous situation, and the use of force was reasonable as it was only in response to Jovany's hostile actions of brandishing a weapon, advancing toward the Officers, and ignoring their commands. Accordingly, the Mercados cannot show any constitutional violation of Jovany's rights.

C.     *The Officers' Use of Lethal Force Cannot Give Rise to a Substantive Due Process Claim (Fourth Cause of Action).*

The Supreme Court has made clear that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (cleaned up). Because the Mercados claim that the use of lethal force against Jovany was unconstitutional falls squarely within the Fourth Amendment, they cannot maintain a substantive due process claim based on that same use of force.

"[A]ll claims that law enforcement officers have used excessive force in the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth

Amendment and its reasonableness standard, rather than under a substantive due process approach." *Graham*, 490 U.S. at 395 (cleaned up). "[T]he Fourth Amendment protects a person's liberty interests under the constitution by ensuring that any arrest or physical incarceration attendant to a criminal prosecution is reasonable [and] the more general procedural and substantive due process considerations of the Fourteenth Amendment are not a fallback to protect interests more specifically addressed by the Fourth Amendment in this context." *Turner v. Houseman*, 268 F. App'x 785, 789 (10th Cir. 2008) (unpublished) (cleaned up).

Because the Mercados are unable to establish a violation of Jovany's constitutional rights, the Officers are entitled qualified immunity under the first prong of that analysis and Ogden City is entitled to judgment in its favor, *see Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1317–18 (10th Cir. 2002) ("We will not hold a municipality liable for constitutional violations when there was no underlying constitutional violation by any of its officers." (cleaned up)).

IV.  **EVEN ASSUMING THE MERCADOS HAVE SUFFICIENTLY PLEADED A CONSTITUTIONAL VIOLATION, THE OGDEN DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW.**

    A.  *The Officers Are Entitled to Qualified Immunity Under the Second Prong of the Analysis Because They Did Not Violate Clearly Established Law.*

The officers are entitled to qualified immunity because there was no clearly established law at the time that would have alerted them their actions were "plainly incompetent or . . . knowingly violate[d] the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Taking the Mercados' second alleged violation of Jovany's constitutional rights first, in light of *Albright*, *Graham*, and *Turner*, it cannot be said that it was clearly established that Officers' use of lethal force would implicate Jovany's substantive due process rights. Each of those cases establishes the contrary—that the use of force must be evaluated under the *Fourth Amendment*.

28

Turning to that claim, the Supreme Court has cautioned courts against relying on broad, general principles when determining whether a right is clearly established, specifically admonishing courts for turning to the "general" test that "deadly force is only permissible where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others" into a strict rule. *Mullenix*, 136 S. Ct. at 309 (citing *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). Instead, a court should conduct an inquiry into the *specific* facts of each case to determine whether the conduct was reasonable and, if not, "whether it was clearly established that the Fourth Amendment prohibited the officer's conduct in the situation she confronted." *Id.* (quotation marks and brackets omitted).

In this case, the inquiry is whether there is clearly established law from the Supreme Court or the Tenth Circuit that prohibited the Officers' specific conduct: shooting a suspect armed with a knife, who ignored multiple commands to stop and drop the knife, and advanced in a deliberate, threatening manner toward the Officers when civilians were known to be nearby. There is not.

The Mercados appear to rely on *Ceballos* to meet the "clearly established law" prong. (Compl. [Dkt. No. 2] ¶ 111.) As discussed above, however, *Ceballos* is distinguishable from the present case in important respects. First, the Officers did not know who Jovany was or any reason to believe he was authorized to be in the area. The Officers had no knowledge as to Jovanny's mental or emotional state. There were multiple partygoers in the immediate vicinity and neighbors nearby, unlike the man in *Ceballos* who remained in his driveway or garage. Jovany was actively advancing toward the Officers and the open gate, putting those nearby at greater risk. Here, the Officers retreated, giving Jovany ground, unlike the officers in *Ceballos*

29

who gave no ground as the man approached them.  *Ceballos* 919 F.3d at 1209–11.  And lastly, Jovany was armed with a weapon with more lethal potential than a baseball bat.

The Supreme Court has recently held that it was not clearly established that the use of deadly force in response to a woman holding a knife next to her roommate was unreasonable.  In *Kisela v. Hughes*, 138 S.Ct. 1148 (2018), the Supreme Court ruled an officer was entitled to qualified immunity after shooting a woman with a knife.  *Id.* at 1155.  Police responded to a 911 call of a woman hacking a tree with a knife.  *Id.* at 1151.  One of the officers saw a woman standing next to a car in the driveway of a nearby house, separated from the street by a chain-link fence with a locked gate.  *Id.*  The officers then saw another woman, matching the description provided by the 911 caller, exit the house carrying "a large knife at her side."  *Id.*  The second woman walked toward the first woman and stopped approximately six feet from her.  *Id.*  The officers drew their guns, and at least twice, told the woman to drop the knife.  *Id.*  The woman with the knife appeared calm but "did not acknowledge the officers' presence or drop the knife." *Id.*  One officer shot the woman with the knife four times through the fence.  *Id.*  Less than a minute elapsed from the time the officers saw the first woman to when the officer fired the shots. *Id.*

The Supreme Court determined the officer was entitled to qualified immunity and affirmed the district court's grant of summary judgment.  *Id.* at 1152.  When discussing whether the woman's rights were "clearly established," the Supreme Court reemphasized that "specificity is especially important."  *Id.* (brackets omitted).  The Court then distinguished the Ninth Circuit's precedent and determined the differences were enough that the right was not clearly established.  *Id.* at 1154.  The Supreme Court noted that the officer shot the woman because he

believed she was a threat to the other woman.  *Id.* at 1153.  The officer only had "mere seconds" to assess the potential danger.  *Id.*  The officer was "confronted with a woman who had just been seen hacking a tree with a large kitchen knife and whose behavior was erratic enough to cause a concerned bystander to call 911 and then flag down" the officers.  *Id.*  The woman was within "a few feet" of the other woman and she "failed to acknowledge at least two commands to drop the knife."  *Id.*  The Court noted the "commands were loud enough that the women heard them."  *Id.*

Similarly, Jovany's concerning behavior of trespassing while holding a knife was enough for a neighbor to call 911.  The Officers knew there were bystanders and partygoers nearby, and Jovany posed a threat to those individuals, as well as the Officers.  Jovany also failed to acknowledge multiple clear commands to drop the knife.  Instead, he advanced toward the Officers, clenching the knife, and looking agitated.

In light of the differences in *Ceballos*, the analysis in *Kisela*, and the other cases discussed above, it was not clearly established at the time of the incident that the Officers' use of deadly force against Jovany was unconstitutional under the circumstances with which they were presented.  This entitles the Officers to qualified immunity under the second prong of that analysis.

### B.  *There is No Pleaded Basis for* Monell *Liability Against Ogden City.*

The United States Supreme Court has long held that municipalities may not be held liable for the allegedly unconstitutional actions of their employees based on the theory of respondeat superior.  *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978).  They can be held liable in a § 1983 suit only where their policies are the moving force behind the alleged constitutional violation.  *Id.* at 694.  Therefore, to establish liability against Ogden City, the Mercados must

plead and prove (1) the existence of an unconstitutional Ogden City policy or custom; and (2) a direct causal link between the unconstitutional policy or custom and the alleged injuries. *See Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010).

"To survive a motion to dismiss, [a municipal liability] claim must allege sufficient facts to show that a specific policy or custom was the moving force behind the alleged violation." *Dalcour v. City of Lakewood*, 492 F. App'x 924, 930 (10th Cir. 2012) (unpublished) (evaluating an official capacity claim, which requires the same showing). "The plaintiff cannot simply allege there is a policy [or custom] in place, but, rather, must plead facts that, if true, would give rise to a plausible inference that such a policy [or custom] exists." *Griego v. City of Albuquerque*, 100 F. Supp. 3d 1192, 1213 (D.N.M. 2015).

The Mercados have asserted an excessive force claim under § 1983 (second cause of action) against Ogden City, through the OPD.[6] However, they have failed to plead facts, as opposed to conclusions, supporting that claim.

The Mercados have made general allegations about policies and procedures including:

- The Officers "violated the customary rules of police procedure, violated the rules on the use of deadly force promulgated by the Ogden Police Department, and violated the training officers receive at POST (Police Officers Standards and Training)." (Compl. [Dkt. No. 2] ¶ 72.)

- That "OPD training materials and actual training warned or should have warned [the Officers] that deadly force may only be used where there is an immediate threat of serious bodily injury or death to the officer or others." (*Id.* ¶ 118.)

---

[6] For the reasons discussed above, any separate claim against OPD must be dismissed.

- "The actions of [the Officers] toward Jovany Mercado were pursuant to, and consistent with, an established policy, and/or custom of Defendant Ogden City, through the OPD, for which Ogden City is responsible."  (*Id.* ¶ 133.)

- The Officers' actions "were pursuant to an OPD policy, practice, or custom that consists of arming police officers with deadly weapons and condoning their use without requiring the consideration of less lethal alternatives, and without providing proper training and/or supervision regarding their safe, reasonable, and appropriate use."  (*Id.* ¶ 134.)

However, the Mercados have failed to allege any *facts* showing "continuing, persistent and widespread" unconstitutional acts by Ogden City employees, as required to establish a "practice" or "custom."  *See Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008).  Importantly, the Mercados do not identify prior instances of alleged unconstitutional conduct, let alone any indication that any such "prior grievances were the same or substantially similar to the plaintiffs' constitutional injury."  *Watson v. City of Kansas City*, No. CIV.A.99-2106-CM, 2002 WL 922155, at *5 (D. Kan. Apr. 12, 2002), *aff'd sub nom. Watson v. Unified Gov't of Wyandotte City*, 70 F. App'x 493 (10th Cir. 2003); *see also Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008) ("In attempting to prove the existence of . . . 'continuing, persistent and widespread' custom, plaintiffs most commonly offer evidence suggesting that *similarly situated individuals* were mistreated by the municipality *in a similar way*.").

The complaint likewise does not contain sufficient allegations to support municipal liability based on a failure to train. "To state a claim for failure to train officers . . . a plaintiff

must show 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [county or city] can reasonably said to have been deliberately indifferent to the need.'" *Yocum*, 2017 WL 448586 at *6 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). "[T]he Tenth Circuit also requires the plaintiff to show more than negligent failure to act, but that defendants were 'on notice of the need for more or different training." *Id.* (quoting *J.V. ex rel. C.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1298 (10th Cir. 2016)).

This District (Judge Waddoups) has held that similar allegations were insufficient to state a supervisory liability claim under § 1983, based on policy, practice, or custom, explaining,

> Plaintiffs' complaint is merely conclusory: defendants allegedly had a "practice, custom and policy that led and allowed . . . officers to deprive Plaintiffs of their constitutional rights;" they "developed and maintained policies and customs using deliberate indifference to the constitutional rights of persons;" and "it was the policy and/or custom" of the defendants "to inadequately supervise and train its police officers." . . . As a result, plaintiffs' allegations about practices, customs, and policies are conclusory, not plausible, and therefore must be dismissed, even if they had successfully pled a constitutional violation by the supervisors' subordinates.

*Yocum v. Utah*, No. 1:16-CV-00098, 2017 WL 448586, at *6 (D. Utah Feb. 2, 2017) (unpublished). And, this district further held that allegations similar to the Mercados' were insufficient to state a claim for failure to train,

> Plaintiffs' failure to train allegations are conclusory restatements of the elements devoid of factual allegations. For example, they allege, in count one, that Summit County and Syracuse City "failed to properly train officers . . . in the proper basis for detaining residents and children during the execution of a search warrant," and in count two, that plaintiffs failed to properly train officers "in the proper execution of search warrant consistent with Constitutional safeguards and principles" and "in the proper conduct of interviews and requests for consent." In count three, plaintiffs claim that defendants "knowingly, recklessly, and with deliberate indifference and callous disregard . . . failed to instruct, supervise, control and/or discipline on a continuing basis" concerning duties to refrain from

a list of behaviors that appear to relate solely to Mr. Yocum rather than to the named plaintiffs. Count three also alleges that defendants did not "provide appropriate in-service or retraining" of officers. These are alleged to be part of an "institutional culture" that "supports and encourages" constitutional violations.

*Id.* The Court concluded, "Even if plaintiffs had successfully alleged a constitutional violation by the supervisors' subordinates, because plaintiffs' failure to train and/or supervise allegations are conclusory and thus not plausible, the court finds them insufficient and dismisses them." *Id.*; *see also Long v. Boucher*, No. 1:19-CV-56, 2020 WL 6899496, *9 (D. Utah Nov. 24, 2020) (unpublished) (determining similarly pleaded claims of municipal liability also did not meet the required pleading standard). The Mercados' generalized allegations regarding Ogden City Police Department's policy, practice, or custom, and failure to train theory are as conclusory as those in *Yocum* and fail for the same reason.

Because the Mercados have failed to plead any facts supporting that Ogden City had an unconstitutional formal policy, informal policy or custom, or was deliberately indifferent to the need for more training, they cannot maintain their § 1983 claims against Ogden City.

## V. PLAINTIFFS' UTAH CONSTITUTIONAL CLAIMS FAIL BECAUSE THE ALLEGATIONS DO NOT ESTABLISH A FLAGRANT VIOLATION OF JOVANY'S STATE CONSTITUTIONAL RIGHTS.

The Mercados have alleged violations of art. I, sections 1, 6, 7, 14, and 25 of the Utah Constitution by the Ogden Defendants. (*See* Compl. [Dkt. No. 2] ¶¶ 177-88.) "The Utah Constitution does not expressly provide damage remedies for constitutional violations." *Jensen ex rel. Jensen v. Cunningham*, 2011 UT 17, ¶ 57, 250 P.3d 465. "And the Utah Code does not include a statute akin to 42 U.S.C. § 1983." *Id.* "As a result, a plaintiff's remedy for state constitutional violation rests in the common law." *Id.* In *Spackman ex rel. Spackman v. Board of Education*, 2000 UT 87, 16 P.3d 533, the Utah Supreme Court "recognized that the common

law gives Utah courts the authority to accord an appropriate remedy to one injured from the violation of a constitutional right." *Jensen*, 2011 UT 17, ¶ 57 (internal quotation marks omitted).

"In order to recover damages for the violation of a constitutional provision under *Spackman,* a plaintiff must clear two hurdles." *Id.* ¶ 58. "First, the plaintiff must prove that the constitutional provision violated is 'selfexecuting.'" *Id.* "Next, a plaintiff must establish the following three elements:  (1) the plaintiff suffered a 'flagrant' violation of his or her constitutional rights; (2) existing remedies do not redress his or her injuries; and (3) equitable relief, such as an injunction, was and is wholly inadequate to protect the plaintiff's rights or redress his or her injuries." *Id.* (internal quotation marks omitted).

Article I, sections 1, 7, and 14 are self-executing, *see P.J. ex rel Jensen v. Utah*, No. 2:05CV00739 PGC, 2006 WL 1702585, *14 (D. Utah 2006) (unpublished); *Jensen*, 2011 UT 17, ¶ 61, and the Ogden Defendants have assumed article I, section 6 is self-executing.[7]  However, this District has determined that article I, section 25 is not self-executing.  *See P.J. ex rel Jensen v. Utah*, No. 2:05CV00739 PGC, 2006 WL 1702585, *14 (D. Utah 2006) (unpublished); *see also Coleman v. Utah State Charter Sch. Bd.*, No. 2:10-CV-1186-TC, 2011 WL 4527421 *14 (D. Utah 2011) (unpublished).  Because section 25 is not self-executing, the Mercados cannot recover for an alleged constitutional violation under this section.

As to article I, sections 1, 6, 7, and 14, the Mercados have not established a "flagrant violation."  "The test measuring the flagrance of a state constitutional violation is the same test which determines qualified immunity under § 1983." *Cardall v. Thompson*, 845 F. Supp. 2d

---

[7] It does not appear that any court has addressed this issue.  However, even assuming section 6 is self-executing, as discussed below, the Mercados have not established the second requirement of showing a flagrant violation.

1182, 1197 (D. Utah 2012).  That is, the "flagrant violation" element "is not satisfied unless the conduct violates clearly established constitutional rights of which a reasonable person would have known."  *Id.* (internal quotation marks omitted); *see also Jensen*, 2011 UT 17, ¶ 66 ("This element is not satisfied unless the conduct violates clearly established constitutional rights of which a reasonable person should have known." (internal quotation marks omitted)).  "A right is not clearly established unless its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Cardall*, 845 F. Supp. 2d at 1197.  (internal quotation marks omitted); *see also Dexter v. Bosko*, 2008 UT 29, ¶ 23, 184 P.3d 592 ("To be considered clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that [constitutional] right." (alteration in original) (quoting *Spackman*, 2000 UT 87, 16 P.3d 533)).

For the reasons discussed above under the § 1983 analysis, the Mercados have not shown a flagrant violation of any state constitutional right under sections 1, 7, and 14.  Furthermore, as to section 6, the right to bear arms, this right is not absolute.  While there is a right to keep and bear arms, the legislature can define the lawful use of arms, including complying with commands to drop a dangerous weapon when asked by police.  *See Univ. of Utah v. Shurtleff*, 2006 UT 51, ¶ 20, 144 P.3d 1109; *see also Hansen v. America Online, Inc.*, 2004 UT 62, ¶ 20, 96 P.3d 950 (determining that "the legislature has purposefully declined to give the right to keep and bear arms absolute preeminence over the right to regulate one's own private property"); *see also State v. Willis*, 2004 UT 93, ¶¶ 11, 17 100 P.3d 1218 (rejecting the defendant's "hard and fast distinction between use and possession" and interpreting section 6 as a "grant of authority to the legislature to regulate the lawful 'use' of arms" including the ability "to restrict convicted felons

from possessing firearms"). In short, the right to bear arms, or carry a knife, can be limited, and the Mercados have not shown that the Officers' actions violated Jovany's right to carry a knife when he flicked it open and did not comply with commands to drop the weapon. Absent a flagrant violation, the Mercados cannot maintain their claim under the Utah Constitution against any of the Ogden Defendants.

Additionally, the Utah Supreme Court has held that where a plaintiff has asserted a claim under the Utah constitution against a municipality, like Ogden City, such that it is "seeking to prove that a municipality committed a flagrant violation," the plaintiff "must show an action pursuant to official municipal policy of some nature caused a constitutional tort." *Kuchcinski v. Box Elder Cnty.*, 2019 UT 21, ¶ 32, 450 P.3d 1056. The existence of such a violation requires a showing very similar to that required for a municipal liability claim under § 1983. *Kuchcinski, 2019 UT 21, ¶ 32* (explaining that the requirement is "borrow[ed] from Section 1983 jurisprudence"). "[I]n order for an action pursuant to an official municipal policy to constitute a flagrant violation, the plaintiff must show (1) the existence of a municipal policy or custom, (2) that this policy or custom evidences a 'deliberate indifference to the plaintiff's constitutional rights, and (3) that this policy or custom was closely related to the ultimate injury." *Id.* For the reasons discussed above, the Mercados have not shown any action pursuant to official policy.

The Ogden Defendants are unaware of any authority interpreting these provisions more broadly than the Fourth, Fifth, and Fourteenth Amendments in the context at issue in this case. *See State v. Jackson*, 937 P.2d 545, 549 (Utah App. 1997) (declining to interpret art. I, § 14 of the Utah Constitution more broadly than the analogous Fourth Amendment because the Utah Supreme Court does so only when necessary to "shield[] Utah citizens 'from the vagaries of

inconsistent interpretations given to the fourth amendment by the federal courts.'").  As a result,

for much the same reasons discussed above in connection with the § 1983 claims, the Mercados

have also failed to state a flagrant violation of Jovany's rights under the Utah Constitution

against Ogden City.

## VI. OGDEN CITY IS NOT SUBJECT TO PUNITIVE DAMAGES.

"Both 42 U.S.C. § 1983 and Utah law bar punitive damage awards against municipal

agencies." *Youren v. Tintic Sch. Dist.*, 343 F.3d 1296, 1307 (10th Cir. 2003) (citing what is now

Utah Code § 63G-7-603).  Accordingly, Ogden City is entitled to judgment on the Mercado's

claim for punitive damages.

## VII. PLAINTIFFS' CLAIMS ARE INSUFFIENT TO STATE A CLAIM FOR INJUNCTIVE RELIEF.

In addition to seeking damages, the Mercados have sought various forms of injunctive

relief, including an order requiring Defendants to "issue a public apology"; "to establish new

policies to prioritize the safety of citizens in welfare, mental health, and other such police and

citizen misconduct investigations"; "requiring OPD to be equipped with and utilize body

cameras and vehicle dash cameras while on patrol"; "requiring OPD Officers to carry non-lethal

weapons while on patrol, and to prioritize use of non-lethal weapons"; "to provide and require

annual training regarding the use of non-lethal as well as lethal force"; "to provide and require

annual training how to deal with a mentally ill or emotionally disturbed person"; and "to

implement regular training, supervision, and policies required to meet federal and state

constitutional requirements."  (*E.g.,* Compl. [Dkt. No. 2] at 33, ¶ 174 & 36-37, ¶ 8.)

"[W]hile a plaintiff who has been constitutionally injured can bring a § 1983 action to

recover damages, that same plaintiff cannot maintain a declaratory or injunctive action unless he

or she can demonstrate a good chance of being likewise injured in the future." *Facio v. Jones*, 929 F.2d 541, 544 (10th Cir. 1991); *see also Hamer c. City of Trinidad*, 924 F.3d 1093, 1109 (10th Cir. 2019). "Thus, standing to obtain injunctive and declaratory relief must be analyzed separately from standing to obtain retrospective relief." *Id.* (brackets and citation omitted).

Given that Jovany is deceased, the Mercados cannot establish the requisite "real and imminent threat" of a future violation of his constitutional rights. This precludes any injunctive relief, and Ogden Defendants are entitled to judgment on these claims. *See, e.g.*, *Pope v. Ward*, No. 95-7129, 1996 WL 460023, at *2 (10th Cir. Aug. 14, 1996) (unpublished) ("[P]laintiffs lack standing to bring a conditions of confinement claim for injunctive relief on behalf of Pope and the other inmates. Pope's claims for injunctive and declaratory relief were mooted by his death. Plaintiffs thus lack standing to seek injunctive relief based on Pope's conditions of confinement." (citations omitted)); *Davis v. Cty. of Amherst*, No. 6:07CV00017, 2008 WL 591253, at *3 (W.D. Va. Mar. 3, 2008) (unpublished) ("The difficulty faced by Plaintiff is that because Taylor is deceased, there is no possibility that he will have another encounter with the Sheriff's Department. Plaintiff's harm will not be redressed by injunctive or declaratory relief, and Plaintiff therefore lacks standing."); *Dowdell v. Chapman*, 930 F. Supp. 533, 553 (M.D. Ala. 1996) ("Because the plaintiff's claims are based on the death of Mr. Dowdell, the court finds that the plaintiff has no standing to obtain declaratory or injunctive relief because Mr. Dowdell faces no threat of future harm from any defendant.")

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' claims as a matter of law.

## REQUEST FOR ORAL ARGUMENT

The Ogden Defendants respectfully request oral argument to answer questions from the Court about the complex legal and factual issues involved in this case.

DATED this 12th day of January, 2021.

SNOW CHRISTENSEN & MARTINEAU

*/s/ Heather S. White*
Heather S. White
Dani N. Cepernich
*Attorneys for Ogden Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 12th day of January, 2021, I electronically filed the foregoing

**OGDEN DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS** with the

Clerk of the Court using the CM/ECF System:


Robert B. Sykes
C. Peter Sorensen
Christina D. Isom
Sykes McAllister Law Offices,
PLLC
311 S. State Street, Ste. 240
Salt Lake City, UT 84111
bob@sykesmcallisterlaw.com
pete@sykesmcallisterlaw.com
christina@sykesmcallisterlaw.com

Mario Arras
Mario Arras Law Firm, PLLC
4001 S. 700 E., Ste. 500
Salt Lake City, UT 84107
attorneymarioarras@gmail.com
*Attorneys for Plaintiff*

Noah M. Hoagland
Jesse C. Trentadue
Sarah Jenkins Dewey
Suitter Axland, PLLC
8 East Broadway, Suite 200
Salt Lake City, UT  84111
nhoagland@sautah.com
jesse32@sautah.com
sjenkins@sautah.com

Brody E. Flint
Roy City Attorney's Office
5051 S 1900 W
Roy, UT 84067
bflint@royutah.org
*Attorneys for Defendant Detective Trent
Fusselman*


*/s/ Annette Gamero*