HEATHER S. WHITE (7674)
DANI N. CEPERNICH (14051)
SNOW CHRISTENSEN & MARTINEAU
10 Exchange Place, Eleventh Floor
Post Office Box 45000
Salt Lake City, Utah 84145
Telephone: (801) 521-9000
hsw@scmlaw.com
dnc@scmlaw.com

*Attorneys for Defendants Ogden City, Brandon Sevenski,
Nigil Bailey, Karson Garcia, and John Poulsen*

## UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| JUAN MERCADO, ROSA MERCADO and ESTATE OF JOVANY MERCADO,<br><br>    Plaintiffs,<br><br>  vs.<br><br>OGDEN CITY, BRANDON SEVENSKI, NIGIL BAILEY, KARSON GARCIA, JOHN POULSEN, AND DET. TRENT FUSSELMAN;<br><br>    Defendants. | **REPLY MEMORANDUM IN SUPPORT OF OGDEN DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br><br>Case No. 1:20CV90 RJS<br><br><br>Judge Robert J. Shelby |

# TABLE OF CONTENTS

PROPER STANDARD OF REVIEW ........................................................................................... 3

OBJECTIONS ........................................................................................................................... 4

ARGUMENT ............................................................................................................................. 8

    I.      STANDING AND CLAIMS AGAINST OGDEN POLICE DEPARTMENT....... 8

    II.    THE OGDEN DEFENDANTS' USE OF FORCE WAS REASONABLE UNDER THE GRAHAM FACTORS AND THE TOTALITY OF THE CIRCUMSTANCES. ............................................................................. 8

        A.    Jovany Was an Immediate Threat to the Officers' and Neighbors' Safety. ................................................................... 9

        B.    Severity of Crime ..................................................................... 13

        C.    Resisting Arrest ........................................................................ 13

    III.   THE OFFICERS ARE ENTITLED TO QUALIFIED IMMUNITY. ................. 14

    IV.   THE MERCADOS HAVE NOT ADEQUATELY PLEADED MUNICIPAL LIABILITY ............................................................................ 19

    V.    THE MERCADOS HAVE NOT IDENTIFIED ANY FLAGRANT VIOLATIONS OF JOVANY'S STATE CONSTITUTIONAL RIGHTS. .......... 20

    VI.   REMAINING CLAIMS ........................................................................ 21

CONCLUSION ....................................................................................................................... 22

ORAL ARGUMENT .............................................................................................................. 22

Defendants Ogden City, Brandon Sevenski, Nigil Bailey, Karson Garcia, and John Poulsen (collectively, the Ogden Defendants or the Officers) respectfully submit the following reply in support of their motion for judgment on the pleadings.

## PROPER STANDARD OF REVIEW

The Mercados confuse the standard of review and how the Court is to view the facts on a motion for judgment on the pleadings. The Ogden Defendants attached five recordings to their motion, all of which are specifically referenced in Plaintiffs' complaint. As required, Ogden City Defendants treat the allegations in the complaint as true and describe the events in the recordings referenced by Plaintiffs. The Mercados take issue with these descriptions citing four "examples" they claim show the Ogden Defendants rely on information outside of the complaint: 1) Jovany had a scowl on his face; 2) the Officers had no information about Jovany's mental health; 3) Jovany was less than twenty feet from the Officers when they shot; and 4) the Officers' commands to drop the knife were not confusing or overlapping. (*See* Opp. [Dkt. No. 36] at 14–15.)

While not specifically pleaded in Plaintiffs' complaint, these facts are documented in the recordings specifically referenced and relied upon in the complaint. This Court can review the recordings and make its own determinations as to the descriptions provided by the parties without converting the motion to one for summary judgment. *See Rowell v. Bd. of Cty. Commissioners of Muskogee Cty., Oklahoma*, 978 F.3d 1165, 1171 (10th Cir. 2020) ("[W]e cannot ignore clear, contrary video evidence in the record depicting the events as they occurred."); *see also Estate of Harmon v. Salt Lake City*, 471 F. Supp. 3d 1203, 1210 n.22 (D. Utah 2020) (determining the court could consider officer body-camera videos in a motion to

dismiss § 1983 claims "because they are referred to in the Complaint and central to many of Plaintiffs' claims" (citing *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997)).

Furthermore, the Mercados' third argument in opposition to the motion claims that the Ogden Defendants' statement of facts is unreliable. (Opp. [Dkt. No. 36] at 14.) The Mercados also filed an objection to the same. (*See* Obj. [Dkt. No. 37].) Interestingly, the Mercados have made many objections to the Ogden Defendants' reliance on the recordings, but the Mercados rely on these same recordings in both their complaint and opposition. (*See* Opp. [Dkt. No. 36] at 23 ("As *the video of the incident clearly shows*….") (emphasis added).) And they further rely on the videos as support that the Officers exercised unreasonable use of force. (*Id.* at 24 ("The videos show conclusively…."); *id.* ("Defendants ignore the video….").) The Mercados cannot pick and choose when it is appropriate to rely on the recordings.

For the reasons set forth in the Ogden Defendants' response to the Mercados' separate objection, the facts presented in the motion are not unreliable, the Court can and should properly consider the facts as portrayed in the recordings, and the motion need not be converted into a motion for summary judgment.

## **OBJECTIONS**

**Objection 1:** The Ogden Defendants object to the following "Background" paragraphs in the Mercados' opposition as stating conclusions, not facts: 25 (slowly and at a steady pace), 28 (overlapping and confusing), 31–32 (threatening), 34 (normal pace), 35 (slow advance, immediate threat), 37 (aggressive), 41–42 (need to use deadly force, deadly force violated training and procedure), 48–49 (standard of care and state of mind, unreasonable), 52 (deficient

training), 54 (standard of care and state of mind), 55 (punishment, execution), 56 (execution, harassing), 63 (execution).  (*See,* Opp. [Dkt. No. 36].)  Many of these conclusions relate to the actions depicted in the recordings.  When the allegations made in the complaint are contradicted by attached exhibits, as is the case here, the Court need not accept those allegations and conclusory assertions as true.  *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1196 (10th Cir. 2013); *see also Papasan v. Allain*, 478 U.S. 265, 286 (1986) ("Although for the purposes of this motion to dismiss we must take all the factual allegations in the complaint as true, *we are not bound to accept as true a legal conclusion couched as a factual allegation*."); *see McFarlane v. Nexeo Staffing, LLC*, No. 2:10CV222 DAK, 2011 WL 1226105, at *1 (D. Utah Mar. 30, 2011) ("However, legal conclusions, deductions, and opinions couched as facts are not presumed to be true, and the court must disregard conclusory allegations without supporting factual averments.").

**Objection 2:** The Ogden Defendants object to many of the Mercados' statements because they are not relevant to the motion before the Court.  *See* Fed. R. Evid. 401, 402.  The statements in paragraphs 43 to 46[1], 48, 56–68 are irrelevant to the claims against the Ogden Defendants and to the issue of whether the Officers used excessive force.  (*See* Opp. [Dkt. No. 36].)  They are assertions as to what happened *after* the shooting and have no bearing on whether the shooting was reasonable.

Additionally, the statement in paragraph 13 that "Jovany was living with his parents" is irrelevant.  Even if true, there is nothing in the recordings that shows the Officers knew Jovany was living with his parents or that he was on his/their property at the time of the incident.  (911

---

[1] The Mercados' opposition has a numbering error.  (*See* Opp. [Dkt. No. 36].)  There are two paragraph 43s on page six.  (*See id.* at 6.)  This refers to the second paragraph 43.

Call [Dkt. No. 27-1] at 0:44–0:46, 0:57–1:15, 2:38–2:44, 3:20–3:25; Pouslen Camera Footage [Dkt. No. 27-3] at 0:08–0:11.)  The Mercados likewise have not alleged the Officers knew of this fact at the time of the shooting.  This information is therefore irrelevant because an officer's use of force is determined based on the information known to the officers at the time of the incident. *See Estate of Valverde ex Padilla v. Dodge*, 967 F.3d 1049, 1060 (10th Cir. 2020) (stating that reasonableness is "judged from the perspective of a reasonable officer *on the scene*, rather than with the 20/20 vision of hindsight." (emphasis added)).

**Objection 3:** The Ogden Defendants object to the following statements by the Mercados as inconsistent with and contradicted by the recordings.  As outlined above, the Court does not have to accept these statements as true and should rely on the depictions in the recordings.

The statement in paragraph 2 that "Jovany was obviously disoriented, intoxicated and/or mentally impaired or mentally ill," is not a fact but a characterization and is inconsistent with the recordings.  (Opp. [Dkt. No. 36] at 15; *See* 911 Call [Dkt. No. 27-1] at 0:34, 2:50, 3:56, 4:06.)

Similarly, the statement in paragraph 5 that, "The 911 caller made it clear that Jovany was likely having an episode of mental illness," is inconsistent with the 911 call recording.  The recordings demonstrate that the Officers had no information Jovany was "probably mentally ill and/or emotionally disturbed based on the 911 call."  (*See id.*)

The characterization in paragraph 11 that the Officers "were essentially responding to a 'welfare check,' not a violation of criminal law" is inconsistent with the 911 recordings, which establish the Officers were responding to a "weapons disturbance."  (911 Dispatch [Dkt. No. 27-2] at 0:23-2:00.)  There is no factual support that they were responding to a "welfare check." (*See id.*)

The characterization in paragraph 26 that the light from the flashlights was blinding, and the statement in paragraph 28 that the Officers' "yelling was overlapping and confusing" are inconsistent with the facts because the Officers repeatedly gave one simple command: to drop the knife. (Carport Video [Dkt. No. 27-5] at 2:04–2:15; Poulsen Camera Footage [Dkt. No. 27-3] at 0:49–1:30; Sevenski Camera Footage [Dkt. No. 27-4] at 0:23–50.)

The statement in paragraph 29 that "[a]t no time did Jovany indicate that he heard or understood what the Officers were yelling at him" is unsupported by the recordings or any other factual assertion. As seen from the recordings, there was no indication that Jovany did not hear or understand the simple and repeated commands to drop the knife. (Sevenski Camera Footage [Dkt. No. 27-4] at 0:20–30.)

The statement in paragraph 37 that Jovany "never raised or moved the pocketknife in an aggressive manner" is inconsistent with the recordings, which show Jovany flicked the knife open *after*, and arguably in response to, the Officers identifying themselves. (Poulsen Camera Footage [Dkt. No. 27-3] at 0:45–52; Sevenski Camera Footage [Dkt. No. 27-4] at 0:23-0:28.)

The statements in paragraph 38 that "Jovany was given virtually no time (just a few seconds) to comply" and that the Officers gave "confusing and overlapping 'drop it' and 'come to them' commands" are inconsistent with the recordings, which show the Officers gave one command—to drop the knife—over the course of twenty seconds, which Jovany ignored as he advanced toward the Officers. (Sevenski Camera Footage [Dkt. No. 27-4] at 0:30–48.)

The statement in paragraph 43[2] that one officer did not remember feeling he could not retreat further does not mean the civilians and other Officers were not in imminent danger of

---

[2] This refers to the first paragraph 43. (Opp. [Dkt. No. 36] ¶ 43.)

serious physical harm is contradicted by the recordings. As shown in the video recordings, the Officers were in different positions on the street with different objects behind them which presented different cross-fire and retreat options. (Sevenski Camera Footage [Dkt. No. 27-4] at 0:31–0:48; Poulsen Camera Footage [Dkt. No. 27-3] at 1:13–1:18; Carport Video [Dkt. No. 27-5] at 2:30–2:40.) Additionally, Officer Garcia pulled up directly in front of the house after the other Officers were in the street with their guns drawn. (Poulsen Camera Footage [Dkt. No. 27-3] 1:03–1:10; Carport Video [Dkt. No. 27-5] at 2:25–2:30.)

## ARGUMENT

### I. STANDING AND CLAIMS AGAINST OGDEN POLICE DEPARTMENT.

Because it was unclear from the complaint, the Ogden Defendants moved to dismiss any claims brought by Juan and Rosa Mercado individually, as well as all claims asserted against the Ogden Police Department. It appears the Mercados have acknowledged they are not suing the Ogden Police Department and that the § 1983 claims against the Ogden Defendants are only brought by the personal representative of Jovany's estate. (*See* Opp. [Dkt. No. 36] at 12–13.) To the extent this is not the case, the Mercados have not provided any authority that they can maintain a claim against the police department or that anyone other than the personal representative can bring claims under § 1983, such that dismissal of any such claims is appropriate.

### II. THE OGDEN DEFENDANTS' USE OF FORCE WAS REASONABLE UNDER THE GRAHAM FACTORS AND THE TOTALITY OF THE CIRCUMSTANCES.

The Mercados agree that the *Graham* factors are central in determining whether the Officers' use of force was reasonable. They have failed to show, however, that the *Graham* factors weigh against the Officers. The Mercados erroneously claim the Ogden Defendants'

motion references the Officers' subjective beliefs regarding how they felt about Jovany. (Opp. [Dkt. No. 36] at 25–26.) Nowhere in their motion do the Ogden Defendants rely on the Officers' subjective "beliefs" as to whether Jovany was aggressive. All supporting evidence in the motion comes directly from the facts alleged in the complaint and the recordings referenced in it that objectively show what happened. It is from those facts that the Ogden Defendants then argue the *Graham* factors weigh in their favor. The Mercados misinterpret the Ogden Defendants' arguments as fact. These arguments do not create a question of fact that needs to be resolved by a jury. The facts alleged and as depicted in the recordings are accepted as true, for purposes of this motion. Based on these undisputed facts, the Court then resolves the question of reasonableness—addressed in the Ogden Defendants' arguments—as a matter of law. *Medina v. Cram*, 252 F.3d 1124, 1131 (10th Cir. 2001) ("Whether the officers acted reasonably, however, is a *legal* determination in the absence of disputed material facts." (emphasis in original)).

A.    *Jovany Was an Immediate Threat to the Officers' and Neighbors' Safety.*

As both parties have identified, the threat Jovany posed to the Officers and others is the most important factor in determining the reasonableness of an officer's use of force. *See Pauly v. White*, 874 F.3d 1197, 1216 (10th Cir. 2017); *see also Reavis Estate of Coale v. Frost*, 967 F.3d 978, 985 (10th Cir. 2020). Appellate courts have found that "[a] reasonable officer need not await the glint of steel before taking self-protective action; by then it is often too late to take safety precautions." *Estate of Larsen v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) (cleaned up).

As discussed above, and in the Ogden Defendants' response to the Mercados' objection, this Court can rely on the recordings regarding the incident and need not accept any conclusions

that are contradictory to those recordings.  The recordings confirm Jovany was a serious threat of harm to those around him.

Relying on *Hastings v. Barnes*, 252 F. App'x 197 (10th Cir. 2007) (unpublished), the Mercados argue Jovany was not a threat because "he was some distance away" and not making any threatening gestures.  In *Hastings*, the Tenth Circuit affirmed denial of qualified immunity on a motion for summary judgment for officers who shot a man in his home while holding a Samurai sword.  *Id.* at 198.  There, four officers were sent to conduct a welfare check on a man who called expressing thoughts of suicide.  *Id.* at 199.  In evaluating whether the officers used excessive force, the Tenth Circuit analyzed whether the officers' actions "unreasonably precipitated" the need to use deadly force.  *Id.* at 203.  It noted that the man was not a criminal suspect and was a potentially mentally ill person contemplating suicide who had called for help, and the officers knew this.  *Id.*

The Mercados claim Jovany, like the man in *Hastings*, was "crowded" and "boxed in" the carport, was issued loud and forceful commands which were confusing, had a decreased mental state, and was not verbally or physically threatening the Officers.  They also point to his "slow walk toward the officers."  (Opp. [Dkt. No. 36] at 22.)  However, *Hastings* is quite distinguishable.

First, in *Hastings*, all four officers knew they were responding to a welfare check to a man who had threatened suicide by asphyxiation.  *Id.* at 199.  Here, the Officers had no information regarding Jovany's potential mental illness or impairment.  (911 Call [Dkt. No. 27-1] at 0:34, 2:50, 3:56, 4:06.)  Moreover, they were not responding to a welfare check; they were responding to a crime: a reported weapons disturbance.  Additionally, the officers in *Hastings* entered the

man's home and then bedroom doorway, leading him to feel crowded and threatened.  *Id.* at 199–200.  Here, the Officers here did not encroach upon Jovany.  They were outside and even retreated as Jovany advanced toward them.  And finally, the Officers did not create the need for any use of force, such as by pepper-spraying or otherwise aggravating Jovany.  *Id.* at 203.  (*See also* Mot. [Dkt. No. 27] at 21–27.)  They simply ordered him— repeatedly—to drop the knife, which he did not.  These key differences make *Hastings* inapplicable.

In addition to the cases cited in the Ogden Defendants' motion,[3] *Clark v. Bowcutt*, 675 F. App'x 799 (10th Cir. 2017) (unpublished) provides a useful contrast.  There, the Tenth Circuit reversed the district court's ruling denying a deputy sheriff qualified immunity after he shot a man while retreating from the path of the man's oncoming vehicle.  *Id.* at 800.  After a five-minute pursuit ending in a residential area, the deputy used his vehicle to block the man from exiting a cul-de-sac.  *Id.* at 801.  To prevent the man from advancing, the deputy exited his vehicle, drew his weapon, and stepped in front of the man's oncoming car.  *Id.* at 801.  The man continued to drive forward as the deputy stepped backwards, with the vehicles only inches from the deputy.  *Id.* at 801.

In analyzing whether the man posed an immediate threat, the Tenth Circuit determined "it is nevertheless readily apparent to us from examining the video that [the man] posed an immediate threat to [the deputy's] safety."  *Id.* at 808.  The court noted that the man continued to drive forward, toward the deputy as the deputy stepped backwards.  *Id.* at 808.  The deputy ordered the man to stop, but he did not.  *Id.* at 808.  The deputy had "mere seconds to react."  *Id.*

---

[3] *See e.g.*, *Emmett v. Armstrong*, 973 F.3d 1127, 1134 (10th Cir. 2020); *Estate of Larsen v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008); *Atencio v. City of Albuquerque*, No. 15CV343, 2015 WL 13651179, *3 (unpublished).

at 808.  The Tenth Circuit also noted that the deputy was in the vehicle's path in a "very confined area."  *Id.* at 808.  Similarly, the Officers were in Jovany's direct path in a relatively close distance.  And, the Tenth Circuit, referencing the video, noted that the man had time to stop the vehicle, in part because the deputy "was backing up as the vehicle was moving forward."  *Id.* at 809.  It also determined that the deputy "was under no obligation to take cover in order to discourage [the man] from using his vehicle as a weapon to inflict potentially deadly force."  *Id.* at 809–10.

The Tenth Circuit additionally noted that the man offered "no indication that he intended to stop," and the deputy gave at least eight commands to stop or get out of the vehicle.  *Id.* at 801.  Similarly, Jovany ignored multiple commands to drop the knife and gave no indication that he would stop or drop the knife.  Like the man in the vehicle, he continued to advance towards the Officers after flicking his knife open, and the Officers retreated, trying to create distance between them and Jovany.  Furthermore, as shown in the video, the distance between Jovany, the Officers, the partygoers, and the neighbors' homes was minimal at the moment the Officers had to make the split-second decision to use deadly force to prevent harm to themselves and others.

Given Jovany's actions of ignoring multiple commands, opening his knife, advancing toward the Officers, and his aggressive body language—all objectively shown on the body camera recordings—the Officers reasonably concluded he was an immediate threat to their safety and that of the nearby partygoers.  Plaintiffs' characterization otherwise is the precise visible fiction courts are instructed by the Supreme Court in *Scott v. Harris*, 550 U.S. 372, 380 (2007), to disregard.

B.      *Severity of Crime*

The Mercados allege Jovany was not committing a crime at the time of the incident. However, the 911 dispatch call identified the call as a "weapons disturbance." (911 Dispatch [Dkt. No. 27-2] at 0:23–2:00.) While Jovany had not yet been arrested, his threatening behavior and aggressive actions can be considered as part of a "tense, uncertain, and rapidly evolving situation." *Giannetti v. City of Stillwater*, 216. F. App'x 756, 765 (10th Cir. 2007) (unpublished). And contrary to the Mercados' claim, there are no facts that show the Officers had knowledge Jovany was "likely having an episode of mental illness." (Opp. [Dkt. No. 36] at 2, 18.) The 911 caller only indicated that the man was potentially drunk or high, seemed disoriented and did not "appear to be present in the situation." (911 Call [Dkt. No. 27-1] at 2:50, 4:06.) Nor are there any facts that show the Officers knew who Jovany was or whether he was entitled to be on the property. (Mot. [Dkt. No. 27] ¶¶ 2–5; 911 Call [Dkt. No. 27-1] at 2:38–44; 3:20–25; 911 Dispatch [Dkt. No. 27-2] at 0:57–1:15; Poulsen Camera Footage [Dkt. No. 27-3] at 0:11.) The 911 caller indicated only that the unknown man was now on his neighbor's property and had been hanging around and looking into vehicles. (911 Call [Dkt. No. 27-1] at 0:53–1:05, 4:33-4:48.) The Officers could reasonably conclude Jovany was not authorized to be there and may have been trespassing or in the process of committing a criminal offense, such as vandalism or robbery. The potential that Jovany was committing a serious crime weighs in favor of the Officers' actions.

C.      *Resisting Arrest*

The Mercados argue Jovany committed no crime and was not told he was under arrest or that he might face arrest. But, as explained in the Ogden Defendants' motion, this factor has

been applied broadly to investigatory actions preceding an intent (or ability) to arrest a suspect. The Mercados do not respond to this authority. Instead, they argue that the Ogden Defendants' claims regarding Jovany resisting investigatory actions is unsupported by the complaint. This ignores the content of the recordings from the incident.

The Officers had no indication that Jovany was on his own or his parents' property. The information presented to them was the 911 caller's report that a man with a knife had been in their driveway without permission and, when he left, had entered a neighbor's property. The call indicated the man had been trespassing with a knife and may have then been trespassing on a different, neighboring property with a knife. (Mot. [Dkt. No. 27] at ¶ 8; Poulsen Camera Footage [Dkt. No. 27-3] at 0:11.) When the Officers approached to speak with Jovany and investigate the report, Jovany ignored commands to drop the knife and advanced toward the Officers. (Motion [Dkt. No. 27] ¶¶ 13–24.) Jovany's actions of ignoring commands, opening the knife, and advancing toward the Officers in response to the Officers' efforts to investigate the situation weighs in the Officers' favor and supports that their use of force was reasonable.

Thus, for the reasons set forth in the Ogden Defendants' motion, and considering the totality of the circumstances presented to the Officers, the Officers' actions were reasonable and did not constitute excessive force. This entitles the Officers to judgment in their favor under the first prong of the qualified immunity analysis and likewise entitles Ogden to judgment in its favor.

### III. THE OFFICERS ARE ENTITLED TO QUALIFIED IMMUNITY.

Even if there is some question about whether the Officers' use of force was unconstitutional, the Officers are nevertheless entitled to qualified immunity under the clearly-

established-law prong of that analysis. As explained in the Ogden Defendants' motion, prior

cases illustrate that it was *not* clear the Officers' use of force was unconstitutional.

It is notable that, in arguing otherwise, the Mercados appear to rely on an incorrect

standard as to what constitutes "clearly established law." They rely, in part, on *Hope v. Pelzer*,

*536 U.S. 730 (2002)* for the proposition that for the law to be clearly established, prior cases

need not be fundamentally similar but only provide fair warning. (Opp. [Dkt. No. 36] at 27.)

However, as the more recent standard articulated in *White v. Pauly*, 137 S. Ct. 548, 552 (2017)

requires, a plaintiff must rely on authority with similar underlying circumstances. Indeed, as the

Supreme Court recently explained, the authority "must be particularized to the facts of the case."

*Id.* (internal quotation marks omitted); *see also id.* (determining the court misunderstood the

analysis and "failed to identify a case where an officer acting under *similar circumstances*" as

the officer and instead relied on authority which "lay out excessive-force principles at only a

general level" (emphasis added)). And, this requirement is especially true in an excessive force

case. *See McCoy v. Meyers*, 887 F.3d 1034, 1053 (10th Cir. 2018) (referencing the need for

"sufficiently particularized" cases to "satisfy the ordinary clearly established law standard" in an

excessive force case.) Applying the standard required by *White*, the Mercados have failed to

establish that the Officers' use of force violated law that was clearly established at the time of the

incident.

As explained in the Ogden Defendants' motion, prior cases illustrate it was *not* clear the

Officers' use of force was under unconstitutional under the circumstances confronting them.

One such case is *Kisela v. Hughes*, 138 S.Ct. 1148 (2018). The Mercados argue that case is

distinguishable for the sole reason that, unlike the woman in *Kisela*, "Jovany was nowhere near

the Officers or any individuals" when he was shot. The recordings show this is simply visible fiction. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is *blatantly contradicted by the record*, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment." (emphasis added).) They show partygoers nearby, (Mot. [Dkt. No. 27] ¶ 9), and the Officers quite near Jovany, approaching them as they tried backing as far as they could before firing, (*id.* ¶¶ 18–27).

The Mercados also rely on *Ceballos v. Husk*, 919 F.3d 1204 (10th Cir. 2019), to try to meet the clearly-established prong. They appear to argue that because Jovany was allegedly mentally ill and on his own property, this case is sufficiently similar to *Ceballos*. But, the Mercados overlook a critical distinction about the information the Officers had at the time of the shooting. In *Ceballos*, there were reports that the man may have had mental health issues in addition to being on drugs. *Ceballos*, 919 F.3d at 1209. In fact, one of the officers at the scene testified that he recognized the man from a hospital "walkaway" the night before. *Id.* at 1210. In contrast, other than reports that Jovany was not "making any sense," potentially "really drunk or really high," and did not appear to be "present in the situation," the Officers had no knowledge as to Jovany's mental health or condition. (Mot. [Dkt. No. 27] ¶ 4; 911 Call [Dkt. No. 27-1] at 0:34, 2:50, 3:56, 4:06.)

The Mercados also repeatedly rely on the assertion Jovany was on his own property or his parent's property. However, unlike the officers in *Ceballos* who had information that the man was in his own driveway, the Officers here had no information or facts that Jovany was anything other than a trespasser who had been carrying a knife and looking into neighboring

cars. (Mot. [Dkt. No. 27] ¶¶ 2–5; 911 Call [Dkt. No. 27-1] at 2:38–44; 3:20–25; 911 Dispatch [Dkt. No. 27-2] at 0:57–1:15; Poulsen Camera Footage [Dkt. No. 27-3] at 0:11.) Additionally, the officers in *Ceballos* knew the man's wife and child were parked several houses down the street, and there was no one else in the home. *Ceballos*, 919 F.3d at 1209–10. Here, the Officers had no information about who else might be on the property but knew there were partygoers nearby. (Mot. [Dkt. No. 27] ¶¶ 3, 6, 8–9.) In fact, there was a car in the carport and lights on inside the home where Jovany was located, indicating others were likely to be present in the home. (*Id.* ¶ 14.) These key differences show *Ceballos* does not clearly establish the Officers' use of force in this case was unreasonable.

The Mercados next rely on *Tenorio v. Pitzer*, 802 F.3d 1160 (10th Cir. 2015) for the proposition it was clearly established that officers cannot use deadly force on a suspect who is not charging or making "slicing or stabbing motions" at the officers. (Opp. [Dkt. No. 36] at 31.) In *Tenorio*, the officers responded to a call to "protect against danger from a man who had been violent in the past and was waving a knife around *in his home*." *Id.* at 1164 (emphasis added). The officers knew the man was taking medication for seizures, had a knife to his own throat, was agitated, and had been drinking. *Id.* at 1162. After talking to the 911 caller, the officer entered the home with his handgun drawn. *Id.* at 1162. While in a small living room, the man's wife came out, followed by the man, "who had a blank stare and was carrying a santoku-style kitchen knife with a three-and-a-quarter-inch blade." *Id.* at 1163. The man walked forward at an average speed, and the officer yelled to put down the knife. *Id.* at 1163. When the man was only a few steps into the living room, the officer shot him and a second officer tased him. *Id.* at 1163. Because the man did not refuse to drop the knife, made no hostile motions toward the officers

17

but merely held a small kitchen knife "loosely by his thigh" and made no threatening gestures toward anyone, the Tenth Circuit determined the officer used excessive force.  *Id.* at 1165.

Again, these facts are distinguishable.  Upon turning and seeing the Officers, Jovany flicked open his knife.  His actions were not like the man in *Tenorio*, who was walking into a room with a smaller knife loosely at his side.  Jovany actively opened the knife and advanced after the Officers identified themselves.  He ignored commands to drop the knife, exhibited aggressive body language, and continued advancing as the officers backed away.  Additionally, the man in *Tenorio* only took three steps toward the officer who shot him.  *Id.* at 1166; *see also Estate of Larsen v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008) (affirming summary judgment on an excessive force case under § 1983 for an officer after he shot and killed a man holding a knife who ignored four commands to drop the knife and took steps toward the officer).  As shown in the recordings, Jovany took many more steps toward the Officers over approximately twenty seconds as they retreated from him.

Lastly, the Mercados appear to rely on *Bond v. City of Tahlequah, Okla*. 81 F.3d 808, 825 (10th Cir. 2020).  (Opp. [Dkt. No. 36] at 32.)  But, they have not pointed to any allegations or any portions of the recordings that would indicate the Officers "recklessly confronted" Jovany such that they created the need for the use of force.  Their only claim appears to be an unsupported conclusion the Officers recklessly confronted Jovany who was mentally impaired and armed.  As detailed above, the Officers did not know if Jovany might have been suffering from any mental illness or mental health concerns.  And importantly, the recordings clearly show that the Officers were retreating from Jovany, not advancing or "cornering" him.  For the reasons

set forth in the opening motion, the Officers did not create any need to use force.  (Mot. [Dkt. No. 27] at 21–27.)

None of the cases on which the Mercados rely establish that the Officers' use of force was plainly incompetent or that they knowingly violated the law.  Thus, the Mercados have not carried their "heavy burden" by identifying prior case law with sufficiently similar facts to provide notice to the Officers that their conduct was unreasonable.  *See Puller v. Baca*, 781 F.3d 1190, 1196 (10th Cir. 2015) ("This is a 'heavy, two-part burden' that the plaintiff must meet."). Accordingly, the Officers are entitled to qualified immunity.

## IV. THE MERCADOS HAVE NOT ADEQUATELY PLEADED MUNICIPAL LIABILITY.

As an alternative basis for judgment in Ogden City's favor, the Ogden Defendants argued that the Mercados have not adequately pleaded a basis for municipal liability.  The Mercados allege in response that Ogden City is liable because it "has taken a deliberately indifferent approach to deficient police practices and procedures."  (Opp. [Dkt. No. 36] at 33.)  In support of this assertion, the Mercados have simply recited the legal elements required to prove municipal liability.  However, they have failed to plead any facts that satisfy these required elements.  This is insufficient to overcome the Ogden Defendants' motion.

For the reasons set forth in the Ogden Defendants' motion, and for much the same reasons articulated in *Yocum v. Utah*, No. 1:16-CV-00098, 2017 WL 448586, at *6 (D. Utah Feb. 2, 2017) (unpublished), and  *Long v. Boucher*, No. 1:19-CV-56, 2020 WL 6899496, *9 (D. Utah Nov. 24, 2020) (unpublished), Ogden City is entitled to judgment in its favor.  (*See* Mot. [Dkt. No. 27] at 31–35.)

## V.  THE MERCADOS HAVE NOT IDENTIFIED ANY FLAGRANT VIOLATIONS OF JOVANY'S STATE CONSTITUTIONAL RIGHTS.

In their motion, the Ogden Defendants noted that article I, section 25 of the Utah Constitution is not self-executing, such that the Mercados' claim based on that section fails at the first prong of the *Spackman* test.  In response, the Mercados claim that article I, section 25 *is* self-executing.  They have failed, however, to cite any case in which a court has reached this conclusion.  Indeed, their assertion is inconsistent with and contrary to the case law identified in the Ogden Defendants' motion.  *See P.J. ex rel Jensen v. Utah*, No. 2:05CV00739 PGC, 2006 WL 1702585, *14 (D. Utah 2006) (unpublished); *see also Coleman v. Utah State Charter Sch. Bd.*, No. 2:10-CV-1186-TC, 2011 WL 4527421 *14 (D. Utah 2011) (unpublished).  The Mercados have not addressed how these cases are distinguishable or identified any change in the law.  Because article I, section 25 is *not* self-executing, the Mercados cannot recover for an alleged constitutional violation under this section.  The Mercados also do not respond to the Ogden Defendants' arguments as to article I, section 6, so the Ogden Defendants' are entitled to judgment on that claim as well.  (*See* Mot. [Dkt. No. 27] at 37–38.)

As to the remaining claims under the Utah Constitution, the second *Spackman* prong requires that "a plaintiff . . . establish the following three elements:  (1) the plaintiff suffered a 'flagrant' violation of his or her constitutional rights; (2) existing remedies do not redress his or her injuries; and (3) equitable relief, such as an injunction, was and is wholly inadequate to protect the plaintiff's rights or redress his or her injuries."  *Jensen ex rel. Jensen v. Cunningham*, 2011 UT 17, ¶ 58, 250 P.3d 465 (internal quotation marks omitted).  The Mercados focus mainly on the third element and argue that equitable relief, like an injunctive relief (which the Mercados have asserted in their complaint) is inadequate to protect their rights or redress their injuries.

The Ogden Defendants, however, did not base their motion on the third element. Rather, the Ogden Defendants argued that the Mercados had not established a flagrant violation of Jovany's rights under the Utah Constitution. (*See* Mot. [Dkt. No. 27] at 36–38.)

The Mercados briefly argue they have established a flagrant violation based on their argument under the "clearly established" prong for the qualified immunity analysis. They did not identify any authority establishing that the provisions of the Utah Constitution on which their claims are based provide broader protection than their federal counterparts. (*See* Mot. [Dkt. No. 27] at 38–39.) For the same reasons discussed above and in the Ogden Defendants' opening memorandum, these claims fail.

The Ogden Defendants additionally argued that even if the Mercados could establish a flagrant violation of self-executing provisions of the Utah Constitution, they had not sufficiently pleaded municipal liability of Ogden City. The Mercados did not respond to this argument. For the reasons set forth in their motion, the Ogden Defendants are entitled to judgment on this claim. (*See* Mot. [Dkt. No. 27] at 38.)

## VI. REMAINING CLAIMS

The Mercados do not address the Ogden Defendants' arguments regarding punitive damages and injunctive relief.[4] Accordingly, the Ogden Defendants are entitled to dismissal of these claims for the reasons set forth in their motion. (*See* Mot. [Dkt. No. 27] at 39–40.)

---

[4] In fact, the Mercados argue elsewhere that "Because Jovany is dead, *no injunction* or other form of equitable relief could possibly serve to protect his rights." (Opp. [Dkt. No. 36] at 36.) This confirms that the Mercados lack standing to seek their requested injunctive relief.

## CONCLUSION

Based on the foregoing, the Ogden Defendants are entitled to judgment in their favor on the pleadings.

## ORAL ARGUMENT

Pursuant to DUCivR 7-1(f), the Ogden Defendants request that the Court conduct oral argument if it has questions of counsel for the Ogden Defendants on any of the issues necessary to resolve their motion. The Ogden Defendants do not request oral argument if the Court does not have any such questions or does not think oral argument will be helpful in rendering a decision.

DATED this 9th day of March, 2021.

SNOW CHRISTENSEN & MARTINEAU


*/s/ Heather S. White*
Heather S. White
Dani N. Cepernich
*Attorneys for Ogden Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 9th day of March, 2021, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF System:

> Robert B. Sykes
> C. Peter Sorensen
> Christina D. Isom
> Sykes McAllister Law Offices, PLLC
> 311 S. State Street, Ste. 240
> Salt Lake City, UT 84111
> bob@sykesmcallisterlaw.com
> pete@sykesmcallisterlaw.com
> christina@sykesmcallisterlaw.com
>
> Mario Arras
> Mario Arras Law Firm, PLLC
> 4001 S. 700 E., Ste. 500
> Salt Lake City, UT 84107
> attorneymarioarras@gmail.com
> *Attorneys for Plaintiff*
>
> Noah M. Hoagland
> Jesse C. Trentadue
> Sarah Jenkins Dewey
> Suitter Axland, PLLC
> 8 East Broadway, Suite 200
> Salt Lake City, UT  84111
> nhoagland@sautah.com
> jesse32@sautah.com
> sjenkins@sautah.com
>
> Brody E. Flint
> Roy City Attorney's Office
> 5051 S 1900 W
> Roy, UT 84067
> bflint@royutah.org
> *Attorneys for Defendant Detective Trent Fusselman*

> */s/ Annette Gamero*