## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JUAN MERCADO, father, heir and personal representative of Jovany Mercado, deceased; ROSA MERCADO, mother and heir of Jovany Mercado; and ESTATE OF JOVANY MERCADO, by its Personal Representative, Juan Mercado, <br><br>       Plaintiffs, <br><br> v. <br><br> OGDEN CITY, by and through its Police Department (OPD); OFFICERS BRANDON SEVENSKI; NIGIL BAILEY; KARSON GARCIA; JOHN POULSEN; DETECTIVE TRENT FUSSELMAN; and JOHN AND JANE DOES 1-10, <br><br>       Defendants. | **MEMORANDUM DECISION AND ORDER:** <br><br> **1) GRANTING IN PART AND DENYING IN PART OGDEN DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS AND** <br><br> **2) GRANTING DEFENDANT FUSSELMAN'S MOTION FOR JUDGMENT ON THE PLEADING** <br><br> 1:20-cv-00090-RJS-DAO <br><br> Chief District Judge Robert J. Shelby <br><br> Magistrate Judge Daphne A. Oberg |

This action arises from the shooting death of twenty-six-year-old Jovany Mercado outside his parents' home in Ogden City, Utah on the night of August 19, 2019.  Four Ogden City police officers fatally shot Jovany[1] as he walked through the home's carport toward them, holding a six-inch pocketknife and failing to heed the officers' commands to drop it.

Plaintiffs are Jovany's parents, Juan and Rosa Mercado.  Suing on their own behalf and through Juan as personal representative of Jovany's estate, Plaintiffs assert civil rights claims arising out of both the United States and Utah State Constitutions against Ogden City, its

---

[1] Jovany is referred to herein by his first name, simply because multiple Mercado family members are Plaintiffs, and because Plaintiffs do the same in their Complaint and their briefing.

officers, and 'Doe' Defendants who may have supervised and trained the Ogden officers (collectively, "Ogden Defendants").[2]  They also assert a claim against Trent Fusselman, a Roy City, Utah officer.  Fusselman was not involved in the shooting or its precipitating events.  But about four hours after the shooting, he supplied an affidavit supporting a warrant to search the Mercados' home to obtain bullets, casings, and home security surveillance video footage.

Plaintiffs allege five causes of action in their Complaint: 1) an excessive force claim brought pursuant to 42 U.S.C. § 1983 against the Ogden officers and Doe Defendants;[3] 2) a § 1983 claim against Ogden City for failure to train its officers and unconstitutional practices and procedures;[4] 3) a § 1983 claim against Fusselman for violating the Fourth Amendment by knowingly or recklessly including false statements or omissions in his warrant affidavit;[5] 4) a § 1983 claim against all Ogden Defendants for outrageous, conscience-shocking conduct violating the Fourteenth Amendment's substantive due process protections;[6] and 5) a claim the Ogden Defendants violated Jovany's rights under the Utah Constitution, Article I, §§ 1, 6, 7, 14, and 25.[7]  Plaintiffs attach to their Complaint redacted copies of the warrant Fusselman obtained, and its 'return.'[8]

---

[2] Dkt. 2 (Complaint).

[3] *Id.*  ¶¶ 104-130.

[4] *Id.* ¶¶ 131-137.

[5] *Id.* ¶¶ 138-159.  At oral argument, Plaintiffs' counsel agreed the only claim asserted against Fusselman is the § 1983 claim for a Fourth Amendment violation.  Thus, though other claims purport to target "all" Defendants, including the claim alleging Utah Constitutional violations, the court does not treat them as asserted against Fusselman.

[6] *Id.* ¶¶ 160-176.

[7] *Id.* ¶¶ 177-188.

[8] Dkt. 2-1.

The Ogden Defendants and Fusselman each filed Motions for Judgment on the Pleadings pursuant to Rule 12(c), Federal Rules of Civil Procedure.[9]  In theirs, the Ogden Defendants contend: 1) Juan and Rosa Mercado lack standing to assert § 1983 claims on their son's behalf, 2) they are entitled to qualified immunity from the § 1983 claims where the facts neither show a constitutional violation by the officers nor that Ogden City had a policy giving rise to a violation, 4) that even if there had been a violation, no law clearly established a violation at the time of the shooting, 5) there was no requisite "flagrant" violation that might support a claim under the Utah Constitution,[10] and 6) Plaintiffs are not entitled to the injunctive relief and punitive damages they seek.[11]  The Ogden Defendants attach as exhibits to their Motion recordings from the night in question: 1) audio of a 911 call,[12] 2) audio of a dispatch call,[13] 3) body camera video footage from two Ogden officers,[14] and 4) home surveillance video showing the carport.[15]

Fusselman argues in his Motion he is entitled to qualified immunity from Plaintiffs' § 1983 claim against him, having committed no constitutional violation under clearly established law where he provided no false or misleading information in his search warrant affidavit.[16] While Fusselman attaches no exhibits to his Motion, in his prior Answer[17] to Plaintiffs'

---

[9] Dkts. 27 and 39.

[10] Dkt. 27 at 2-3.

[11] *Id.* at 4.

[12] Dkt. 27-1.

[13] Dkt. 27-2.

[14] Dkt. 27-3, Dkt. 27-4.

[15] Dkt. 27-5.

[16] Dkt. 39 at 3-4.

[17] Dkt. 17.

Complaint, he attaches: 1) the affidavit he prepared to obtain the search warrant at issue,[18] 2) the search warrant,[19] and 3) the return for the search warrant.[20]

The court has carefully considered the parties' briefing, argument, and post-argument supplemental authority and briefing, and concludes for the reasons discussed below, the Ogden Defendants' Motion[21] is GRANTED IN PART AND DENIED IN PART, and Fusselman's Motion is GRANTED.[22]

## BACKGROUND

"The first step in assessing the constitutionality of [Defendants'] actions is to determine the relevant facts."[23]  But before providing factual background, the court sets forth the legal standards generally applicable to Defendants' Rule 12(c) Motions for Judgment on the Pleadings and identifies the facts and evidence that may be considered at this stage.

### I.     Applicable Legal Standards

A Rule 12(c) motion for judgment on the pleadings is evaluated using the same standards applicable to a Rule 12(b)(6) motion,[24] accepting all of the well-pled allegations in a complaint "as true and grant[ing] all reasonable inferences from the pleadings" in a plaintiff's favor.[25]  A defendant's motion should be denied unless they have "clearly established that no material issue of fact remains to be resolved and [they are] entitled to judgment as a matter of law."[26]

---

[18] Dkt. 17-1.

[19] Dkt. 17-2.

[20] Dkt. 17-3

[21] Dkt. 27.

[22] Dkt. 40.

[23] *Scott v. Harris*, 550 U.S. 372, 378 (2007).

[24] *Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1228 (10th Cir. 2012) (citations omitted).

[25] *Id.* (citations omitted).

[26] *Id.* (citations omitted).

In a Rule 12(b)(6) analysis, claims are dismissed if inadequately pled – that is, where the complaint fails "to state a claim upon which relief can be granted."[27]   To avoid dismissal, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[28]   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[29]   In other words, "[t]he allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief."[30]   This does not require "detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."[31]   Indeed, "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do."[32]

When matters outside the pleadings are presented for consideration at the Rule 12 stage, "as a general rule the court must either exclude the material or treat the motion as one for summary judgment."[33]   But documents—including video and audio recordings— "attached to or referenced in the complaint" may be considered "if they 'are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.'"[34]

Still, the well-pled allegations in a plaintiff's complaint must be accepted as true unless a recording "blatantly contradicts" them.   For example, in *Estate of Ronquillo by and through*

---

[27] Fed. R. Civ. P. 12(b)(6).

[28] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks and citation omitted).

[29] *Id.* (citation omitted).

[30] *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008).

[31] *Iqbal*, 556 U.S. at 678 (quotation marks and citation omitted).

[32] *Id.* (quotation marks and citation omitted).

[33] *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.,* 861 F.3d 1081, 1103 (10th Cir. 2017) (quotations omitted).

[34] *Id.* (quotations omitted).

*Estate of Sanchez v. City and County of Denver*, the district court considered video surveillance of a fatal shooting at the motion to dismiss stage, noting the parties have asked the Court to . . . review and consider video surveillance" and had not challenged its authenticity.  Additionally, the plaintiff had "incorporated the video . . . in the complaint by reference," "relie[d[ on its contents throughout the complaint," and filed it as an exhibit with the court.[35]  The court explained it would view the video "in the light most favorable to Plaintiff, except where the video 'blatantly contradicts' Plaintiff's version of events.[36]  On appeal, the Tenth Circuit also found it appropriate to consider the video under those circumstances, noting that even at the Rule 12(b)(6) stage, a court "may consider not only the complaint itself, but also attached exhibits. Accordingly, we accept as true Plaintiff's allegations except when directly contracted by the attached exhibits—in this case the video of the incident."[37]

In the *Estate of Harmon v. Salt Lake City*, the Tenth Circuit reviewed the district court's dismissal at the 12(b)(6) stage, and in doing so considered "body-cam videos and still frame excerpts [of a police shooting] because they were referred to in the complaint and neither party disputes their authenticity."[38]  Though considering the video and photos, the court of appeals explained, "[w]here there is video evidence, the court continues to accept all well-pleaded allegations as true unless they are 'blatantly contradicted by the record.'"[39]  This level of

[35] 2016 WL 10843787 (D.Colo. Nov. 17, 2016) at *2 (citing *Scott*, 550 U.S. at 379); *aff'd*, 720 F. App'x 434 (10th Cir. 2017) (unpublished).

[36] *Id.* (quoting *Thomas v. Durasanti*, 607 F.3d 655, 372 (10th Cir. 2010) (other citations omitted)).

[37] 720 F. App'x at 437 (quotations and citations omitted).

[38] 2021 WL 5232248 (10th Cir. Nov. 10, 2021) at *2 (unpublished).

[39] *Id.* (quoting *Scott,* 550 U.S. at 380; citing *Estate of Ronquillo*, 720 F. App'x at 437).

contradiction "involves a 'version of events [that] is so utterly discredited by the record that no reasonable jury could have believed [the plaintiff's version].'"[40]

Applying these standards, the court "first discard[s] allegations in the complaint that are 'legal conclusions' or 'threadbare' recitals of the elements of a cause of action, supported by mere conclusory statements."[41]  Next, the court "accepts as true the remaining, well-pleaded (that is, plausible, non-conclusory, and non-speculative) factual allegations and construe[s] them in the light most favorable to the plaintiff."[42]  But when those well-pleaded factual allegations are "blatantly contradicted" by a properly-considered exhibit, the court relies on the facts depicted by the exhibit.[43]

As noted above, both sides have appended exhibits to their pleadings and briefing on the pending Motions.  The court thus evaluates how it may properly consider them at this stage.

First, Plaintiffs attach to their Complaint the search warrant Defendant Fusselman obtained to search their home signed by a Utah judge, and the warrant's 'return' in which Fusselman describes what was obtained,[44] but do not attach Fusselman's affidavit.  But Fusselman attached his affidavit to his Answer.  No party objects to the authenticity or consideration of any of these warrant-related documents in resolving Fusselman's Motion.  And while Plaintiffs did not directly introduce the affidavit, it is the central basis of their lone claim

---

[40] *Id.* (quoting *Scott,* 550 U.S. at 380).  But when video does not blatantly contradict allegations in a complaint, the court relies on well-pled allegations.  *See Myers v. Brewer*, 773 F. App'x 1032 (10th Cir. 2019) (affirming denial of motion to dismiss based on qualified immunity; agreeing with district court that "as a matter of law, . . . the video here does not clearly contradict the allegation in the complaint, and we confine our analysis accordingly.").  The Ogden Defendants argue in supplemental briefing that the court should consider the recordings in their "entirety."

[41] *Soto for Estate of Jimenez v. Bd. of Cty. Comm'rs of Caddo Cty., Okla.*, 748 F. App'x 790, 793 (10th Cir. 2018) (unpublished) (brackets omitted) (quoting *Iqbal*, 556 U.S. at 678).

[42] *Id.* (citing *Iqbal*, 556 U.S. at 679).

[43] *See Scott,* 550 U.S. at 380–81 ("The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.").

[44] Dkt. 2-1.

against Fusselman, which is labeled "Falsification of Affidavit, Illegal Search and Misleading a Judge."[45]  Plaintiffs refer to and quote the affidavit at length in that cause of action.[46] Accordingly, the warrant documents are properly considered.

Considered next are the recordings the Ogden Defendants submit: the 911 and dispatch calls, body camera footage, and home surveillance video.  There are slight differences in how the court views the 911 and dispatch calls one the one hand, and the body camera and home surveillance footage on the other, but in the end, all may be considered.

First, the 911 and dispatch calls are plainly "central" to Plaintiffs' claims and are referred to at length in the Plaintiffs' Complaint.[47]  Plaintiffs rely on the content of these calls in establishing their claims, including that Jovany was in an intoxicated or disoriented state on the night in question, but had not been committing a crime or acting in a threatening manner. Plaintiffs allege that based on this information in Defendants' possession, they should have understood they were conducting a welfare check, and acted accordingly.[48]  Thus, the court can consider the information conveyed in the 911 calls in view of Plaintiffs' claims that the 911 and dispatch calls themselves provided Defendants with critical information that should have guided their interaction with Jovany the night he was killed.

Second, the court considers the body camera and home surveillance footage.  The content of the video footage itself does not give rise to Plaintiffs' claims in the same way as the content of the 911 and dispatch calls does—Plaintiffs might have alleged their claims that Jovany was wrongly killed, and a subsequent warrant wrongly obtained, even if the content of the footage

---

[45] Dkt. 2 at 26.

[46] *Id.* at 28-30.

[47] Dkt. 2 at ¶¶ 23, 24, 30, 120, 121, 161 (911 call references), ¶¶  25, 30, 32 (dispatch call references).

[48] *Id.*

was destroyed.  But the footage is clearly invaluable evidence capturing the events of the night in question from multiple angles.  Thus, the footage is central to Plaintiffs' claims.  And importantly, no party disputes the authenticity of the footage.  Indeed, Plaintiffs refer to and rely on the body camera and home surveillance footage in both their Complaint[49] and in opposing the Ogden Defendants' Motion—indeed, they implore the court to view and rely on the video recordings submitted.[50]  Thus, under the above-referenced cases from the Tenth Circuit approving consideration of surveillance video at the motion to dismiss stage, the court will consider the body camera and home surveillance footage.

Based on the foregoing, the court reviews the recordings in addition to the allegations in the Complaint and the warrant documents.  They are reviewed in the light most favorable to Plaintiffs, except where the recordings blatantly contradict the Complaint's allegations.

## II.      Facts Surrounding the Shooting

On August 16, 2019, twenty-six-year-old Jovany Mercado was living with his parents, Juan and Rosa Mercado, in their home in Ogden, Utah.[51]  Jovany was there because he had separated from his wife.[52]  He was five feet, seven inches tall, and weighed about 135 pounds.[53]

---

[49] Dkt. 2 ¶ 80 (noting the "entire shooting event was caught on multiple Officers' body cameras, as well as on the Mercado's [sic] home security cameras at the rear of the home.").

[50]  Dkt. 36 at 24-26.  Plaintiffs argue:

> The entire interaction with Jovany was videotaped both by the Officers and by the Mercados' home video system. The videos show conclusively that Jovany: a) made no threats, b) was not aggressive to the officers, c) did not raise the pocketknife in a threatening manner, d) committed no crime, e) did not try to escape, f) was obviously mentally impaired, g) not under arrest, and h) was not warned he would be shot. Defendants ignore the video and construct a fictional opposing story. . . . We urge the court in this case to view the facts as set forth in the videotape and Complaint.

[51] Dkt. 2 ¶¶ 15, 33.

[52] *Id.* ¶ 33.

[53] *Id.* ¶ 16.

Between 8:45 and 9:00 p.m. that night, one of the Mercados' neighbors saw Jovany walking around outside with an open pocketknife.[54] Jovany appeared to be "obviously disoriented, intoxicated, and/or mentally impaired or ill."[55] But he never threatened or assaulted anyone, and broke no laws walking with his knife, as Utah is an open carry state.[56]

Around 9:00 p.m., the neighbor called 911 to report Jovany walking around, stating Jovany appeared intoxicated or disoriented, and possibly suffering an episode of mental illness.[57] As the 911 call began, the caller explained he was having a party, that a male (Jovany), whom the caller did not know, had been walking around cars and carrying a knife, then came onto the caller's driveway, and was hanging out in front of his house. The caller stated Jovany was "not making any sense,"[58] was "not really responsive," and looked "very confused," but had not threatened anyone—he just had a six-inch pocketknife "out."[59] The caller observed that Jovany had gone to a "neighbor's parking spot" to the east, though a gate, and under a carport.[60] The caller thought Jovany seemed disoriented, and explained that when he tried talking to him, Jovany said he was "ok" then "just looked at [the caller]."[61] The caller explained he worked in a homeless shelter, so he "has experience with individuals," which is why he called 911.[62] When asked if Jovany needed medical attention, the caller stated Jovany was "either really drunk or

---

[54] *Id.* ¶ 17.

[55] *Id.* ¶ 18.

[56] *Id.* ¶¶ 19-22.

[57] *Id.* ¶ 23.

[58] Dkt. 27-1 (911 Call Recording) 0:11-12.

[59] *Id.* 0:35-1:38.

[60] *Id.* 2:18-43.

[61] *Id.* 2:48-3:02.

[62] *Id.* 3:02-3:13.

really high," and that though he didn't appear injured, he also didn't "look like he's here," or "'present' in the situation."[63]  Aside from the pocketknife, the caller saw no other weapons.[64]

After the 911 call was received, a dispatch call went out to four Ogden City Police Officers: Brandon Sevenski, Nigil Bailey, Karson Garcia, and John Poulsen.[65]  Poulsen reported the information relayed was that a male had brought a knife to an outdoor party, was not threatening anyone with the knife but was in a state that had people nervous and scared.[66] Plaintiffs allege that "[b]ased on the 911 dispatch call, these Officers were essentially responding to a 'welfare check,' not a violation of criminal law."[67]  But Plaintiffs further agree "Defendants report that they were responding to a weapons disturbance"—however that term is understood.[68]

The dispatch call recording does not blatantly contradict these allegations.  The dispatcher begins the call stating there has been a "weapons disturbance," that a male was seen

---

[63] *Id.* 3:49-4:06.

[64] *Id.* 4:06-4:13.  *See also* Dkt. 2  ¶ 24.  The Ogden Defendants contend Plaintiffs' allegation that Jovany was "obviously disoriented, intoxicated, and/or mentally impaired or mentally ill," is "not a fact but a characterization and is inconsistent with the recordings."  Dkt. 43 at 6.  Relatedly, they argue the statement that the 911 caller "made it clear that Jovany was likely having an episode of mental illness is inconsistent with the 911 call recording."  *Id.* The court disagrees.  The recording of this 911 call, viewed as required in a light favorable to Plaintiffs, supports these allegations—far from blatantly contradicting them.

[65] Dkt. 2 ¶ 25.

[66] *Id.* ¶ 32.

[67] *Id.* ¶ 30.

[68] *Id.* ¶ 31. Here, the Ogden Defendants argue the characterization "that the Officers 'were essentially responding to a 'welfare check,' not a violation of criminal law, is inconsistent with the 911 recordings, which establish the Officers were responding to a 'weapons disturbance,'" and that there is no "factual support that they were responding to a 'welfare check.'"  Dkt. 43 at 6.  The court disagrees, finding that the recordings do not blatantly contradict this characterization—though whether the dispatch call is specifically labeled a "welfare check" or not appears immaterial.  First, as noted above, in the recording of the 911 call, the caller provides a trove of perceptions of Jovany and his confused, unresponsive, intoxicated, high, or otherwise disoriented behavior, but never stated he had threatened anyone or had any weapons other than the pocketknife.  Second, though the dispatch recording provided to the court inexplicably does not include a great level of detail, the dispatcher states only that there has been a "weapons disturbance," where a male has been seen with a pocketknife, but the male has not threatened anyone.  There is no description of a theft or assault.  Third, the Ogden Defendants do not identify what part of the recordings blatantly contradict Plaintiffs' allegation that the officers were not responding to any criminal violation of the law.  In view of all these facts, it is not an impermissible characterization to label the officers' dispatch as one checking on someone's welfare—though the label seems immaterial in view of the aforementioned facts.

with a knife "out," but he "hasn't threatened anyone."[69]  The dispatcher explained "the complainant is having a party," and the male approached the driveway with a six-inch pocketknife in his hands.[70]  A few seconds later, the dispatcher reported the male had gone to the neighbors' home to the east of the complainant, and was in a parking spot.[71]

Officers quickly arrived at the 911 caller's home in Ogden at about 9:00 p.m.[72]  Sevenski arrived first and called for backup.[73]  Bailey, who was training Poulsen at that time, took the call as a training exercise though it was not in their assigned area.[74]  A fourth, Garcia, arrived later, very soon after the other officers arrived at the Mercado home and were confronting Jovany.[75]

Initially, Poulsen and other officers met and spoke to the 911 caller, who indicated the male with the knife was on another street, at a house with a star above the carport.[76]  Officers then walked from the caller's street to a corner, and at left-leaning diagonal, walked across the street to a carport with a star—the Mercados' home.[77]  As the officers crossed the Mercados' street to approach the home at the angle, their body camera footage captured a view of the street in front of the home and farther down.  There are no bystanders visible in the body camera footage.  There is no car or other obstruction in the street in front of the carport.

---

[69] Dkt. 27-2 at 0:5-0:30.

[70] *Id.* 0:31-0:40.

[71] *Id.* 1:06-1:11.

[72] Dkt. 2 ¶ 26.

[73] *Id.* ¶ 27.

[74] *Id.* ¶¶ 28-29.

[75] *Id.* ¶ 40.

[76] Dkt. 27-3 (Poulsen Footage) 0:0-0:28.

[77] *Id.* 0:28-0:48.

A west-facing, sliding chain-link gate on wheels was slightly open at the entrance to the carport's driveway.[78]  The gate separated the Mercados' property and an Ogden City sidewalk.[79]  The officers stopped at the carport fence, flashlights raised.

Jovany was alone, initially turned away from the officers, and standing in the very back of the carport, a few feet behind a car parked in the driveway between the fence and the carport's rear.[80]  Officers Sevenski, Bailey, and Poulsen began shouting "Hey man," "come out here," "police," and "come here."[81]  They never instructed him to stop coming to them.[82]  Nor did they ask any questions or attempt to engage in conversation.

Jovany slowly turned to the officers and switched the knife he held in his right hand to his left.[83]  Almost simultaneously, Sevenski raised his firearm, and the officers begin shouting commands to drop the knife.[84]  Seconds later, Officer Garcia drives up, parks his car in the street off to the side of the carport in front of the Mercado home, and joins the others.[85]

The Mercados' carport surveillance video footage shows the light from the initial three, then four officers' flashlights consistently appears to be blindingly bright in the direction of where Jovany was in the carport, unless an officer drops a hand momentarily,[86] as Sevenski's

---

[78] Dkt. 2  ¶¶ 34-35.

[79] *Id.* ¶ 37.

[80] Dkt. 27-4 (Sevenski Footage) 0:19; Dkt. 2 ¶¶ 38-39.

[81] Dkt. 27-3 (Poulsen Footage) 0:49-0:54.

[82] Dkt. 2 ¶¶ 42-45.

[83] Dkt. 27-4 (Sevenski Footage) 0:24-0:25; Dkt. 2 ¶¶ 41-42.

[84] Dkt. 27-4 (Sevenski Footage) 0:25-0:26.

[85] Dkt. 27-5 (Carport Footage) 2:26.

[86] *Id.* 2:10-2:40.

briefly does to open the carport gate a little.[87]  At least in the carport footage, it is often difficult to see the officers' faces or hands, including whether they are holding a firearm.[88]

As Jovany turned, Plaintiffs allege the officers stood twenty to twenty-five feet from the gate's opening in the street, and several feet further from Jovany, who was initially far inside the carport.[89]  Over the next twenty seconds, the four officers began yelling at Jovany to drop his pocketknife, while shining the blinding flashlights.[90]  The commands were at times overlapping, with multiple officers sometimes yelling "drop it" or "drop the knife' over one another.[91]  On both Poulsen's and Sevenski's body camera footage, multiple officers are heard shouting commands for Jovany to drop his knife.  A few times, the command seems to come clearly from one officer at a time.  At other times, including just before Jovany is shot, the commands are overlapping, coming from most if not all the officers.[92]

Plaintiffs allege Jovany never indicated he heard or understood the officers.[93]  This is simply unclear from the recordings, which show him turn around and begin walking toward the

---

[87] *Id.* 2:22.

[88] *Id.* 2:10-2:40.

[89] Dkt. 2 ¶ 62.

[90] *Id.* ¶¶ 48-50, 62.  The Ogden Defendants argue Plaintiffs cannot accurately allege "the light from the flashlights was blinding."  Dkt. 43 at 7.  But as noted above, viewing the Mercados' carport surveillance video footage (Dkt. 27-5, beginning at 2:10)—from a vantage point facing the chain link fence where the officers were standing, and the direction Jovany faced as he walked toward them, shows as soon as the first three officers arrived, joined seconds later by a fourth (Garcia, at 2:32) all officers were holding up bright flashlights that the undersigned finds could be seen as blinding much of, if not most the time Jovany could have perceived them.  Indeed, the officers' heads and hands are often, though not always, obscured in the video by the lights in the approximately thirty seconds from the time the first three officers arrived until Jovany was shot.  *Id.* at 2:09-2:40.

[91] Dkt. 2 ¶ 65.

[92] Dkt. 27-3 (Poulsen Footage) 0:54-0:15.

[93] Dkt. 2 ¶ 52.

officers.  But the recordings also show Jovany said nothing in response to the officers shouting, instead staring blankly at them.[94]

As the officers shouted at Jovany to drop the pocketknife, he slowly walked sideways to one side of the back of the carport,[95] then began walking out of the back of the carport toward the officers, also slowly, but according to Sevenski, at "a steady pace."[96]  Sevenski confirmed Jovany never spoke or wavered from his walking route toward the officers.[97]  Garcia reported that Jovany's countenance remained "blank" as he walked.[98]  Jovany held his pocketknife to his left side, and never raised it or moved it aggressively[99]—but neither did he drop it.  As he neared the chain link fence, motion-activated lights on the home turned on and illuminated the carport.[100]

About eight seconds after he began walking out of the back of the carport taking steps toward the officers, and just as he reached the opening of the carport's chain link fence, officers

---

[94] Dkt. 27-4 (Sevenski Footage at 0:31-0:34; Dkt. 2 at ¶¶ 29-30.

[95] Dkt. 27-4 (Sevenski Footage) 0:33-0:39.

[96] *Id.* 0:39-0:47; Dkt. 2 ¶¶ 46-47.

[97] Dkt. 2 ¶ 54.

[98] *Id.* ¶ 55.

[99] *Id.* ¶ 64.  The Ogden Defendants argue the statement that Jovany did not raise or move the knife in an aggressive manner is inconsistent with Officer Poulsen's and Sevenski's body camera recordings, because they claim the recordings show Jovany "flicked the knife open *after*, and arguably in response to, the Officers identifying themselves."  Dkt. 43 at 7.  This statement is untethered to the standards the court must apply at the Rule 12 stage.  Assuming Jovany flicked open the knife, the court could not surmise at this stage that he did so because the officers identified themselves.  But the footage does not clearly show this in any event, and thus does not blatantly contradict Plaintiffs' allegations.  First, Jovany's hands are not clearly visible in Poulsen's footage at all at the time the Defendants allege he flicked the knife—indeed Jovany is often obscured behind a car.  *Id.* (citing Dkt. 27-3 (Poulsen Video) at 0:45-52).  In Sevenski's footage, the camera is very shaky when the officers approach the Mercado home, and at the moment in question, Jovany is far away in the back of the carport as he moves the knife from one hand to the other.  Dkt. 27-4 at 0:23-50.  It is entirely possible, but not at all clear, based on the undersigned's review of the video that Jovany "flicked open" the knife as he moved it.  At this stage, the court cannot find Plaintiffs' allegations blatantly contradicted by a claim Jovany did so.  In any event, no party disputes that Jovany held an open pocketknife at the time his neighbor saw him outside and during his confrontation with the officers.

[100] *Id.* ¶ 53.

fired, releasing a combined total of twenty rounds, and Jovany fell to the ground.[101]  As they fired, three officers are seen in the carport surveillance video retreating backwards nearly all the way across the street, and one is far off to the left, near Garcia's vehicle parked in the street.[102]  Still, Sevenski reported he could not have retreated from his position, because it would have put other officers at risk.[103]  Garcia did not share that view, and stated he thought he could have even gotten back in his patrol car if needed.[104]

After the shooting, Jovany's mother, Rosa, and his sister came out of the Mercado home and were grief-struck.[105]  Officer Garcia instructed them to get back.[106]  The officers rolled Jovany onto his stomach to handcuff him, then again rolled him onto his back.[107]  About three minutes later, another Officer, Officer Docsteader, arrived on the scene and began to perform CPR on Jovany.  He performed 12-15 compressions, stopped to talk to another officer, then resumed CPR for a time.[108]

At 1:07 a.m. on August 17, 2019—about four hours after the shooting—Roy City Detective Trent Fusselman sought to obtain a warrant to search the Mercados' home.[109]  In the

---

[101] Dkt. 27-4 (Sevenski Footage) 0:39-0:47; Dkt. 2 ¶¶ 66-67.

[102] Dkt. 27-5 (Carport Footage) 2:41-2:45.

[103] Dkt. 2 ¶ 75.

[104] *Id.*  The Ogden Defendants take issue with this allegation citing Officer Garcia.  They contend all the video recordings "contradict[]" the notion that "civilians and other Officers were not in imminent danger of serious physical harm."  Dkt. 43 at 7-8.  But nothing in the recordings blatantly contradicts Plaintiffs' allegations.  Indeed, the footage in the time frames the Ogden Defendants cite (*Id.* at 8 (citing Dkt. 27-4 (Sevenski Footage) 0:31-:48; Dkt. 27-3 (Poulsen Footage) 1:13-18; Dkt. 27-5 (Carport Footage) 2:25-2:30) show no civilians near the Mercado home at all, other than Jovany, and that the street in front of the carport was clear, with cars parked only across the street or to the side of the carport.

[105] Dkt. 2 ¶ 76.

[106] *Id.*

[107] *Id.* ¶ 77.

[108] *Id.* ¶ 78.

[109] *Id.* ¶ 96.

warrant affidavit he prepared, Fusselman swears he believes certain property and evidence at the Mercado home is "evidence of the crime or crimes of Aggravated Assault on a Police Officer (x4)."[110]  Fusselman swears that at the Mercado home there are "[b]ullet slugs, empty shell casings, DVR and all electronic devices with the home surveillance system including digital recordings from the DVR, blood evidence, weapons including any similar knives that the subject was holding,"[111] and that these items:

- "[were] unlawfully acquired or [are] unlawfully possessed;"

- "[have] been used or [are] possessed for the purpose of being used to commit or conceal the commission of an offense; or"

- "[are] evidence of illegal conduct."[112]

Fusselman obtained a warrant, and as a result collected bullets, bullet fragments, and DVR video footage from the Mercado home within hours of Jovany's shooting.[113]

The Mercados allege that since the shooting, officers have undertaken new and unusual activity near their home for the purpose of harassing and intimidating them.  This includes parking in front of their home and doing "paperwork" and assisting as crossing guards for a nearby elementary school a block away.[114]

---

[110] Dkt. 17-1 at 2.

[111] *Id.* at 1.

[112] *Id.* at 1-2.

[113] Dkt. 2-1 (Warrant Return) at 3.

[114] Dkt. 2 at ¶¶ 89-95.

### III.     Procedural Background

Plaintiffs filed suit against the Ogden Defendants and Fusselman in July 2020.[115]  The

Ogden Defendants and Fusselman thereafter moved for Judgment on the Pleadings.[116]  As the

Motions were briefed, the parties lodged a series of objections.  First, Plaintiffs filed a separate

'Objection to Ogden Defendants' Facts Cited in Their Motion for Judgment on the Pleadings.'[117]

This Objection targets a Statement of Facts—thirty paragraphs—the Ogden  Defendants include

in their Motion and appended exhibits,[118] the: 1) 911 call recording; 2) recording of the dispatch

call that went out to Ogden officers after the 911 call; 3) video body camera footage from Ogden

Officers Poulsen and Sevenski; and 4) video footage of the Mercados' carport taken from their

home surveillance.[119]  Plaintiffs argue the Ogden Defendants mischaracterize the Complaint's

allegations, cite to recordings outside the Complaint, and simply make up facts.  They ask the

court to take one of three possible actions in response to this:

1)  Exclude the new facts as Plaintiffs contend they are not referenced in the
    Complaint and are false.  Notably, Plaintiffs do not distinguish between the
    characterizations of evidence the Ogden Defendants offer and the audio
    recordings and video that have been submitted.

2)  To either deny or stay a ruling on the Ogden Defendants' Motion to permit
    discovery because they have "referenced facts that are currently unknown to
    [Plaintiffs]."  But Plaintiffs do not specifically identify any of these facts that
    are currently unknown to them on which they need to conduct this discovery.

3)  Convert the Ogden Defendants' Motion to one for summary judgment and
    deny it on the grounds that there are disputes of material fact.  Again,
    Plaintiffs leave the court to guess what disputes they reference here as creating
    issues of fact.

---

[115] Dkt. 2.

[116] Dkts. 27 and 43.

[117] Dkt. 37.

[118] Dkt. 27 at 4-9.

[119] Dkt. 27-1 to -5.

The Ogden Defendants respond[120] that the court it may consider the recordings to be 'documents referred to in the Complaint' because they are central to the claims and the parties do not dispute the documents' authenticity.  But the Ogden Defendants skirt that their Statement of Facts contains numerous characterizations and selective quotes of the events on the recordings, which are inappropriate for the court to accept at this stage unless they "blatantly contradict" an allegation.  To cite one example, the Ogden Defendants state as facts that Jovany "had a scowl and an angry look on his face" and was "clenching" a knife.[121]

Fusselman and the Ogden Defendants in their Reply Memoranda also lodge what they label "Objections" to portions of the Mercados' Opposition Memoranda.  Fusselman's objections are essentially arguments that Plaintiffs misstate the standard of review, rely on non-binding and irrelevant precedent, misstate the content of his warrant affidavit, have an infirm Utah Constitution claim, and failed to address some arguments Fusselman made in his Motion.[122]

The Ogden Defendants lodge "objections" based on their view that the Plaintiffs responded to their facts with characterizations, have relied on irrelevant facts, and have made allegations inconsistent with the recordings.[123]  The alleged inconsistencies were addressed in the factual background set forth above.

The court held oral argument on the pending Motions on June 8, 2021.  At that hearing, the court overruled all parties' Objections for reasons stated on the record.  The viable claims were also narrowed as follows for the reasons stated on the record, based on concessions from Plaintiffs' counsel and with the agreement of Defendants' counsel, summarized as follows:

---

[120] Dkt. 44.

[121] Dkt. 27 at 7 ¶ 17.

[122] Dkt. 49 at 3-7.

[123] Dkt. 43 at 4-8.

- The First Cause of Action for excessive force survives only on of behalf of the Estate of Jovany Mercado and fails to the extent it is brought on behalf of Juan and Rosa Mercado individually.

- The Fourth Cause of Action, for due process violations, fails entirely.[124]

- The Fifth Cause of Action, for Utah state constitutional violations, fails in part to the extent it relies on Article I §§ 1, 6, and 7 of the Utah Constitution.

- All claims for punitive damages against Ogden City and for injunctive relief against any Defendant fail as Plaintiffs did not oppose Defendants arguments on these points.

- The Plaintiffs further clarified that they do not assert any claims directly against Ogden Police Department.

Counsel for all parties agreed with the court that the following claims remained alive at the time of the hearing:

- The First Cause of Action's § 1983 claim asserted by the Estate, based only on the Fourth Amendment.

- Second Cause of Action, municipal liability claim against Ogden City.

- The Third Cause of Action, Juan and Rosa Mercados' individual § 1983 false warrant claim against Fusselman.

- The portion of the Fifth Cause of Action brought only under Utah Constitution Article I, § 14, alleging a claim by the Estate for excessive force.

At the hearing's end, the court requested supplemental briefing on three issues: 1) how it may consider video evidence at the motion to dismiss stage (i.e., only for rebutting facts in the

---

[124] Plaintiffs did not oppose Defendants' Motions on this point and have waived any argument.

20

Complaint, or for supplementing the allegations); 2) how it may consider, if at all, the availability of less lethal means in a qualified immunity analysis; and 3) how the court views evidence of time that elapses in which the officers can assess a situation and employ less lethal means.  The parties filed supplemental briefing, followed by a series of citations to supplemental authority and responses over the course several months, concluding in June 2022.[125]

Now having carefully considered the parties' briefing and argument, and the supplemental authorities provided, the court concludes for the reasons discussed below that the Ogden Defendants' Motion is GRANTED IN PART AND DENIED IN PART, and Fusselman's Motion is GRANTED.

## ANALYSIS

### I.     The § 1983 Claim against the Ogden Officers

The Ogden officers assert they are entitled to qualified immunity from suit on the Estate's § 1983 claim for excessive force/unreasonable seizure under the Fourth Amendment.  "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[126]  Where the officers assert this defense, Plaintiffs bear "the burden of establishing both (1) that the [officers] violated a constitutional right and (2) that the right had been clearly established by the time of the violation" in August 2019.[127]

---

[125] Dkts. 53, 54, 56, 57, 58, 59, 60, and 61.

[126] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotations omitted).

[127] *Tenorio v. Pitzer*, 802 F.3d 1160, 1164 (10th Cir. 2015) (citations omitted).

**A. Constitutional Violation**

Plaintiffs allege the officers violated Jovany's Fourth Amendment rights when they used excessive force, shooting him when any threat he posed did not justify deadly force. As discussed below, the court agrees a jury could reasonably find a violation in view of the Complaint's allegations and the recordings the Ogden Defendants submit, when viewed in Plaintiffs' favor except where they blatantly contradict Plaintiffs' allegations.

The Fourth Amendment ensures the right of citizens "to be secure in their persons . . . against unreasonable . . . seizures."[128] To establish a violation of this right, "the plaintiff must demonstrate the force used [by the officers] was objectively unreasonable."[129] To apply this objective standard, the reasonableness of the officers' conduct is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[130] Further, an officer's belief "as to the appropriate level of force" is judged from the officer's "on-scene perspective" because officers must make "split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving."[131]

Under the Fourth Amendment, an officer's use of deadly force is reasonable and therefore "constitutionally permissible if a reasonable officer in the defendant's position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others."[132] Yet, this analysis "is limited to the facts that were knowable to the defendant

---

[128] U.S. Const. amend. IV.

[129] *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008).

[130] *Id.* (citation omitted).

[131] *Id.* at 1259–60.

[132] *Jiron v. City of Lakewood*, 392 F.3d 410, 418 (10th Cir. 2004) (citation and internal quotation marks omitted).

officers' at the time they engaged in the conduct in question."[133]  Thus, "[f]acts an officer learns after the incident ends—whether those facts would support granting immunity or denying it—are not relevant."[134]

To assess whether an officer's use of force was justified, courts look at "the totality of the circumstances" and "pay careful attention to the facts and circumstances of the particular case."[135]  As part of this analysis, the Supreme Court in *Graham v. Connor* identified three, non-exclusive factors for courts to weigh: "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight."[136]  Nevertheless, this analysis has "no bright line rule[]" and "in the end the inquiry is always whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force."[137]

Further, the Tenth Circuit has long held that the reasonableness of law enforcement's actions "depends both on whether the officers were in danger at the precise moment that they used force and on whether [their] own reckless or deliberate conduct during the seizure unreasonably created the need to use such force."[138]  Thus, the court may consider conduct prior to any threat if such conduct is "immediately connected" to any threat of force by a suspect.[139]

---

[133] *Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017) (citation and internal quotation marks omitted).

[134] *Id.*

[135] *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995) (internal quotation and alteration marks omitted).

[136] 490 U.S. 386, 396 (1989) (citation omitted).

[137] *Estate of Larsen*, 511 F.3d at 1260, 1262 (citation omitted).

[138] *Estate of Ceballos v. Husk,* 919 F.3d 1204, 1215 (10th Cir. Mar. 26, 2019) (quoting *Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997)).

[139] *Id.* (quoting *Allen*, 119 F.3d at 840 (other citations omitted).

## 1. Severity of the Crime

In evaluating this factor, the court may consider any criminal act that occurs during the police-citizen encounter and is not limited to only considering the crime that caused the encounter.[140] Generally, violent or felony crimes support an officer using more force than would be reasonable for nonviolent crimes or crimes classified as misdemeanors or less.[141]

This factor favors Plaintiffs. They allege Jovany had committed no crime and threatened no one before his interaction with the officers. And far from blatantly contradicting, the recordings provide factual support for these allegations. The 911 caller reported Jovany to be walking around the neighborhood with a pocketknife in a very concerning mental state—whether caused by alcohol, drugs, or mental illness—but did not report he had threatened or acted violently toward anyone.

The Ogden Defendants counter that the situation "presented a 'tense, uncertain, rapidly-evolving situation'"[142] where Jovany was a "suspect in a weapons disturbance, and it was reported he was trespassing on the 911 caller's property." The court cannot agree, particularly at this stage, where Plaintiffs' allegations must generally be accepted.

To start, though the Ogden Defendants repeat the term often, is unclear precisely what the bounds of a 'weapons disturbance' are. The term remains undefined in the papers. But whatever the label means, the facts as the court must accept at this stage are noted above—Jovany lawfully

---

[140] *See Clark v. Bowcutt*, 675 F. App'x 799, 807 (10th Cir. 2017) (unpublished) (including in its analysis of the first *Graham* factor the citizen's initial crime—public urination—and his subsequent offense—fleeing from a traffic stop.).

[141] *See id.* ("Felonies are deemed more severe.") (citation omitted); *see also Casey v. City of Fed. Heights*, 509 F.3d 1278, 1281 (10th Cir. 2007) ("Officer Sweet was faced with somebody who had committed a misdemeanor in a particularly harmless manner, which reduces the level of force that was reasonable for him to use."); *Ronquillo*, 720 F. App'x at 438 (weighing the first *Graham* factor in favor of the citizen even though he had committed a felony because none of his "alleged crimes were accompanied by violence.").

[142] Dkt. 27 at 18 (quoting *Giannetti v. City of Stillwater*, 216 F. App'x. 756, 763 (10th Cir. 2007) (unpublished)).

carried a six-inch pocketknife, was walking around on a summer evening at a time when others were also outside, was threatening no one, but his apparent mental state deeply concerned the 911 caller during their short interaction.  That caller indicated Jovany had walked onto the caller's driveway, they spoke, and then Jovany was hanging out in front of his house.  He then left and went to a neighbor's "parking spot."

Plaintiffs do not allege, and it is not clear from the 911 or the dispatch call recordings that the 911 caller ever asked Jovany to leave his property, that Jovany refused such a request, or that he was trespassing on the caller's property.  At worst, the 911 caller indicated near the end of the call that Jovany—someone the caller did not know—entered a neighbor's property, perhaps implying (incorrectly) that Jovany might be trespassing while holding a pocketknife.  And one may view as suspicious—or at least odd—for Jovany to be in the back of a dark carport when the officers arrived.  But even so, or if a trespass had been expressly communicated on the dispatch call (it was not),[143] Plaintiffs' allegations can fairly lead to a conclusion that, at most, a minor, non-violent crime precipitated the officers' confrontation with Jovany, not dangerous, seriously concerning, or "severe."

## 2. Immediate Threat

The Tenth Circuit has established four non-exclusive factors for assessing the threat posed to officers during an encounter: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions

---

[143] The dispatcher explained Jovany hasn't threatened anyone, though he approached the 911 caller's driveway carrying a knife, and he was currently in a "parking spot" at the home of the neighbors to the east of the 911 caller. The Ogden Defendants also point to Jovany's actions during his short interaction with the officers—that he "flicked" the knife open after the approached, ignored their commands, and "advanced" toward them. Dkt. 27 at 18. As noted above in the discussion of the relevant facts, it is unclear that Jovany flicked open the knife.  In any event, these facts are considered in the discussion of the threat Jovany may have posed.

were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect."[144]

### a. Whether Officers Ordered Jovany to Drop his Weapon

Over the course of about twenty seconds, the Ogden officers repeatedly instructed Jovany to drop his pocketknife.  Plaintiffs allege in their Complaint these commands were "confusing" and "overlapping."[145]  The officers' body camera video footage both supports and blatantly contradicts these allegations, as there are times the commands are overlapping, and times the commands were clearly given by one officer at a time.  Yet Jovany failed to drop his pocketknife before he was shot.  This factor favors the officers viewing Jovany's actions as threatening.

### b. Hostile Motions Made with the Weapon Towards the Officers and Jovany's Manifest Intentions

The Ogden Defendants argue Jovany made hostile motions with his weapon—a six-inch pocketknife, when he "flicked" it open upon seeing the officers, "advance[ed] toward" them, and ignored their commands while he "appeared agitated and angry."[146]  And, with "shoulders back and hands clenched," he manifest his intentions to "continue on his course, . . present[ing] a danger to Officers and partygoers nearby."[147]

The court cannot at this stage accept the Ogden Defendants' characterizations of Jovany's body language and facial expressions where Plaintiffs' allegations that Jovany moved slowly and had a blank (not angry or agitated) look on his face are not blatantly contradicted by the video footage.  Likewise, though the Ogden Defendants allege Jovany was "advancing" on them,

---

[144] *Estate of Larsen*, 511 F.3d at 1260 (citations omitted).

[145] Dkt. 2 ¶¶ 51, 65, 168.

[146] Dkt. 27 at 16

[147] *Id.* at 17.

committed to "continue on his course" and possibly harm others (though there were no bystanders nearby), Plaintiffs have also alleged that the officers called Jovany to them, and never told him to stop.  In the diminished mental state Plaintiffs have also alleged, a jury could conclude Jovany—saying nothing and with a blank stare on his face—was not manifesting an intent to cause harm beyond his failure to drop the knife, a factor treated above.

And even if the court could accept that the officers perceived that Jovany flicked open the knife in his hands (though the court cannot conclude at this stage if he did or did not), the court cannot find that this action amounted to a hostile action that significantly added to the threat calculus and justified a shift in approach from merely aggressive, to the use of deadly force.  The officers knew Jovany had been seen with the pocketknife earlier that night, but he had not threatened anyone.  That was part of why they were called.  Jovany had the same knife in his hands when the officers arrived.  He did not reach for it, grab it and hold it up to use it, rush at the officers with it, or engage in "slicing" motions with it.[148]  He kept it in his hand, by his side, and was shot and killed without having moved it from that position.

### c.  Distance Between the Officers and Jovany

In assessing the objective reasonableness of deadly force, there is no "bright line rule[]" about distance between an officer and suspect.[149]  Rather, this factor must be considered in the

---

[148] *Tenorio v. Pitzer*, 802 F.3d 1160, 1164-65 (10th Cir. 2015) (quoting with approval district court findings that suspect "made no hostile motions toward the officers but was merely 'holding a small kitchen knife loosely by his thigh . . . and made no threatening gestures toward anyone;'" also noting that he had not charged the officer, but was "[u]nspeaking and with a blank stare on his face. . . ."); *see also Walker v. City of Orem,* 451 F.3d 1139, 1160 (10th Cir. 2006) (noting it had was established that "where an officer had reason to believe that a suspect was holding only a knife, not a gun, and suspect was not charging the officer and had made no slicing or stabbing motions toward him, that it was unreasonable for the officer to use deadly force against the suspect." (citations omitted)).

[149] *Estate of Larsen*, 511 F.3d at 1262.

totality of the circumstances.[150]  Distance may be less important if a suspect has a gun or other weapon of long-range lethality, or other factors heighten or lessen the threat.

In *Estate of Larsen ex rel. Sturdivan v. Murr*, for example, the Tenth Circuit affirmed the district court's finding at the summary judgment stage that the distance between a shooting officer and the suspect supported the use of force under totality of circumstances.[151]  The officers knew the suspect, Mr. Larsen, had threatened to "kill someone or himself."[152]  The officers approached Larsen at his home, where he stood above them on his raised porch with a knife large enough that it looked like a "small sword."[153]  The officers were between seven and twenty feet from Larsen.[154]  Larsen raised the knife above his shoulder with the blade turned toward Murr. The officers warned Larsen to drop the knife, or they would shoot him.  Larsen took a step toward the officers, and they shot him.[155]  On appeal, the court noted that though there may have been twenty feet between the officer and Larsen, the relatively far distance was "not the only factor," and the plaintiff's argument on it was "unpersuasive when we consider the other undisputed facts in their totality."[156]

In contrast, in *Walker v. City of Orem*, a case where an officer shot a person who had driven recklessly, almost ran over an officer, attempted to elude police, and exited his vehicle with a knife, the Tenth Circuit found fact questions remained at the summary judgment stage on this issue where not only was there at least twenty-one feet between the officer and the shooting

---

[150] *Id.*

[151] *Id.* at 1261-62.

[152] *Id.* at 1258.

[153] *Id.* at 1258.

[154] *Id.* at 1261.  The shooting officer, Murr, testified he thought he was seven to ten feet away from Larsen, while other evidence supported up to twenty feet. *Id.* at 1261.

[155] *Id.* at 1258-59.

[156] *Id.* at 1262.

victim, but the officer should have known before the confrontation the victim was "suicidal, not homicidal," was holding only a small two-inch knife against his own wrist, and had not made any prior violent threats toward the officers at the scene.[157]

Against this backdrop, the court considers the allegations in the Complaint and the recordings and finds the distance between the officers and Jovany when he was shot was relatively far, especially in relation to the weapon at issue, and weighs against justifying the deadly force used. Plaintiffs and the Ogden Defendants seem to agree the officers were roughly twenty feet from Jovany when they shot him—about the same distance in *Larsen* and *Walker*. Plaintiffs specifically allege in their Complaint that the officers stood twenty to twenty-five feet from the carport gate's opening in the street, and initially several feet further from Jovany, who was far inside the carport as they approached.[158] They also allege the evidence is at least disputed as to whether the circumstances would have allowed the officers to retreat further.[159]

The video footage does not blatantly contradict that there was significant distance between the officers and Jovany, and room to retreat. The video shows the officers in the street in front of the Mercado home, with no people around or cars directly in front of the carport that could directly impede their ability to occupy the space or retreat across or down the street from

---

[157] 451 F.3d at 1159-60.

[158] Dkt. 2 ¶ 62. The Ogden Defendants contend Jovany "was only a short distance away from the Officers—less than twenty feet—when [the officers] fired." Dkt. 27 at 16.

[159] Dkt. 2 ¶ 75. Sevenski reported he could not have retreated from his position, because it would have put other officers at risk, but Garcia did not share that view, and stated he thought he could have even gotten back in his patrol car if needed.

the home.[160]  Additionally, Jovany and the officers were on the same level ground.  There is also

a barrier—a chain link fence separating the carport from the officers—with a gate that appeared

capable of being opened or closed, in the case of a distant and, like Jovany, fairly slow-moving

threat.[161]  The officers knew Jovany had a six-inch pocketknife, but no indication he had other

weapons or had threatened anyone.[162]  There are no allegations that they knew Jovany was at his

parents' home, but they also lacked specific information that he was trespassing.[163]

On balance, in view of all these facts, the relatively far distance of twenty feet with

additional room to retreat weighs against the use of deadly force.

### 3. Resisting or attempting to evade arrest

Evaluated next is whether Jovany was resisting or attempting to evade arrest or flee

during his interaction with the Ogden Officers.  Plaintiffs argue this factor favors them, where

the video of the incident shows Jovany was never told he was facing or actually under arrest.

Plaintiffs further allege in the Complaint that Jovany had committed no crime, and the 911 caller

never indicated Jovany had committed a crime or threatened anyone.[164]

---

[160] In arguing the distance factor favors them, the Ogden Defendants contend "there were neighbors and partygoers just behind and around [the officers]," and "[a] car was in the driveway and lights were on in the home where Jovany was found lurking, indicating someone might be home, and a light on the carport switched on, furthering that possibility." Dkt. 27 at 16.  The video does not support these statements in a few important ways.  First, all the video surveillance of the street in front of the Mercado home shows no one on the street at all as the officers arrive to confront Jovany.  Second, in viewing the video, the undersigned can see no lights on in or on the Mercado home as the officers approach.  And there is no basis at the Rule 12 stage to infer the carport light "switched on" due to a person turning a switch –particularly where Plaintiffs specifically allege that the light came on due to automatic motion sensors when Jovany was walking.  Dkt. 2 ¶ 53.

[161] As noted above, Sevenski at one point opened the gate more than it had been open when the officers arrived.

[162] Dkt. 2 ¶¶ 32, 119.

[163] The dispatch call stated Jovany had gone to a parking spot east of the 911 caller's home.  When they arrived at the scene, the 911 caller pointed the officers toward the Mercado home down the street and around the corner.  There is no concrete information offered that Jovany committed a crime.  Admittedly, it is strange and likely suspicious that he was in the back of a darkened carport when the officers arrived.

[164] Dkt. 2 ¶¶ 24, 30, 63.

Plaintiffs' view is supported by the Tenth Circuit's decision in *Bond v. City of Tahlequah, Oklahoma (Bond I),* finding the target of an officer shooting "could not have been actively resisting arrest or attempting to evade arrest by flight" where it was "undisputed that the officers did not intend to arrest [the shooting victim] when they first encountered him in the garage doorway."[165]  But, as the Ogden Defendants note, seven years earlier, in *Cavanaugh v. Woods Cross City,* the Tenth Circuit found no abuse of discretion in a trial court refusing to give a jury instruction requested by the § 1983 plaintiff tethering this factor only to a Utah definition of actively resisting "arrest."  The court of appeals agreed the jury could consider whether the § 1983 plaintiff was "actively resisting *seizure* or attempting to evade."[166]  There, the court stated "[t]here is a use-of-force spectrum, and where along the spectrum the officer's conduct justifiably falls depends on a variety of circumstances.  This spectrum exists even when the seizure effected is merely an investigative detention and not an arrest."[167]

The Ogden Defendants argue though Jovany admittedly was not resisting arrest, he was "resisting the investigatory actions of the Officers as he ignored commands to drop the knife and advanced toward the Officers in an aggressive and threatening manner."[168]  And in their Reply, they add that the "information presented to [the officers] was the 911 caller's report that a man (Jovany) "had been in their driveway without permission and, when he left, entered a neighbor's property."[169]  The Ogden Defendants then suggest the 911 caller indicated, and somehow knew,

---

[165] 981 F.3d 808, 820 (10th Cir. 2020), *reversed on other grounds by* 595 U.S. 9 (2021).

[166] 718 F.3d 1244, 1252 (10th Cir. 2013).

[167] *Id.* (citations omitted).

[168] Dkt. 27 at 19.

[169] Dkt. 43 at 14.

"the man had been trespassing with a knife and may have been trespassing on a different, neighboring property with a knife."[170]

Viewing the allegations and recordings in the light most favorable to Plaintiffs, the court cannot accept many of Defendants' characterizations, including that Jovany was "advancing" toward the officers in an aggressive manner.  Plaintiffs allege and the body camera footage supports that the officers instructed Jovany to come out from the back of the carport, which he did, and was not told to stop.  He moved slowly, with an arguably strange and blank look on his face, never spoke, and never raised the arm holding his pocketknife from his side.

Nor can the court accept that the 911 caller clearly indicated Jovany was trespassing.  As noted above, the 911 caller did not state Jovany had trespassed or entered his property "without permission," or refused requests to leave.  It is possible to infer the 911 caller suggested Jovany may be trespassing on a neighbor's property.  But this possibility is not clearly communicated on the dispatch call.  The dispatcher simply informed officers that Jovany was on the property of a neighbor to the east of the 911 caller.  The officers arrived quickly, saw Jovany in the back of the carport, asked him no questions, commanded him to come out, never told him to stop, then raised their firearms and began shouting at him to drop his knife before shooting him seconds later. Under these circumstances, at this stage, there is evidence upon which to conclude that Jovany was not actively resisting arrest or an investigatory detention.

### 4.  Officers' conduct in recklessly or deliberately creating the need for the level of force

The Tenth Circuit has held that the reasonableness of an officer's use of force turns not only on the danger faced at the exact moment force was used, but "also on whether the officers' own conduct during the seizure unreasonably created the need to use such force," if such conduct

---

[170] Dkt. 15.

was "reckless and deliberate" and immediately connected to the seizure."  Moreover, [t]he mentally ill or disturbed condition of the suspect is a relevant factor in determining reasonableness of an officer's responses to a situation."[171]

Citing *Hastings v. Barnes*,[172] Plaintiffs contend a jury could conclude the officers' "deliberate, aggressive, and threatening" actions toward Jovany created the danger and unreasonably escalated the situation."[173]  The court agrees.  While the facts of *Hastings* are not identical, they are instructive.  There, officers conducting a check on a man experiencing a desire to self-harm interacted with him for a time, then saw him in his bedroom "pick up a Samurai sword with a 20-inch blade and 21-inch handle . . . [holding] it like he was going to swing a baseball bat."[174]  Thereafter, they crowded his bedroom door issued loud commands to him, pepper sprayed him, and, when he still moved again toward the officers, shot him.[175]  The Tenth Circuit affirmed the district court's finding at the summary judgment stage that genuine issues or material fact existed on a variety of issues, including whether the officers actions "unreasonably precipitated their need to use deadly force. . . ."[176]

Similarly, Plaintiffs allege Jovany had committed no crime, was the subject of a welfare check, but that nonetheless the four officers recklessly boxed Jovany in on "his own" carport; yelled loud, confusing commands; and failed to see he was not comprehending the situation due to a troubled mental state.[177]  While there is no allegation the officers knew Jovany was at the

---

[171] *Estate of Ceballos*, 919 F.3d at 1214 (citations omitted).

[172] 252 F. App'x. 197 (10th Cir. 2007) (unpublished).

[173] Dkt. 36 at 20.

[174] 252 F. App'x. at 199-200.

[175] *Id.* at 200.

[176] *Id.* at 203.

[177] Dkt. 36 at 22.

family home, the video recordings do not otherwise blatantly contradict Plaintiffs' allegations. They show three (and later four) officers start their interaction with Jovany by, all at once, spreading out at the edge of the carport with blindingly bright flashlights shining.  The officers asked no questions of Jovany, but just seconds after arriving and after seeing the pocketknife they already knew he had been open-carrying –a reason they were called in their first place— either "out" or "flicked open," they aimed their firearms at him, yelling at him and shining their flashlights for twenty seconds as he slowly walked until he was shot at the carport gate.  Jovany had said nothing, expressed no threats, had a blank stare, and never raised either arm.

And though in dispute, a jury could also conclude the video evidence shows Jovany in the visibly diminished mental state Plaintiffs allege in their Complaint, and that the officers should have appreciated and reacted that diminished state—even if they were inexplicably not given the detailed information on Jovany's apparent mental state the 911 caller had provided to the dispatcher.  They knew they received a dispatch call for a weapons disturbance because a neighbor was concerned enough to call about a male walking around with a pocketknife—though he had made no threats and committed no apparent crime.  Jovany was standing alone, in the dark, in the back of an open carport with only his six-inch pocketknife in his hands—somewhat unusual behavior.  When called out, he moved slowly and oddly, sideways then slowly forward with a blank stare, saying nothing the entire time, moving toward the officers with only his pocketknife in his hand, down to his side.

A jury could reasonably conclude that given the lack of information the officers had about any threat or clear crime, the apparent state Jovany was in and the way he reacted, the officers should have suspected a mental or substance use issue was present.  And it bears noting that only a short time earlier, the neighbor who called 911—a stranger to Jovany—was able

ascertain after interacting with him that Jovany seemed confused, not responsive, and "not present" in the situation, possibly due to drugs or alcohol.

The Ogden Defendants attempt to avoid this by arguing the officers cannot be found to have been reckless in their approach where they had no reason to know Jovany was at his parents' house or that he was having a mental health issue.[178]  It is true that there are no allegations the officers should have known it was his family's home—or assumed with certainty it was not.  But for the reasons stated above, a jury could reasonably conclude the officers could have appreciated that Jovany was in a diminished mental state when they confronted him and should have responded to that information in a less aggressive way so as not to unnecessarily escalate the situation.

The Ogden Defendants next repeat the refrain that there were bystanders and partygoers "in the immediate vicinity and indications (which turned out to be true)" that people were inside the Mercado home, thus warranting the aggressive approach the officers took.[179]  This is disputed at best.  More importantly at this Rule 12 stage, it is not in Plaintiffs' Complaint or evident in the recordings the court has reviewed.  As noted above, the body camera and carport surveillance footage show no one on or near the Mercado home, or on their street, before or during the time of the confrontation.  The party the Ogden Defendants refer to appears from the video to have been around the corner and up a nearby street.[180]  Moreover, even if the court could consider at the Rule 12 stage the Ogden Defendants' contention that unspecified "indications" suggested people were inside the Mercado home (perhaps the car in the driveway), other evidence places

---

[178] Dkt. 27.

[179] *Id.* at 25.

[180] It is quite a stretch, particularly at this stage and in view of the video footage of the confrontation, to suggest as the Ogden Defendants do, that Jovany very well could have "taken a hostage from the numerous bystanders. . . ." Dkt. 27 at 25.

even that in dispute.  For instance, the Sevenski body camera footage of officers walking toward the Mercado home shows no people or illuminated lights, and no visibly apparent indication anyone was home.[181]  In any event, no camera footage captures anyone on the street near the home before or during the confrontation.[182]  For these reasons, the court concludes there is evidence upon which a jury could reasonably find the officers' actions created the danger they allege necessitated shooting Jovany as he reached the carport gate.

With the exception of Jovany's failure to drop the pocketknife, under the factors the court has considered above, Plaintiffs have supplied in their Complaint on behalf of the Estate sufficient allegations to support a violation of Jovany's Fourth Amendment rights arising from his shooting on August 16, 2009.

### B.  Clearly Established Law

The court next addresses whether the right Plaintiffs have identified was clearly established at the time of Jovany's shooting, such that "'a reasonable officer would understand that what he is doing violates that right.'"[183]  Plaintiffs may satisfy this burden by identifying a Supreme Court or Tenth Circuit decision on point, "or clearly established weight of authority from other courts" illustrating the Defendant officers' actions violated his rights.[184]

In making this determination, the Supreme Court has instructed courts "not to define clearly established law at too high a level of generality."[185]   A rule is not clearly established if

---

[181] Dkt. 27-4 (Sevenski Footage) 0:13-0:18.  The Poulsen Footage begins after the officers are stationed outside the carport and is less helpful on this point.

[182] At the beginning of the carport surveillance video, it is possible to see movement across the street—perhaps someone walking—before the officers arrive.  No one walks on the sidewalk in front of the Mercado home.

[183] *Mecham v. Frazier*, 500 F.3d 1200 at 1206 (10th Cir. 2007) (quoting *Medina v. Cram,* 252 F.3d 1124 at 1128 (10th Cir. 2001)).

[184] *Id*.  (citations omitted).

[185] *City of Tahlequah, Oklahoma v. Bond (Bond II),* 595 U.S. 9 at 12 (2021) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

merely "suggested by then-existing precedent; the 'rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"[186] And "[s]uch specificity is 'especially important in the Fourth Amendment context,' where it is 'sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'"[187]

Plaintiffs primarily rely on *Estate of Ceballos v. Husk*,[188] decided in March 2019, arguing it "cuts squarely against Defendants."[189]  The court agrees.

In that case, Ceballos's wife called 911 to get help removing her husband, who was drunk, probably on drugs, "acting crazy" in their driveway, and holding a baseball bat.[190] Dispatch information went out regarding "a high priority disturbance" involving a drunk and unwanted person "armed with one or more bats," who was "known to have knives,"[191] and was a 'walkaway' from a medical center the prior night.[192]

Officer Husk took charge at the scene, assisted by three other officers.  One officer thought Ceballos "didn't seem right."[193]  He went back to his car to get a beanbag shotgun,[194] not thinking lives were in danger, given the distance between the officers and Ceballos and the fact

---

[186] *Id.* (quoting *District of Columbia v. Wesby*, 583 U. S. 577 at 590 (2018) (quoting *Saucier v. Katz*, 533 U.S. 194 at 202 (2001)).

[187] *Id.* at 12-13 (quoting *Mullenix v. Luna*, 577 U.S. 7 at 12 (2015) (*per curiam*) (internal quotation marks omitted)).

[188] 919 F.3d 1204.

[189] Dkt. 36 at 29.

[190] *Id.* at 1209.

[191] *Id.* at 1209.

[192] *Id.* Still other information—which, unlike the rest was *not* seen by reporting City of Thornton Colorado police Officer Husk—indicated (somewhat relatedly) that Ceballos had threatened his wife with a knife several months earlier and was not taking his anti-depression medication.  *Id.*

[193] *Id.* at 1210.

[194] *Id.*

that he was armed only with a bat.[195]  Ceballos paced in the driveway, swinging the bat, yelling, and throwing his arms in the air.  No one else was nearby.[196]

From the street, the officers commanded Ceballos to drop his bat.[197]  But instead, Ceballos went into the garage.  Husk drew his gun, another officer drew his taser.[198]  Ceballos came out holding the bat, refused to drop it, and walked toward the officers, yelling at them, though warned he would be shot.[199]  Husk then shot Ceballos as the other officer deployed his taser—all before the officer who ran to his car returned with his beanbag shotgun.[200]

Ceballos's estate sued Husk.  The district court denied him summary judgment on qualified immunity, finding Plaintiffs "stated a clearly established Fourth Amendment violation and there were genuinely disputed issues of material fact that precluded granting the officer summary judgment on that Fourth Amendment claim."[201]  Husk appealed only that clearly established law should have apprised him his conduct violated the Fourth Amendment."[202]

The Tenth Circuit affirmed.[203]  The court first cited with approval the district court's summary of the applicable familiar Fourth Amendment principles, reciting the *Graham* factors;[204] noting use of force should be judged from the perspective of a reasonable officer on the scene, rather than with hindsight, and allowing for split-second judgments in rapidly-

---

[195] *Id.*

[196] *Id.*

[197] *Id.*

[198] *Id.*

[199] *Id.*

[200] *Id.*

[201] *Id.* at 1213.

[202] *Id.*

[203] Judge Bacharach dissented, concluding the "district court erroneously concluded that Officer Husk's conduct violated a clearly established right."  *Id.* at 1232.

[204] *Id.* at 1213.

evolving situations;[205] but stating that officers may not use deadly force unless an objectively reasonable officer would have probable cause to "'believe there was a threat of serious physical harm to themselves or to others.'"[206]

The district court had "further correctly recognized that '[t]he reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment they used force but also on whether the officers' own conduct during the seizure unreasonably created the need to use such force.'"[207]  But "only reckless and deliberate conduct that is immediately connected to the seizure will be considered."[208]  Thus, "[m]ere negligence or conduct attenuated by time or intervening events is not to be considered."[209]  "The mentally ill or disturbed condition of the suspect is a relevant factor in determining reasonableness of an officer's responses to a situation."[210]

Against this backdrop, the court of appeals next found that the case of *Allen v. Muskogee*[211] provided Ceballos with a requisite prior "'case where an officer acting under similar circumstances'" as Husk "'was held to have violated the Fourth Amendment.'"[212]  There, officers confronted Mr. Allen, who had threatened suicide and harm to his family, while he was in his car with a gun.  The disputed evidence arguably showed the officers approached the car screaming at Allen to leave the vehicle, after which a struggle ensued, ending with Mr. Allen

---

[205] *Id.* (citing *Kisela v. Hughes*, 584 U.S. ---, 138 S.Ct. 1148, 1152 (2018) (per curiam)).

[206] *Id.* at 1213-14 (quoting *Thomson v. Salt Lake City,* 584 F.3d 1304, 1313 (10th Cir. 2009) (other citations omitted)).

[207] *Id.* at 1214 (citing *Hastings*, 252 F. App'x. at 203; *Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001); *Allen*, 119 F.3d at 840; *Sevier v. City of* Lawrence, 60 F.3d 695, 699 (10th Cir. 1995)).

[208] *Id.* (quoting *Hastings*, 252 F. App'x. At 203 (citing *Medina*, 252 F.3d at 1132)).

[209] *Id.* (citing *Sevier*, 60 F.3d at 699).

[210] *Id.* (citing *Giannetti*, 216 F. App'x. at 764; *Allen*, 119 F.3d at 840; and *Sevier*, 60 F.3d at 699, 701 and n.10)).

[211] 119 F.3d 837.

[212] 919 F.3d at 1215 (quoting *White v. Pauly*, 137 S.Ct. 548, 552 (2017) (per curiam)).

shot and killed—all within ninety seconds.  The court of appeals highlighted *Allen*'s discussion of the evidence concerning the officers' initial approach on the scene, combined with the brief time that elapsed between the approach and the shooting, rendering the "'officers' preceding actions . . .so 'immediately connected' to [Allen's] threat of force that they should be included in the'" inquiry into the reasonableness of the officers' actions."[213]

The court of appeals noted the circumstances there were analogous to *Allen*'s, including a combative approach by shouting officers who held their ground near an emotionally distraught suspect, ending with a shooting in a short period of time, unattenuated from the initial approach.[214]  Indeed, the court of appeals noted that there was less justification for shooting Ceballos than had existed in *Allen*, where Mr. Allen had a gun—much more capable of lethality and at a longer range than a bat—and there were bystanders nearby.  Thus, the court of appeals concluded *Allen* "was sufficient, *a fortiori*, to put Officer Husk on notice that his actions (as we must accept them here) violated Ceballos's Fourth Amendment rights."[215]

Husk's efforts to distinguish *Allen* gained no traction.  First, the court declined to cabin *Allen* to situations when an officer knows a suspect has a "mental illness or disability," finding it could apply when an officer had reason to know a suspect's "capacity to reason was diminished, whatever the underlying reason might have been—mental health problems, emotional distress,

---

[213] *Id.* at 1216 (quoting *Allen*, 119 F.3d at 841).

[214] *Id.*

[215] *Id.*  The court of appeals also found this conclusion "bolstered" by a handful of other cases, including *Sevier*, 60 F.3d 695 (officers shot "despondent man who had a knife and had locked himself in his bedroom when, after coaxing him out of his room, the man refused to drop his knife and instead lunged at one of the officers;" but ultimately concluding the court lacked jurisdiction to consider the interlocutory appeal . . . ."); *Hastings,* 252 F. App'x.197 (in unpublished decision, affirming denial of qualified immunity to four officers "called to a home about a suicidal man, after they chased the man into a small bedroom where, after he grabbed a samurai sword, they pepper sprayed him, causing him to lift the sword and move toward the officers.").  *Id.* at 1216-17.

drunkenness, or drugs."[216]  Second, the court rejected Husk's distinction that he had been investigating "violent criminal activity," while the *Allen* officers were responding to a "welfare check,"[217] where the *Allen* officers knew the suspect was reported to have a gun, had threatened his family that same day, and had an outstanding warrant.[218]  Third, Husk argued that the suspect in *Allen* only acted aggressively after the officers approached, whereas "Ceballos was already pacing in his driveway, swinging a bat and yelling, when officers arrived."[219]  The court found no meaningful distinction, noting that Ceballos did not retreat to the garage or become aggressive until officers approached him, yelling commands.[220]

Finally, the court of appeals distinguished the cases Husk cited to support qualified immunity, where in those cases the officers were immune for "using deadly force to keep an armed suspect from escaping into the general public or to locate and stop an armed person who already escaped into the general public."[221]  In contrast, no one was near Ceballos, and the mere possibility he could pose a threat if he left the driveway did "not weight heavily on Officer Husk's side."[222]

Similarly, here, the evidence viewed in the light most favorable to Plaintiffs could support their allegations that Jovany was visibly in a diminished mental state when the officers confronted him.  The 911 caller, who did not know Jovany, recognized this based on Jovany's

---

[216] *Id.* at 1217.

[217] *Id.*

[218] *Id.*

[219] *Id.*

[220] *Id.* at 1217-18.

[221] *Id.* at 1218 (citing *Jiron* 392 F.3d at 411-13, 418-19); *Medina*, 252 F.3d at 1126-27, 1132; and *Thomson*, 584 F.3d at 1309-10.

[222] *Id.* (citing *Cordova v. Aragon*, 569 F.3d 1183, 1190 (10th Cir. 2009); *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).  The *Ceballos* Court also distinguished *Estate of Larsen v. Murr*, 511 F.3d 1255 (10th Cir. 2008), on the grounds that "Larsen did not claim that the officers' conduct caused the need for them to use deadly force."  *Id.*

unusual appearance and actions.  The video footage does not blatantly contradict this, showing

Jovany with a blank stare, moving slowly and oddly, and never speaking.  Worse for the Ogden

Defendants when compared to Mr. Ceballos, Jovany was not accused of, or known for, being

violent or threatening; nor did he adamantly refuse requests to leave property before and during

the confrontation with officers.  As in *Ceballos*, the evidence shows multiple officers confronted

Jovany at once, but arguably more aggressively—failing to ask questions or engage in

conversation, shining their blinding flashlights, and shouting—often all at once.  As in *Ceballos*,

the officers largely held their ground in the street until after Jovany slowly approached them and

was shot following twenty seconds of commands to drop his pocketknife (and a few more

seconds of being told to "come out")—despite the fact that the street was seemingly clear of

bystanders and Jovany having a weapon of only short-range lethality that—unlike in *Ceballos*—

was never raised up to attack before the shooting occurred.

 Plaintiffs also cite *Tenorio v. Pitzer*,[223] in which Officer Pitzer shot a knife-holding

Russell Tenorio while responding to a 911 call to remove Tenorio from a home.  He was drunk,

holding a knife to his throat, had a history of violence, and the caller feared he would hurt

himself or his wife.[224]  The Tenth Circuit affirmed the denial of Officer Pitzer's motion for

summary judgment, finding the evidence supported a violation of clearly established law.[225]

 There, officers lined up outside the open front door to the home—Pitzer in front with

handgun drawn, a second officer behind carrying a taser, a third with his handgun drawn, and a

---

[223] 802 F.3d 1160.

[224] *Id.* at 1161-62.

[225] *Id.* at 1161.  Because the court of appeals affirmed on this theory, it saw no need to address a second basis on
which the district court had denied summary judgment—that the evidence could show Pitzer also violated clearly
established law when he and his fellow officers "recklessly created the situation that resulted in the use of deadly
force."  *Id.*

fourth carrying a shotgun loaded with beanbag rounds.[226]  Pitzer could see into the home's living room with doorways on the opposite wall, one leading to a kitchen.[227]  Three officers entered the home, unannounced.  Tenorio was called out of the kitchen, a blank stare on his face and his arms to his side, carrying loosely in his right hand a santoku-style knife with a three and a quarter inch blade.  His wife and another male were nearby.[228]

Tenorio's wife was taken outside.  Tenorio walked into the living room at an "average speed."  Officer Pitzer yelled, "Sir, put the knife down!  Put the knife down, please! Put the knife down!" Put the knife down!"  Without dropping the knife, Tenorio took two and one-half more steps into the living room.  Pitzer shot him and another officer tased him.[229]  Not quite four minutes had elapsed since officers arrived at the house, and the commands and shooting entirely took place in about two to three seconds.[230]

The district court denied Pitzer summary judgment, finding a reasonable jury could conclude he lacked probable cause to believe Tenorio posed a threat of serious harm.  The court found a jury could decide three factors weighed against probable cause—whether Tenorio made hostile motions, the distance between Tenorio and the officers, and Tenorio's manifest intentions.  The court further concluded a jury could find one factor to be neutral—whether Tenorio failed to comply with commands to drop the knife or whether he simply had insufficient time to do so.[231]

---

[226] *Id.*

[227] *Id.*

[228] *Id.* at 1163.

[229] *Id.*

[230] *Id.*

[231] *Id.*

On appeal, the Tenth Circuit observed it was "comfortable that the evidence, viewed in this light, suffices for Tenorio's clams.  In fact, our precedents compel this result."[232]  The court of appeals explained that a prior case, *Zuchel v. City and County of Denver, Colo.*,[233] had "'specifically established that where an officer had reason to believe that a suspect was holding only a knife, not a gun, and the suspect was not charging the officer and had made no slicing or stabbing motions toward him, that it was unreasonable for the officer to use deadly force against the suspect.'"[234]

Thus, accepting the facts as the district court found, the court of appeals emphasized that Tenorio had only taken three steps, was not charging, might have been outside "striking distance," had a blank stare on his face, "made no aggressive moves," had the small kitchen knife held loosely by his thigh, and may not have been given sufficient time to comply with demands he drop the knife.  The court noted the distinction between these facts, "support[ing] a finding that Tenorio took no hostile or provocative action toward the officers," and those in the *Estate of Larsen* case, described above, where the deceased victim had taken such action—ignoring multiple commands to drop his weapon, then turning and moving "toward the officer with a large knife raised in a provocative motion."[235]

While Jovany took more than three steps, the remainder of the facts the *Tenorio* Court emphasized are highly analogous.  And again, Jovany was not accused of threatening anyone before officers initiated their confrontation with him.

---

[232] *Id.* at 1165.

[233] 997 F.2d 730 (10th Cir. 1993).

[234] *Id.* at 1165-66 (quoting *Walker,* 451 F.3d at 1160).

[235] *Id.* at 1166 (citing *Larsen,* 511 F.3d at 1263).

Plaintiffs incidentally cite *Bond v. City of Tahlequah, Okla*., (*Bond I*), [236] a case later reversed in part by the Supreme Court in late 2021.[237]  In *Bond I,* the Tenth Circuit reversed the grant of summary judgment in favor of officers who had shot an intoxicated man who refused to leave his ex-wife's home.  Upon arriving at the home, the officers spoke to the suspect while he was inside the home's garage, discussed his concerns about going to jail, unsuccessfully asked for permission to do a 'pat-down,' and watched him grab a hammer and hold it above his head.  At that point, the officers drew their firearms, but the man would not comply with commands to drop the hammer.  Instead, he repeatedly said "no" and argued with the officers that he was in his own home and had done nothing wrong.  With the officers' guns drawn, the man moved to between eight to ten feet from the officers and, with nothing between them, pulled the hammer back behind his head.  At that point the officers shot him.[238]

Under the familiar *Graham* factors, the court of appeals found "inconclusive"[239] or a "close call"[240] whether a sufficient threat existed to justify the officers' use of force at the time they shot, but that an examination of the officers' conduct *before* the use of force revealed facts under which a "jury could reasonably determine [they] . . . unreasonably escalated a non-lethal situation into a lethal one through their own deliberate or reckless conduct."[241]  The court also found the law on this point to be clearly established by *Allen* and its progeny, including *Sevier v.*

---

[236] 981 F.3d 808, 825 (10th Cir. 2020).

[237] 595 U.S. 9 (2021).

[238] 981 F.3d at 813-14.

[239] *Id.* at 824.

[240] *Id.* at 822.

[241] *Id.* at 824 (citations omitted).

*City of Lawrence.*[242]  While an unpublished decision, *Hastings*,[243] also cited *Allen*, the court

noted it could offer "'little support for the notion that the law is clearly established.'"[244]  The

court further found that *Estate of Ceballos*—decided after the underlying conduct—could

nonetheless "advance [their] analysis" where the *Estate of Ceballos* Court agreed that *Allen*

clearly established:

> that an officer violates the Fourth Amendment when his or her reckless or
> deliberate conduct results in the need for lethal force or when the officers rely on
> lethal force unreasonably as a first resort in confronting an irrational suspect who
> is armed only with a weapon of short-range lethality and who has been confined
> on his own property.[245]

The Supreme Court in *City of Tahlequah v. Bond (Bond II)*,[246] reversed in part.  The

Court did not evaluate if the officers violated the Fourth Amendment, or whether recklessly

creating a situation requiring deadly force can itself violate the Fourth Amendment.[247]  It decided

only that on the record before it, the conduct at issue did not violate clearly established law

existing at the time of the shooting on August 12, 2016.[248]

First, the Court noted that the Tenth Circuit relied "most heavily on *Allen*," but found the

facts in *Allen* "dramatically" differed such that *Allen* could not "'clearly establish' that [the *Bond*

officers'] conduct was reckless or that their ultimate use of force was unlawful:"[249]

> The officers in *Allen* responded to a potential suicide call by sprinting toward a
> parked car, screaming at the suspect, and attempting to physically wrest a gun
> from his hands.  119 F.3d at 841.  [The officers here], by contrast, engaged in a

---

[242] 60 F.3d 695 (10th Cir. 1995).

[243] 252 F. App'x. 197 (10th Cir. 2007).

[244] 981 F.3d at 825 (quoting *Grissom v. Roberts*, 902 F.3d 1162, 1168 (10th Cir, 2018)).

[245] *Id.*at 825 (quoting *Estate of Ceballos*, 919 F.3d at 1219).

[246] 595 U.S. 9.

[247] *Id.*at 12.

[248] *Id.*

[249] *Id.* at 13.

conversation with [the suspect], followed him into a garage at a distance of 6 to 10 feet, and did not yell until after he picked up a hammer.[250]

Second, the Court noted the other cases the Tenth Circuit relied on could not provide the needed clearly established law for multiple reasons:

- In *Sevier*,[251] the court of appeals had "merely noted in dicta that deliberate or reckless preseizure conduct can render a later use of force excessive before dismissing the appeal for lack of jurisdiction."[252]  The case therefore could not clearly establish law where it was so dismissed and because the rule stated therein was "much too general to bear on" the evaluation of a Fourth Amendment violation.[253]

- *Estate of Ceballos*[254] was rejected for just one reason: it was "decided after the shooting at issue," and could thus be "of no use in the clearly established inquiry."[255]

- Finally, as for *Hastings v. Barnes*[256] the Court noted that case was unpublished,[257] and factually too different, involving "officers initiating an encounter with a potentially suicidal individual by chasing him into his bedroom, screaming at him, and pepper-spraying him."[258]

---

[250] *Id.*

[251] 60 F.3d 695.

[252] *Bond II*, 595 U.S. at 13 (citing *Sevier*, 60 F.3d at 700-01).

[253] *Id.* (citing *al-Kidd*, 563 U.S. at 742).

[254] 919 F.3d 1204.

[255] *Bond II*, 595 U.S. at 13 (citing *Brousseau v. Haugen*, 543 U.S. 194, 200 n. 4 (2004) (*per curiam*)).

[256] 252 F. App'x. 197, 203 (10th Cir. 2007) (unpublished).

[257] The Tenth Circuit in *Bond I* had already acknowledged this impediment in their discussion of the "clearly established" law.  981 F.3d at 825.

[258] *Id.* at 206.

Thus, the *Bond II* Court found the law cited by the Tenth Circuit in *Bond I* could not have placed the shooting officers on notice that their conduct violated the law (even if it might have).

Regardless of the *Bond II* decision, the undersigned cannot rely on the Tenth Circuit *Bond I* case where it was decided in December 2020—over a year after Jovany was shot—and could not have provided fair notice to the Ogden officers that their conduct in August 2019 might violate the Fourth Amendment.[259]  The court observes, however, *Bond II* does not expressly undermine *Estate of Ceballos,* and the facts of *Bond* differ materially from those Plaintiffs allege here.  The *Bond* officers do not appear to have approached the suspect in an overly aggressive fashion.  The suspect was accused in advance of refusing to leave the home.  Still, the officers conversed with him, listened to his concerns, and requested but were denied a pat-down.  As they continued to talk, the suspect raised the hammer and moved to a place just feet from the officers and with no barrier between them.

Based on the foregoing, the court agrees with Plaintiffs that *Estate of Ceballos*  and *Tenorio* should have put the Ogden officers on notice that their conduct violated Jovany's Fourth Amendment rights.

The Ogden Defendants seek to avoid this conclusion by comparing this case to the 2018 Supreme Court case, *Kisela v. Hughes*, where qualified immunity was affirmed. [260]  But *Kisela*'s facts differ materially from the allegations the court must accept at this stage, and therefore does not help avoid the application of *Estate of Ceballos* and *Tenorio*.

In *Kisela*, a 911 caller stated a "woman was hacking a tree with a kitchen knife."[261]  Two officers responded.  They were flagged down by the woman who called 911.  She described the

---

[259] 981 F.3d at 814.

[260] 138 S.Ct. 1148 (2018) (cited in Dkt. 27 at 30-31; Dkt. 43 at 15-16).

[261] *Id*. at 1151.

woman who had been hacking a tree and told them the woman was acting erratically.  A third officer then arrived.  The officers saw a woman standing near a car in the driveway of a nearby house with a chain link fence and a closed gate.[262]  Another woman—Ms. Hughes—emerged from the house carrying a large knife at her side and matching the description of the tree-hacking suspect.[263]  Hughes walked to the other woman, stopping "no more than six feet" from her.[264]

At that point, the officers drew their guns, and twice told Hughes to drop the knife.  The other woman told both the officers and Hughes to "take it easy."[265]  Hughes was calm but did not acknowledge the officers or comply with their commands.[266]  Because the fence's top bar blocked his line of fire, one officer, Kisela, dropped to the ground and then shot Hughes four times—about one minute from the time the officers saw the first woman in the driveway.[267]

Hughes sued Kisela under § 1983, and the district court granted summary judgment in Kisela's favor.  But the Ninth Circuit reversed, finding a constitutional violation under clearly established law.  The Supreme Court then reversed that determination, finding even if Kisela violated the Fourth Amendment, he was entitled to qualified immunity where no clearly established law would have placed that conclusion "beyond debate."[268]

The Court noted the following critical facts:

---

[262] *Id.*

[263] *Id.*

[264] *Id.*

[265] *Id.*

[266] *Id.*

[267] *Id.*

[268] *Id.* at 1152 (quoting *White v. Pauly*, 580 U.S. ____, 137 S.Ct. 548, 551 (2017) (per curiam) (internal citations omitted)).

- "Kisela says he shot Hughes because, *although the officers themselves were in no apparent danger*, he believed she was a threat to [the other woman]."[269]

- Kisela had "mere seconds" to assess that danger to the other woman.[270]

- Hughes had been seen hacking a tree and acting "erratic enough to cause a concerned bystander to call 911 . . . ."[271]

- The officers were separated from the women by a fence when Hughes moved toward the other woman.[272]

- Hughes failed to acknowledge the commands to drop the knife.

The only one of these critical facts that overlaps entirely with those the undersigned must accept is that Hughes, like Jovany, did not comply with commands to drop her knife.  *Kisela* otherwise focused on the bizarre tree-hacking preceding the 911 call and the fact that Hughes was standing within striking distance—no more than six feet away—from the other woman when officers shot. And importantly, *Kisela* involved no issue or discussion concerning whether the officers' actions recklessly created the need for the level of force used.

Under this set of facts, the Supreme Court found "not one" of the three cases the Ninth Circuit cited placed Kisela on notice of a possible constitutional violation.  First, *Glenn v. Washington County*[273] was decided after the shooting in question, and thus could not have given Kisela fair notice of anything.[274]  Second, the court found citation to *Deorle v. Rutherford*[275]

---

[269] *Id.* at 1153 (emphasis added).

[270] *Id.*

[271] *Id.*

[272] *Id.*

[273] 673 F.3d 864 (9th Cir. 2011).

[274] 138 S.Ct. at 1154.

[275] 272 F.3d 1272 (9th Cir. 2001).

entirely unhelpful in showing Kisela's actions violated clearly established law, where, "[w]hatever [its] merits . . . the differences between that case and the case before [the Court] leap from the page."[276]  In *Deorle*, the officer "shot an unarmed man in the face, without warning, even though the officer had a clear line of retreat; there were no bystanders nearby; the man had been 'physically compliant and generally followed all the officers' instruction;' and he had been under police observation for roughly 40 minutes."[277]  Third, *Harris v. Roderick* likewise was too factually different –indeed the Court agreed with a dissent from the Ninth Circuit's decision that it did "'not pass the straight-face test.'"[278]  In *Roderick*, it was found to be excessive force when an FBI sniper, "positioned safely on a hilltop. . . shot a man in the back while the man was retreating to a cabin during what has been referred to as the Ruby Ridge standoff."[279]

The Ogden Defendants also cite *Estate of Larsen*[280] in their Reply[281] when discussing *Tenorio.*  They refer in passing to some of *Estate of Larsen*'s  basic facts in a parenthetical, noting that summary judgment was affirmed in favor of officers who shot a knife-holding man who ignored four commands to drop the weapon and took steps toward the officers.[282]

If the Ogden Defendants by this parenthetical mean to argue as they do with *Kisela*  that *Estate of Larsen* undermines the notion that the law could have clearly established a possible Fourth Amendment violation when Jovany was shot, the court disagrees.  *Estate of Larsen*'s facts—described in some detail above—like *Kisela*'s, are too materially different from those the

---

[276] 138 S.Ct. at 1154 (quoting discussion of *Deorle* in *City and County of San Francisco v. Sheehan*, 575 U.S. 600, 614 (2015)).

[277] 138 S.Ct. at 1154.

[278] *Id.* (quoting 862 F.3d at 797 (opinion of Ikuta, J.)).

[279] *Id*. (citing *Roderick*, 126 F.3d at 1202-03).

[280] 511 F.3d 1255 (10th Cir. 2005).

[281] Dkt. 43.

[282] *Id.* at 18.

undersigned must accept here at the Rule 12 stage.  Specifically, in affirming the conclusion that

no Fourth Amendment violation occurred, the Tenth Circuit emphasized (among other things),

critical facts absent from the record the undersigned must accept here: 1) "Larsen had already

threatened violence against himself and others," 2) "the knife was a large weapon with a blade

over a foot in length rather than a mere pocket knife or razor blade," 3) "Larsen held the high

ground vis-à-vis the officers," and 4) "Larsen raised the knife blade above his shoulder and

pointed the tip toward the officers . . . ."[283]  Moreover, *Estate of Larsen* involved no discussion

of the officers' conduct as a precipitating factor in the need for deadly force.  For these reasons,

*Estate of Larsen* does not undermine the conclusion that *Estate of Ceballos* and *Tenorio* provide

clearly established law under which the Ogden officers were on notice that their conduct, as

alleged by Plaintiffs at this stage, violated the Fourth Amendment.[284]

In summary, Plaintiffs have alleged a Fourth Amendment violation and have identified

clearly established law existing before Jovany was shot that should have placed the Ogden

officers on notice their conduct might amount to such a violation.  The Ogden Defendants'

Motion for Judgment on the pleadings drawn to the Estate's excessive force claim is therefore

DENIED.  Because the Fourth Amendment claim survives at this stage, the court likewise

---

[283] *Id.* at 1260-61.

[284] The *Estate of Larsen* Court, in concluding the district court was warranted in finding no Fourth Amendment violation, did not evaluate the clearly established prong of the qualified immunity analysis.

declines to dismiss the Estate's lone remaining claim brought under the Utah Constitution's Article I, § 14.[285]

## II.    § 1983 Municipal Liability Claim against Ogden City

Plaintiffs assert in their Second Cause of Action a § 1983 claim against Ogden City for "Failure to Train and Unconstitutional Practices and Procedures."  A municipality like Ogden "is not liable solely because its employees caused injury."[286]  Rather, a municipality may be liable under § 1983 only if it took "action pursuant to official municipal policy of some nature [that] caused a constitutional tort."[287]  To establish a § 1983 municipal liability claim, a plaintiff must show: (1) an officer committed an underlying constitutional violation, (2) a municipal policy or custom exists, and (3) there is a direct causal link between the policy or custom and alleged injury.[288]

Thus, even with the showing of an underlying constitutional violation, Plaintiffs were required to plead in their Complaint a specific policy or custom that led to the violation.[289]  A policy or custom may include "a formal regulation or policy statement, an informal custom that amounts to a widespread practice, decisions of municipal employees with final policymaking

---

[285] Section 14 provides "[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause supported by oath or affirmation, particularly describing the place to be searched, and the person or thing to be seized."  The Ogden Defendants argued Plaintiffs' claim under this provision must be dismissed because Plaintiffs failed to establish the officers flagrantly violated it.  "The test measuring the flagrance of a state constitutional violation is the same test which determines qualified immunity under § 1983." *Cardall v. Thompson*, 845 F. Supp. 2d 1182, 1197 (D. Utah 2012). That is, the "flagrant violation" element "is not satisfied unless the conduct violates clearly established constitutional rights of which a reasonable person would have known." *Id.* (internal quotation marks omitted).  Because the court has permitted the excessive force claim to proceed, the § 14 claim also survives at this stage.

[286] *Mocek v. City of Albuquerque*, 813 F.3d 912, 933 (10th Cir. 2015) (citing *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006)).

[287] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).

[288] *Graves*, 450 F.3d at 1218.

[289] *See Beedle v. Wilson*, 422 F.3d 1059, 1074 (10th Cir. 2005) (affirming 12(b)(6) dismissal where plaintiff's complaint and amended complaint failed to state a policy or custom that caused the alleged constitutional violation).

authority, ratification by final policymakers of the decisions of subordinates to whom authority was delegated, and the deliberately indifferent failure to adequately train or supervise employees."[290]

The identification of a policy or custom must be accompanied by factual allegations that support its existence;[291] a "formulaic recitation of the elements of the cause of action" is insufficient.[292]  District courts within the Tenth Circuit have found that where a policy or custom is formal or written, a plaintiff may state the policy and where it is codified to sufficiently plead its existence.[293]  However, in the case of an informal, unwritten policy, a plaintiff may "either [plead] a pattern of multiple similar instances of misconduct … or use other evidence, such as police officers' statements attesting to the policy's existence."[294]  These principles govern the review of Plaintiffs' allegations against Ogden City.

Plaintiffs specifically allege in their Complaint as follows:

132. The Ogden Police Department (OPD) is an authorized department or division of Ogden City (Ogden). Ogden City is therefore responsible for the actions of OPD Officers.

---

[290] *Pyle v. Woods,* 874 F.3d 1257, 1266 (10th Cir. 2017) (citing *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010)).

[291] *See Soto*, 748 F. App'x at 794 (affirming 12(b)(6) dismissal where plaintiff alleged a constitutional violation that resulted from "Caddo County's Use of Force Policy" but could not point to specific language within the policy or provide factual allegations to support its role in the constitutional violation prior to the discovery stage of litigation).

[292] *Pyle v. Woods*, 874 F.3d 1257, 1266 (10th Cir. 2017) (plaintiff's complaint was insufficient when it alleged that "it was the policy of Cottonwood Heights to query employees' prescription drug records without a warrant" because the allegation was only reciting the elements of the cause of action that requires existence of a policy); *see Mocek v. City of Albuquerque*, 813 F.3d 912, 934 (10th Cir. 2015) (affirming 12(b)(6) dismissal where plaintiff alleged a policy or custom of prohibiting lawful photography at the airport, retaliating against photographers, and failure to train employees but aside from these "conclusory statements, no allegations in the complaint [gave] rise to an inference the municipality itself established a deliberate policy or custom that caused [the plaintiff's] injuries.").

[293] *See Griego v. City of Albuquerque*, 100 F. Supp. 3d 1192, 1214 (D.N.M. 2015).

[294] *Id.* (holding that plaintiff's pleading was insufficient when it indicated that a police policy or custom "is one of always making an arrest—usually of the man—on domestic-violence calls" because it was not supported by a pattern of similar instances, statements from police officers confirming the custom, or written training materials or verbal commands).

133. The actions of Officers Sevenski, Bailey, Garcia, Poulsen and Does 1-10 toward Jovany Mercado were pursuant to, and consistent with, an established policy, practice, and/or custom of Defendant Ogden City, through the OPD, for which Ogden City is responsible.

134. The actions of Officers Sevenski, Bailey, Garcia, and Poulsen and Does 1-10 were pursuant to an OPD policy, practice, or custom that consists of arming police officers with deadly weapons and condoning their use without requiring the consideration of less lethal alternatives, and without providing proper training and/or supervision regarding their safe, reasonable, and appropriate use in situations like the Officers and Does 1-10 faced here.

135. Defendant Ogden City, through the OPD, was deliberately indifferent toward the proper training, arming, and supervision of its employees and agents.

136. The actions of Defendant Ogden, through its OPD, were the proximate cause of Jovany's death, as well as pain and suffering to Jovany Mercado, and the wrongful death and other damages sustained by Plaintiffs as set forth above.

137. As a result of the OPD's and Ogden's actions, and in order to remedy this important issue of public concern, Plaintiffs have had to retain legal counsel.[295]

Thus, Plaintiffs support their municipal claim with reference to an alleged "policy, practice, and/or custom" of Ogden City arming officers with deadly weapons without providing sufficient supervision and training. But these allegations lack any citation to a written policy or code provision, recitation of facts supporting any pattern of similar conduct, or statement from a knowledgeable person such as an officer. And in their Opposition to the Motion for Judgment on the Pleadings, Plaintiffs simply set forth at length the legal standards under which they may maintain a § 1983 claim against a municipality like Ogden. But the entire application of those standards to their Complaint's allegations essentially simply recites paragraphs 134 and 135:

> The City is liable under these standards because [Ogden's Policy Department] was deliberately indifferent toward the proper training, arming, and supervision of its employees and agents. Officers Sevenski, Bailey, Garcia, and Poulsen actions [sic] were pursuant to an OPD policy, practice, or custom that consists of arming police officers with deadly weapons and condoning their use without requiring the

---

[295] Dkt. 2 at ¶¶ 132-137.

consideration of less lethal alternatives, and without providing proper training and/or supervision regarding their safe and reasonable use in situations like the Defendants faced here.[296]

The recitation of a cause of action's elements, coupled with labels lacking factual support "cannot give rise to an inference that [Ogden] itself established a deliberate policy or custom that caused [Plaintiffs'] injuries."[297]  Plaintiffs' allegations thus "'stop[] short of the line between possibility and plausibility of entitlement to relief,'"[298] and cannot sustain the § 1983 claim against Ogden City.  The Ogden Defendants' Motion as to Ogden City is GRANTED.

### III.   § 1983 Claim Against Fusselman for Falsified Affidavit

The Mercados bring a claim against Roy City Detective Trent Fusselman pursuant to § 1983, alleging he "knowingly, improperly, and unconstitutionally falsified information and omitted information in order to obtain a fraudulent search warrant of the Mercado premises" without probable cause and in violation of their Fourth Amendment rights under the U.S. Constitution.[299]  They allege he did this to access their home and "illegally obtain the video footage of the shooting as recorded by [the Mercados'] home security system."[300]  Specifically, the Mercados claim in paragraphs 149-155 of the Complaint:

149. The falsehoods alleged by Fusselman in his affidavit . . . include allegations that "bullet slugs, empty shell casings, DVR and all electronic devices with the home surveillance system including digital recordings from the DVR, blood evidence, weapons including any similar like [sic] knives that the subject was holding" were "unlawfully acquired or is unlawfully

---

[296] Dkt. 36 at 35.

[297] *Mocek*, 813 F.3d at 934.

[298] *Id.* (quoting *Iqbal*, 550 U.S. at 557).

[299] *Id.* at ¶ 12.

[300] *Id.* at ¶ 99.  The Mercados do not allege any impropriety with the actual conduct of the search.  Rather, they focus on alleged misrepresentations and material omissions in the warrant affidavit.

possessed;" and have "been used or is possessed for the purpose of being used to commit or conceal the commission of an offense; or is evidence of illegal conduct."[301]

150. At the time the warrant was obtained, Fusselman knew that the bullet holes and shell casings were from the Officers' weapons, fired at Jovany, and were not evidence of any illegal conduct by the Mercados, or by Jovany for that matter.

151. At the time the warrant was secured, Fusselman knew that the evidence he sought to acquire, particularly the home security video, was not "unlawfully acquired" or "unlawfully possessed" by the Mercados. He knew that the home security video was not illegally obtained footage of the event.

152. At the time Fusselman secured the warrant, he knew the evidence he sought to be gathered, particularly the home security video, was not being used or possessed "for the purpose of being used to commit or conceal the commission of an offense."

153. At the time the affidavit was submitted, and the warrant was obtained, Fusselman knew that the purpose of the warrant was to improperly secure footage from the Mercados' home security system that provided damning evidence of the illegal and unconstitutional use of deadly force by Officers 1-4.

154. Fusselman withheld and/or omitted to state in his affidavit for a search warrant that Officers Sevenski, Bailey, Garcia, and Poulsen each had a body camera which showed the shooting, such that it was totally unnecessary to seize or secure evidence from the surveillance cameras owned by the Mercados and installed in their home.[302]

---

[301] Similarly, at paragraph 100 of the Complaint, the Mercados allege:

> 100. Among several falsehoods, the illegal warrant states that the Mercado's [sic] home video "was unlawfully acquired or is unlawfully possessed; has been used or is possessed for the purpose of being used to commit or conceal the commission of an offense; or is evidence of illegal conduct." [citing Exhibit 1 to the Complaint]. The warrant materials also claim that the Mercado family "illegally" obtained footage of the shooting.

[302] Somewhat related, Plaintiffs initially alleged in their Fifth Cause of Action—based on violations of the Utah Constitution—that *Jovany's* rights under the Utah Constitution's Article I, § 14 to be free from unreasonable searches and seizures were flagrantly violated by all Defendants.  This portion of the Fifth Cause of action, though lacking detail, seems drawn to Fusselman's actions in seeking the warrant.  But at oral argument, Plaintiffs' counsel agreed this portion of the Fifth Cause of Action fails and should be dismissed because Jovany (through his estate) lacks standing to assert such a claim because he lacked an interest in the property searched, which was owned by the Mercados.

Fusselman responds that he is entitled to qualified immunity on the Mercados' § 1983 claim,[303] arguing under the familiar test for such immunity that the record does not establish both that: 1) Fusselman violated a constitutional right; and 2) the right was clearly established at the time of the alleged violations in August 2019.[304]  Fusselman agrees it was clearly established at the time of the search that an officer violates the Fourth Amendment when he or she: 1) deliberately or recklessly makes a false statement or omission in a warrant affidavit and 2) correcting the falsity or omission would vitiate probably cause.[305]  But Fusselman argues he did not violate the Fourth Amendment.  Rather, he argues he properly sought a warrant to investigate and obtain evidence related to the offense he identified for investigation in both the affidavit and actual warrant—Jovany's alleged aggravated assault on the four officers.[306]  As discussed below, the court agrees.

### A.    Clearly Established Law

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause,

---

[303] Fusselman alternatively argues he may be entitled to quasi-judicial immunity "to the extent that Plaintiffs' allegations address the search of their property." Dkt. 39 at 20.  This doctrine provides that "official[s] charged with the duty of executing a facially valid court order [] enjoy absolute immunity . . . in a suit challenging the conduct prescribed by that order."  *Moss v. Kopp*, 559 F.3d 1155, 1163 (10th Cir. 2009) (citations omitted).  For quasi-judicial immunity to apply, "the judge issuing the disputed order must be immune from liability in his or her own right, the officials executing the order must act within the scope of their own jurisdiction, and the officials must act only as prescribed by the order in question." *Id.* (citations omitted).  Fusselman's argument here is misplaced, as the Mercados make no allegations concerning the actual execution of the warrant, such as that he destroyed property or exceeded the warrant's prescriptions.  Fusselman's liability in this case hinges on his alleged lies or omissions in obtaining the warrant.  Thus, it is unnecessary to evaluate this doctrine's application under the facts of this case. *See Dalia v. United States*, 441 U.S. 238, 258 (1979) (noting "the manner in which a warrant is executed is subject to later judicial review as to its reasonableness."); *Moss*, 559 F.3d at 1167 (noting quasi-judicial immunity attaches only to acts "prescribed by the judge's order.") (citations omitted).

[304] *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001).

[305] Dkt. 39 at 14 (citing *Stewart v. Donges*, 915 F.2d 572, 582-83 (10th Cir. 1998)).

[306] *Id.* at 17-18.

supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  Probable cause "require[es] 'more than mere suspicion but less evidence than is necessary to convict.'"[307]  It also "'requires a nexus between suspected criminal activity and the place to be searched.'"[308]  And an affidavit supporting a search warrant "must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity."[309]

It has long been established in this circuit—years before this case arose—that the Fourth Amendment protection against unreasonable searches and seizures is violated if an officer "knowingly or recklessly" includes a false statement or omits information in a warrant affidavit, and correcting the falsehood or including the omitted information would vitiate probable cause.[310]  Elaborating on this standard, the Tenth Circuit has explained:

> Thus, '[w]here the judicial finding of probable cause is based solely on information the officer knew to be false or would have known to be false had he not recklessly disregarded the truth, not only does the arrest violate the fourth amendment, but the officer will not be entitled to good faith immunity [under § 1983].'[311]  A reckless disregard for the truth exists when 'the affiant 'in fact entertained serious doubts as to the truth of his' allegations, . . . [and] a factfinder may infer reckless disregard from circumstances evincing 'obvious reasons to doubt the veracity' of the allegations.'[312]

---

[307] *United States v. Danhauer*, 229 F.3d 1002, 1005-06 (10th Cir. 2000) (quoting *Unites States v. Burns*, 624 F.2d 95, 99 (10th Cir. 1980)).

[308] *Id.* (quoting *Unites States v. Corral-Corral*, 899 F.2d 927, 937 (10th Cir. 1990)).

[309] *Id.* (citing *United States v. Rowland*, 145 F.3d 1194, 1200 (10th Cir. 1998)).

[310] *Stewart*, 915 F.2d at 582-83; *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978).

[311] *DeLoach v. Bevers*, 922 F.2d 618, 622-23 (10th Cir. 1990) (quoting *Olson v. Tyler*, 771 F.2d 277, 282 (7th Cir. 1985)).

[312] *DeLoach*, 922 F.2d at 623 (quoting *United States v. Williams*, 737 F.2d 594, 602 (7th Cir.1984) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731–32, 88 S.Ct. 1323, 1325–26, 20 L.Ed.2d 262 (1968)), *cert. denied*, 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985)).

Where "omissions are so probative they would vitiate probable cause,"[313] recklessness "may be inferred from omission of facts which are 'clearly critical' to a finding of probable cause."[314]

### B.        Alleged Fourth Amendment Violations in § 1983 Claim

The Mercados claim Fusselman falsified or omitted critical information in seeking a search warrant.  A review of the warrant affidavit reveals otherwise.  Moreover, Plaintiffs fail to show that any alleged falsehood or omission, if cured or supplemented, could have vitiated probable cause for a search of the same property.

In his affidavit, Fusselman initially states he believes the property he seeks to search has the following evidence: "[b]ullet slugs, empty shell casings, DVR and all electronic devices with the home surveillance system including digital recordings from the DVR, blood evidence, weapons including any similar like knives that the subject was holding."[315]  He seeks this evidence because it: "[w]as unlawfully acquired or possessed; has been used or possessed for the purpose of being used to commit or conceal the commission of an offense; or is evidence of illegal conduct."[316]  Under these three choices—which are set apart from one another as distinct paragraphs in the affidavit—Fusselman then affirmatively states: "Affiant believes the property and evidence described above is evidence of the crime or crimes of Aggravated Assault on a Police Officer (x4)."[317]  Notably, he does not state under the three choices that he believes the

---

[313] *Id.* at 623 (quoting *Stewart,* 915 F.2d at 582 n. 13, 583).

[314] *Id.* at (quoting *Hale v. Fish,* 899 F.2d 390, 400 (5th Cir.1990); *United States v. Reivich,* 793 F.2d 957, 961 (8th Cir. 1986)).

[315] Dkt. 17-1 at 1.

[316] *Id.* at 1-2.

[317] *Id.* at 2.

evidence was "unlawfully acquired or possessed" or that it was being used or possessed for the purpose of committing or concealing an offense.[318]

Fusselman then describes 1) his personal background and credentials, and 2) the facts preceding the shooting.  He states Ogden City Police Officers had been dispatched to the scene after a complainant called dispatch describing a "Hispanic male" with a knife who was looking into vehicles, "though the male didn't threaten anybody with the knife. . . ."[319]  Fusselman explains that after the Ogden officers arrived on the scene, they called out that they were "at gunpoint with the subject."[320]  Shots were then fired, and officers called for medical help for the male who was "bleeding profusely."[321]  The male "was later declared deceased."[322]  Fusselman describes that when he arrived on the scene, he learned the officers had fired twenty rounds from their duty weapons, a six inch knife was found lying next to the deceased male, fresh blood was seen on and around the male and the knife, outside cameras on a carport were facing toward the male (and a nearby tree had a sign stating that security cameras were in use), and bullet slugs appeared to be on the property.[323]

Fusselman then states that he seeks a warrant for the property "for bullet slugs, processing of blood evidence, DVR and all camera related electronic equipment, and weapons including any household knives similar to what was found on the scene."[324]  He seeks the warrant for use at "any time of the day or night"—and asks to be allowed to collect the items at

---

[318] Nor would any prudent person reading the entire affidavit come away with that impression.

[319] *Id.* at 3.

[320] *Id.*

[321] *Id.*

[322] *Id.*

[323] *Id.*

[324] *Id.* at 4.

night—to prevent the items sought from being "concealed, destroyed, [or] damaged. . . ."[325]  He states that the warrant is brought pursuant to "an ongoing and active investigation."[326]

Against that backdrop, recall that the Mercados in their Complaint first allege Fusselman falsely stated in his affidavit that the evidence sought, including home security video footage, "was 'unlawfully acquired or is unlawfully possessed;' and have 'been used or is possessed for the purpose of being used to commit or conceal the commission of an offense; or is evidence of illegal conduct.'"[327]  Second, they allege that Fusselman knew the bullet holes and shell casings were from the officers' weapons, "and were not evidence of any illegal conduct by the Mercados, or by Jovany . . . ."[328]  Finally, they allege Fusselman omitted the fact that each officer had a body camera recording the shooting, rendering it "unnecessary" to seize home security video at all.[329]  Fusselman allegedly made these false statements and omissions to "improperly secure footage from the Mercados' home security system that provided damning evidence" the officers' alleged excessive use of deadly force.[330]

But as discussed below, the court finds that Fusselman did not provide false information or make omissions in his affidavit, particularly of the kind where, if corrected, probable cause for a search would be vitiated.  There is thus no constitutional violation, and Fusselman is entitled to qualified immunity.

First, Fusselman stated affirmatively that among the three possible listed reasons for seeking evidence via a search warrant, he believed the "property and evidence described above is

---

[325] *Id.*

[326] *Id.*

[327] Complaint at ¶ 149; *see also id.* at ¶¶ 151-152.

[328] *Id.* at ¶ 150.

[329] *Id.* at ¶ 154.

[330] *Id.* at ¶ 153.

evidence of the crime or crimes of Aggravated Assault on a Police Officer (x4)."[331]  The three

possible reasons for the warrant are listed as distinct grounds, and are separated by an "or"

before the last choice, "that the property or evidence is . . . evidence of illegal conduct."[332]  They

are not connected with an "and" as Plaintiffs' inaccurately allege in the Complaint.  That final

choice is the only one Fusselman adopts, separately and clearly stating as much under the three

choices.[333]  And the court concludes Plaintiff has failed to show there was not probable cause—

far more than a hunch—of a crime to be investigated or that the evidence sought was interrelated

to the crime.

At best, Plaintiffs suggest in their Opposition that Jovany "met none of the requirements

under Utah law to be accused of 'Aggravated Assault of a Police Officer.[']  The Affidavit for

Search Warrant omits any mention of these facts."[334]  Aside from this fleeting statement,

Plaintiffs do nothing to develop this argument in their briefing, including any citation to a Utah

statute or other law identifying the elements of aggravated assault and a discussion of the

affidavit's inadequacy.  And Plaintiffs conceded at oral argument that these allegations are not in

their Complaint.  For these reasons, the undersigned declines to consider this contention.[335]  At

---

[331] Dkt. 17-1.

[332] *Id.*at 1-2.

[333] In opposing Fusselman's Motion, the Mercados largely focus only on two of the possible reasons for the warrant. For example, at page 3, they contend "[a]t the time Fusselman secured the warrant, he knew the evidence he sought to gather, particularly the home security video, was not being used or possessed 'for the purpose of being used to commit or conceal the commission of an offense.'"  Dkt. 45 at 3 ¶ 7.  This omits the third possible reason for a warrant—the only one Fusselman affirmatively adopts—that the evidence he sought was evidence of illegal conduct. *See also id.* at 13 (asking "Did Det. Fusselman falsify information that Mercados had illegally obtained their own video and surveillance footage?").

[334] Dkt. 45 at 17.

[335] *See Birch v. Polaris Indus., Inc.,* 812 F.3d 1238, 1249 (10th Cir. 2015) (declining to consider an argument "because it is unsupported and inadequately briefed. . . .").

oral argument, Plaintiffs remained unable to cite the governing law or specific elements, simply offered they believed the crime involved having a "weapon" and "intent to assault."[336]

Second, Plaintiffs point out that the bullet holes and shell casings sought in the warrant were from the officers' firearms and were not evidence of the Mercados' or Jovany's illegal conduct.  Plaintiffs seem to suggest Fusselman either omitted that neither Jovany nor the Mercados fired a weapon, or that the bullet holes and shell casings were not evidence of any crime.[337]  But Fusselman did not any provide misleading information or make any such omission.

In the warrant affidavit, Fusselman states the subject of the dispatch call (Jovany) was seen looking into cars and had a knife, though as Fusselman candidly notes, he had not to that point threatened others.  Shortly after the dispatched officers arrived on the scene, they called out that they were at gunpoint with the subject, then shots were fired, medical was called, and the subject male was "bleeding profusely and was later declared deceased."[338]  A bloody knife was

---

[336] Even if the court were to consider this explanation in light of the affidavit, it finds probable cause to investigate it. The affidavit makes clear that Jovany had a knife and was acting in a way before dispatch was called that concerned at least one neighbor, was later involved in a gunpoint confrontation with officers, was fatally shot, and was found deceased with a knife by his side.

[337] Plaintiffs in their Opposition also contend Fusselman omitted the fact "that Jovany was shot and killed by Ogden Police Officers" and that "the bullet holes and shell casings were from the Officers' weapons, fired at Jovany, and were not evidence of any illegal conduct by the Mercados, or by Jovany . . . ." Dkt. 45 at 10.  This statement contains multiple inaccuracies blatantly contradicted by the warrant affidavit.  *See also id.* at 13 (asking "Did Det. Fusselman deliberately omit information that *inter alia* four Ogden Police Officers used deadly force to kill Jovany Mercado in his own driveway?") and 15 (arguing Fusselman omitted that "the bullet slugs and shell casings were the result of the Officers' actions. . . ."). As discussed above, the affidavit made clear that the officers had fired twenty rounds at Jovany, Jovany was deceased, and bullet slugs from the officers' firearms were seen on the property to be searched.  There is no insinuation in the affidavit that the Mercados may have committed *any* offense—indeed they are not discussed at all—and thus no reckless omission of their lack of connection to the bullets.  There is no suggestion Jovany had a firearm or that bullets were attributable to him shooting—only that there were facts supporting probable cause to investigate whether there had been an aggravated assault on police: Jovany had a knife and was looking in cars, his actions were concerning enough to be the subject of a dispatch call, the officers later reported being in a gunpoint confrontation with him, twenty rounds were fired upon him, and a knife was found near his lifeless body.

[338] *Id.* at 3.

found lying next to the subject.[339]  Fusselman states he learned the officers had fired twenty rounds at the subject, and that "three bullet slugs were observed to be shot by officers" on the property.[340]

Thus, Fusselman makes clear the bullet evidence he seeks came from rounds the officers shot in their confrontation with a knife-wielding subject.  He never suggests that Jovany or the Mercados had or shot a firearm.  Likewise, Fusselman never suggests the Mercados engaged in any illegal conduct—indeed, they are not mentioned in the warrant affidavit.  The suggestion of illegal conduct is directed only to the subject of the dispatch call (Jovany), his carrying a knife, looking in cars, the dispatch call, and gunpoint confrontation with officers culminating in his fatal shooting.  Bullets and shell casings are evidence of the officers' response to the possible assault Fusselman was investigating, and directly connected to it.

And while more factual detail could have been provided concerning this confrontation, Plaintiffs fail to establish that critical facts were missing, or why more detail concerning the confrontation might have *vitiated* probable cause for searching the Mercados' property for bullets, blood, and surveillance video of the night's events, rather possibly than strengthen it.  For example, Plaintiffs pose the question, "Did Det. Fusselman deliberately omit information that *inter alia* four Ogden Police Officers used deadly force to kill Jovany Mercado in his own driveway?"  But Fusselman included a litany of underlying facts surrounding the officers' fatal shooting of Jovany.  Moreover, Plaintiffs fail to explain how using the language they suggest in a search affidavit would vitiate probable cause to search precisely the same property (even if it was known to be the Mercados' home) for precisely the same evidence: bullet slugs, blood, weapons,

---

[339] *Id.*

[340] *Id.*

and surveillance video of the events.  Rather, probable cause would still clearly exist to collect evidence of a possible aggravated assault which ended in a fatal shooting—including the evidence bearing a nexus to those events.  Indeed, it would appear to be reckless not to seek and collect the very same evidence.[341]

The facts here are in stark contrast to those in the case Plaintiffs discuss at length— *Hemingway v. Russo*, a 2018 case decided in this district.[342]  There, Judge Parrish denied summary judgment for a handful of officers connected to obtaining and executing a search warrant on a home.[343]  The home appeared from the outside to be a single-family home.  But in fact, the owner, Trudy Hemingway, had rented out the basement to a woman named Misty Italisano.  Hemingway lived on the main floor with two adult sons.[344]  Officers began an investigation into Italisano following a tip she was selling methamphetamine out of the home, including surveillance on the home for a month.[345]  During that time, there was "significant indicia" that Italisano was living in a basement apartment.[346]  For instance, with only one exception, Italisano entered the home from a door on the side of the home leading to the basement, and her visitors suspected of drug activity used only the side door.  Other individuals not suspected of drug activity used the front door.[347]

---

[341] Though not explicitly set forth in the Complaint, Plaintiffs in their Opposition also fault Fusselman for omitting to state that Jovany "never attacked [the] Officers."  But Fusselman never suggests the opposite—that an officer had actually been "attacked."  Indeed, he had evenhandedly noted that Jovany had *not* actively threatened anyone before the officers were dispatched.

[342] 2018 WL 4082201 (D.Utah Aug. 27, 2018) (unpublished).

[343] *Id.* at *1.

[344] *Id.* at *2.

[345] *Id.*

[346] *Id.* at *3.

[347] *Id.* at *2-3.

But officers who prepared and reviewed a warrant affidavit for the home characterized it as a single family home, and entirely omitted both any suggestion that the owner and her adult sons lived at the property or that the basement was a separate apartment unit.[348]  A warrant for the home was obtained and executed by a SWAT unit, during which the owner and her sons were handcuffed and detained and the entire home searched and subjected to a dog-sniff.[349]

The homeowner and her sons sued under § 1983 the officers who prepared and reviewed the warrant affidavit and others involved in the home search.  Relevant here, Judge Parrish denied summary judgment for the officers who prepared and reviewed the warrant affidavit, finding it had falsely described the home as a single-family residence, and deliberately omitted substantial information suggesting it was not such a residence.[350]  Judge Parrish concluded that it was a jury issue as to whether probable cause would have existed to search the entire home if the evidence was corrected and facts added, and thus denied the officers' motion for summary judgment seeking qualified immunity.  In contrast to the *Hemingway* facts, Plaintiffs here identify no misstatement, and no facts critical to the probable cause determination that were omitted.

Finally, Plaintiffs fault Fusselman for omitting that the officers had body cameras and footage of the deadly confrontation, suggesting probable cause to seek the "unnecessary" home security footage would be vitiated had Fusselman included that fact.  This argument is meritless. Plaintiffs cite no case where the test for probable cause to obtain evidence is whether it is "necessary," explaining how that term should be interpreted, and showing Fusselman should have known this.  Even if an officer could possibly know the universe of evidence that would be

---

[348] *Id.* at *3.

[349] *Id.* at *4-5.

[350] *Id.* at *7-11.

"necessary" at the outset of an investigation, the point of an investigation is to thoroughly and legally gather all the evidence to gain a complete picture.  In this specific case, including the fact that officers had body cameras would not vitiate probable cause to gather home security footage—particularly where it captured activity before the officers arrived, was taken from a different vantage point than the body cameras, and could serve as a 'check' on any conclusions drawn from viewing the body camera footage alone.  Moreover, any given evidence—like body camera footage—might be subject to destruction or exclusion, rendering evidence obtained from other sources to be critical in establishing a case—including to claimants like the Plaintiffs.

For these reasons, the court finds Fusselman did not violate the Fourth Amendment. Without a constitutional violation, he enjoys qualified immunity, and his Motion is GRANTED.

## CONCLUSION

Based on the foregoing:

1.   The Ogden Defendants' Motion for Judgment on the Pleadings[351] is GRANTED IN PART AND DENIED IN PART.  Surviving this Motion are Plaintiffs' claims on behalf of Jovany Mercado's Estate for excessive force in violation of the Fourth Amendment and for violation of Article I, § 14 of the Utah Constitution.

2.   Trent Fusselman's Motion for Judgment on the Pleadings[352] is GRANTED.

 SO ORDERED this 23rd day of February 2024.

BY THE COURT

_____
Honorable Robert J. Shelby
Chief U.S. District Court Judge

---

[351] Dkt. 27.

[352] Dkt. 39.